No. 2012-1042

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

FILED
U.S. COURT OF APPEALS FOR
THE FEDERAL CIRCUIT

FEB 15 2012

JAN HORBALY
CLERK

COMMIL USA, LLC,

*Plaintiff-Appellee,*

*v.*

CISCO SYSTEMS, INC.,

*Defendant-Appellant.*

Appeal from the United States District Court for the Eastern District of Texas in case no. 07-CV-0341, Magistrate Judge Charles Everingham

## BRIEF FOR DEFENDANT-APPELLANT CISCO SYSTEMS, INC.

HENRY B. GUTMAN
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017
(212) 455-2000

JEFFREY E. OSTROW
HARRISON J. FRAHN IV
PATRICK E. KING
JONATHAN SANDERS
SIMPSON THACHER & BARTLETT LLP
2550 Hanover Street
Palo Alto, CA 94304
(650) 251-5000

WILLIAM F. LEE
MARK C. FLEMING
JONATHAN W. ANDRON
FELICIA H. ELLSWORTH
WILMER CUTLER PICKERING
     HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000

WILLIAM G. MCELWAIN
WILMER CUTLER PICKERING
     HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, DC 20006
(202) 663-6000

February 15, 2012

# CERTIFICATE OF INTEREST

Counsel for Cisco Systems, Inc. certifies the following:

1. The full name of every party or amicus represented by us is:

   Cisco Systems, Inc.

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by us is:

   Not applicable

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by us are:

   No other corporation or publicly held company owns 10 percent or more of the stock of Cisco Systems, Inc.

4. The names of all law firms and the partners or associates who appeared for the party now represented by us in the trial court or agency or are expected to appear in this Court are:

   **Wilmer Cutler Pickering Hale and Dorr LLP**: William F. Lee, William G. McElwain, Mark C. Fleming, Jonathan Andron, and Felicia H. Ellsworth

   **Simpson Thacher and Bartlett LLP**:  George M. Newcombe, Henry B. Gutman, Jeffrey E. Ostrow, Harrison J. Frahn, IV,  Patrick E. King, Victor Cole, and Jonathan C. Sanders

   **Ireland Carroll & Kelley, P.C.**:  James Patrick Kelley, Otis W. Carroll, Jr., and Jack Wesley Hill

   **Potter Minton P.C.**: Michael E. Jones and Patrick Colber Clutter, IV

   **Findlay Craft, LLP**: Eric Hugh Findlay

   **Ward & Smith**: Jack Wesley Hill

Dated:  February 15, 2012

WILLIAM G. McELWAIN

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTEREST ........................................................ i

TABLE OF AUTHORITIES.......................................................... v

STATEMENT OF RELATED CASES ........................................ 1

INTRODUCTION.......................................................................... 2

JURISDICTIONAL STATEMENT................................................ 5

STATEMENT OF ISSUES........................................................... 6

STATEMENT OF THE CASE ..................................................... 7

STATEMENT OF FACTS............................................................. 8

    A.    Wireless Communication Protocols .................................. 8

        1.    Bluetooth ................................................................... 9

        2.    WiFi .......................................................................... 10

    B.    Cisco's WiFi Products ...................................................... 11

    C.    The '395 Patent ................................................................. 12

    D.    Commil Limited's Failed Commercial Attempts .............. 16

    E.    Commil USA ..................................................................... 17

    F.    Claim Construction........................................................... 18

    G.    The First Trial .................................................................. 18

        1.    Evidence of non-infringement.................................. 18

        2.    Evidence of invalidity............................................... 20

        3.    Damages ................................................................... 22

        4.    Statements by Cisco's local counsel ....................... 22

5.  The first jury verdict and new trial order ............................... 24

H.  The Second Trial ................................................................. 25

SUMMARY OF ARGUMENT ............................................................... 27

ARGUMENT ............................................................................................ 29

I.  STANDARD OF REVIEW .................................................................. 29

II.  NO REASONABLE FACTFINDER COULD HAVE FOUND INFRINGEMENT .................................................................................. 31

A.  No Substantial Evidence Established That Cisco Or Its Customers Perform Both Steps Of The Claimed Method ................. 31

1.  Neither Cisco nor its customers "run ... an instance" of the relevant protocol "for each connection" ............................ 31

2.  Cisco's customers do not practice the "dividing" limitation ...................................................................................... 33

B.  No Substantial Evidence Established That Cisco Intended To Induce Infringement ............................................................................ 36

1.  The jury was erroneously instructed ....................................... 36

2.  No substantial evidence established specific intent to induce infringement .................................................................... 37

a.  Insufficient evidence that Cisco had pre-suit knowledge of the patent ................................................ 37

b.  Insufficient evidence that Cisco intended to induce infringement ................................................... 39

3.  The court erroneously precluded Cisco from presenting evidence of its good-faith belief of invalidity ......................... 41

III.  THE DISTRICT COURT ERRED IN ITS CLAIM CONSTRUCTION AND IN NOT RULING THE PATENT INVALID AS CONSTRUED ....... 42

A.  The Court Erroneously Construed "Short-Range Communication Protocol" To Include WiFi ..................................... 42

B.   The Court Erroneously Concluded That The Term "Short-Range" Is Not Indefinite ..................................................... 46

C.   As Construed, The Patent Is Invalid ................................. 47

  1.   The claims lack sufficient written description .......... 47

  2.   The claims are not enabled ....................................... 50

IV.   THE DAMAGES AWARD IS UNSUSTAINABLE ..................................... 53

A.   Commil's Royalty Base Violated The Entire Market Value Rule ...................................................................................... 53

B.   Commil's Royalty Rate Was Unsupported ......................... 57

V.   THE DISTRICT COURT ERRED IN GRANTING A PARTIAL NEW TRIAL ...................................................................................... 59

A.   The Court Erred In Granting A New Trial Based On Two Isolated Statements That Did Not Affect The Jury's Verdict ............ 59

B.   The Court Erred In Forbidding Retrial Of Invalidity And Direct Infringement ............................................................. 63

CONCLUSION ...................................................................................... 65

ADDENDUM

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Advanced Display Systems, Inc. v. Kent State University*, 212 F.3d 1272 (Fed. Cir. 2000) ...................................................................... 37

*Aetna Insurance Co. v. Kennedy*, 301 U.S. 389 (1937) ........................................ 65

*Alaniz v. Zamora-Quezada*, 591 F.3d 761 (5th Cir. 2009) .............................. 62

*Anderson v. Siemens Corp.*, 335 F.3d 466 (5th Cir. 2003) ................................... 63

*Apeldyn Corp. v. AU Optronics Corp.*, No. 08-568, 2011 WL 5552520 (D. Del. Nov. 15, 2011) .................................................................. 38

*Ariad Pharmaceuticals, Inc. v. Eli Lilly & Co.*, 598 F.3d 1336 (Fed. Cir. 2010) .......................................................................... 48

*Automotive Technologies International, Inc. v. BMW of North America, Inc.*, 501 F.3d 1274 (Fed. Cir. 2007) ..................................... 30, 51

*Broadcom Corp. v. Qualcomm Inc.*, 543 F.3d 683 (Fed. Cir. 2008) ...................... 39

*Conway v. Chemical Leaman Tank Lines, Inc.*, 610 F.2d 360 (5th Cir. 1980) ......................................................................... 30, 63

*Cornell University v. Hewlett-Packard Co.*, 609 F. Supp. 2d 279 (N.D.N.Y. 2009) ......................................................................... 56

*Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374 (Fed. Cir. 2006) .......................................................................... 45

*Cybor Corp. v. FAS Technologies, Inc.*, 138 F.3d 1448 (Fed. Cir. 1998) .................................................................................. 29

*DSU Medical Corp. v. JMS Co.*, 471 F.3d 1293 (Fed. Cir. 2006) .......................... 33

*Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342 (Fed. Cir. 2005) .................................................................................. 46

*DataQuill Ltd. v. High Tech Computer Corp.*, No. 08-543, 2011 WL 6013022 (S.D. Cal. Dec. 1, 2011) ................................................. 41

*Davidson Oil Country Supply Co. v. Klockner, Inc.*, 908 F.2d 1238 (5th Cir. 1990) ................................................................ 42

*Edwards v. Sears, Roebuck & Co.*, 512 F.2d 276 (5th Cir. 1975) .......................... 61

*Enzo Biochem, Inc. v. Calgene, Inc.*, 188 F.3d 1362 (Fed. Cir. 1999) .................. 52

*Fuentes v. Shevin*, 407 U.S. 67 (1972) .................................................. 64

*Garretson v. Clark*, 111 U.S. 120 (1884) ................................................. 55

*Gasoline Products Co. v. Champlin Refining Co.*, 283 U.S. 494 (1931) ......... 30, 63

*Gautreaux v. Scurlock Marine, Inc.*, 84 F.3d 776 (5th Cir. 1996) .......................... 60

*Genentech, Inc. v. Novo Nordisk, A/S*, 108 F.3d 1361 (Fed. Cir. 1997) ................ 51

*Generation II Orthotics Inc. v. Medical Technology Inc.*, 263 F.3d 1356 (Fed. Cir. 2001) .......................................................... 46

*Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060 (2011) ................................................................ 3, 36, 37, 40

*Hall v. Freese*, 735 F.2d 956 (5th Cir. 1984) ................................... 60, 62, 63

*In re Ricoh Co. Patent Litigation*, No. 03-02289, 2010 WL 3562556 (N.D. Cal. Apr. 15, 2010) .......................................................... 35

*In re Seagate Technology, LLC*, 497 F.3d 1360 (Fed. Cir. 2007) .......................... 40

*International Insurance Co. v. RSR Corp.*, 426 F.3d 281 (5th Cir. 2005) ................................................................ 30

*Johnson v. Ford Motor Co.*, 988 F.2d 573 (5th Cir. 1993) ...................................... 59

*Johnson v. Zerbst*, 304 U.S. 458 (1938) ................................................. 65

*Kinetic Concepts, Inc. v. Blue Sky Medical Group, Inc.*, 554 F.3d 1010 (Fed. Cir. 2009) .......................................................... 44

*Kolmes v. World Elastic Corp.*, No. 93-00719, 1995 WL 918081 (M.D.N.C. Sept. 18, 1995) .......................................................... 42

*Liebel-Flarsheim Co. v. Medrad, Inc.*, 481 F.3d 1371 (Fed. Cir. 2007) ................ 47

*Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301
    (Fed. Cir. 2009) ............................................................... 55, 56, 57

*Medtronic Navigation, Inc. v. BrainLAB Medizinische
Computersysteme GmbH*, 603 F.3d 943 (Fed. Cir. 2010) ............................ 40

*Mikkelsen Graphic Engineering Inc. v. Zund America, Inc.*, No. 07-
0391, 2011 WL 6122377 (E.D. Wis. Dec. 8, 2011) ...................................... 40

*Mills v. Beech Aircraft Corp.*, 886 F.2d 758 (5th Cir. 1989) ................................ 62

*Nystrom v. Trex Co.*, 424 F.3d 1136 (Fed. Cir. 2005) ............................................. 45

*Ohio Bell Telephone Co. v. Public Utilities Commission*, 301 U.S. 292
    (1937) ................................................................................................... 64

*Ormco Corp. v. Align Technology, Inc.*, 498 F.3d 1307 (Fed. Cir.
    2007) .................................................................................................... 52

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) ........................................ 44

*Prima Tek II, L.L.C. v. Polypap, S.A.R.L.*, 412 F.3d 1284
    (Fed. Cir. 2005) ..................................................................................... 41

*ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860 (Fed. Cir. 2010) .............. 57, 58, 59

*Richdel, Inc. v. Sunspool Corp.*, 714 F.2d 1573 (Fed. Cir. 1983) .......................... 41

*Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538 (Fed. Cir. 1995) ............................... 54

*Riverwood International Corp. v. R.A. Jones & Co.*, 324 F.3d 1346
    (Fed. Cir. 2003) ..................................................................................... 30

*SciMed Life Systems, Inc. v. Advanced Cardiovascular Systems, Inc.*,
    242 F.3d 1337 (Fed. Cir. 2001) ....................................................... 43, 45

*Sitrick v. Dreamworks, LLC*, 516 F.3d 993 (Fed. Cir. 2008) ................................ 51

*Therasense, Inc. v. Becton, Dickinson & Co.*, 593 F.3d 1325
    (Fed. Cir. 2010) ..................................................................................... 29

*Trell v. Marlee Electronics Corp.*, 912 F.2d 1443 (Fed. Cir. 1990) ...................... 58

*Tronzo v. Biomet, Inc.*, 156 F.3d 1154 (Fed. Cir. 1998) ........................................ 30

*Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292 (Fed. Cir. 2011)............ 53, 54

*United States v. Morin*, 627 F.3d 985 (5th Cir. 2010) ............................ 61

*VNUS Medical Technologies, Inc. v. Diomed Holdings, Inc.*, No. 05-2972, 2007 WL 2900532 (N.D. Cal. Oct. 2, 2007) ...................... 41

*Verdegaal Brothers, Inc. v. Union Oil Co. of California*, 814 F.2d 628 (Fed. Cir. 1987)........................................................ 50

*Veritas Operating Corp. v. Microsoft Corp.*, 562 F. Supp. 2d 1141 (W.D. Wash. 2008) ................................................ 38

*Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317 (Fed. Cir. 2009) ............... 39

*Wang Laboratories, Inc. v. America Online, Inc.*, 197 F.3d 1377 (Fed. Cir. 1999)........................................................ 43, 46

*Witco Chemical Corp. v. Peachtree Doors, Inc.*, 787 F.2d 1545 (Fed. Cir. 1986)........................................................ 64

## STATUTES AND RULES

28 U.S.C.
　　§ 1295(a) ........................................................ 5
　　§ 1338(a) ........................................................ 5

35 U.S.C. § 112 ...................................................... 30, 46

Fed. R. Civ. P. 50(c)................................................ 62

## OTHER AUTHORITY

Lemley, Mark A., *Inducing Patent Infringement,* 39 U.C. Davis L. Rev. 225 (2005)................................................ 42

Manual of Patent Examining Procedure § 817 (7th ed., Feb. 2000 rev.)................ 45

## STATEMENT OF RELATED CASES

Appellant Cisco Systems, Inc. (Cisco) filed a petition for a writ of mandamus in this Court on February 28, 2011, seeking reversal of the district court's December 29, 2010 order granting the motion for a partial new trial filed by Appellee Commil USA, LLC (Commil). The Court denied Cisco's petition, noting that Cisco could "raise any challenge to the district court's determinations on appeal from a final judgment." *In re Cisco Systems, Inc.*, No. 975 (Fed. Cir. Mar. 4, 2011) (Bryson, J., joined by Rader, C.J., & Newman, J.).

On May 24, 2011, Commil sued Cisco for future damages for infringement of U.S. Patent No. 6,430,395 ('395 patent). *Commil USA, LLC v. Cisco Systems, Inc.*, Case No. 2:11-cv-265 (E.D. Tex.). On September 28, 2011, the district court opened another action for the determination of future damages involving the '395 patent. *Commil USA, LLC v. Cisco Systems, Inc.*, Case No. 2:11-cv-417 (E.D. Tex.).

Other than the foregoing, counsel for Cisco is not aware of any other case pending in this Court or any other court that will directly affect or be directly affected by this Court's decision in this case.

## INTRODUCTION

Cisco sells devices that provide wireless connectivity through the well-known "WiFi" wireless communication protocol. Commil, a non-practicing entity, accused Cisco of infringing the '395 patent, which describes a two-step method directed to a *different* wireless communication protocol, Bluetooth, and addresses a problem that does not exist in WiFi. The patent specification reflects this fundamental difference by mentioning Bluetooth over 50 times and WiFi not at all. Indeed, the inventors tried to make their claimed method work in a WiFi environment, but were unable to do so.

The evidence at trial confirmed that a person using Cisco's WiFi products does not perform the claimed method's second step (running a separate copy or "instance" of the protocol dedicated to a particular wireless connection), a step necessary to improve functionality in Bluetooth but not practiced in WiFi. The evidence also established that Cisco's customers do not directly infringe (and thus Cisco cannot induce their infringement) for the additional reason that Cisco's customers do not perform the claimed method's first step of "dividing" the communication protocol. And the inventors' failure to describe a WiFi implementation, together with their later inability to create one, show that the patent's claims—if construed to cover a WiFi implementation—are invalid for lack of written description and non-enablement.

These facts compelled judgment of non-infringement and invalidity in Cisco's favor. Cisco sought judgment as a matter of law (JMOL) on those issues after a jury rejected Cisco's invalidity contentions and found Cisco liable for direct infringement (though it found Cisco not liable for indirect infringement). Instead of ruling on Cisco's motions, however, the district court ordered an unwarranted new trial, based on two statements made by Cisco's local counsel, the first of which was the subject of a strong curative instruction and neither of which drew an objection from Commil or was shown to have affected the jury's verdict. The court compounded its error by granting a new trial only on the two jury findings that Commil found unsatisfactory (indirect infringement and damages), a ruling that was inconsistent with the Seventh Amendment.

At the second trial, Cisco was prevented from presenting evidence on a number of key issues, including invalidity. Nonetheless, the undisputed evidence again foreclosed a finding of indirect infringement. Commil's inventors and experts admitted (as they had during the first trial) that Cisco's customers—the alleged direct infringers—did not perform the patented method's first step ("dividing" the communication protocol). The jury nonetheless found Cisco liable for indirect infringement, a finding partly explained by the district court's instruction that the jury could find that Cisco intended to induce infringement under the negligence standard rejected in *Global-Tech Appliances, Inc. v. SEB*

- 3 -

*S.A.*, 131 S. Ct. 2060 (2011). The jury also was allowed to compute damages using a royalty base that violated the entire market value rule and a royalty rate based on inapposite licenses.

The district court's judgment rests on this cavalcade of errors, beginning with its failure to recognize the fundamental difference between the invention, which the Patent Office recognized was "drawn to Bluetooth," and Cisco's accused WiFi products. The court erred in construing the claim to encompass WiFi, failing to adjudge the patent invalid or not infringed after the first trial, granting a partial new trial based on isolated statements that were not shown to have affected the verdict, limiting that trial only to the issues on which the first jury found against Commil, ignoring evidence compelling judgment of non-infringement after the second trial, and allowing jury instructions and damages theories contrary to the Supreme Court's and this Court's precedent. This Court should reverse and direct judgment for Cisco or, at the very least, reinstate the first jury verdict or remand for a new trial on all issues.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §1338(a). This Court has jurisdiction under 28 U.S.C. §1295(a)(1). Final judgment was entered on May 20, 2011. Cisco timely filed renewed motions for JMOL, new trial, or remittitur on June 17, 2011. The court denied those motions and entered an amended final judgment on September 28, 2011. Cisco timely appealed on October 17, 2011.

## STATEMENT OF ISSUES

(1)    Whether the district court erred in entering judgment of infringement where:

(a)    Cisco does not perform one of the steps of the claimed method, as required for direct infringement;

(b)    Cisco's customers do not perform either of the steps of the claimed method, as required for indirect infringement;

(c)    the district court erroneously instructed the jury that it could find intent to induce infringement if Cisco "knew or should have known" its customers infringed; and

(d)    there was insufficient evidence of intent to induce infringement, and the court improperly precluded Cisco from presenting evidence that it reasonably believed the patent invalid.

(2)    Whether the district court erred in construing the claim term "short-range communication protocol" to include WiFi or, in the alternative, erred in denying JMOL of invalidity because the patent neither describes nor enables use of its claimed method in a WiFi system.

(3)    Whether the district court erred in allowing the jury's damages award to stand.

(4)    Whether the district court erred in ordering a partial new trial.

## STATEMENT OF THE CASE

Commil sued Cisco in the United States District Court for the Eastern District of Texas, alleging infringement of the '395 patent. A1500-1504; A1848-1853. Commil claimed that Cisco induced and contributed to infringement by Cisco's customers and that Cisco infringed the patent directly through its testing and use of its own products.

After a five-day trial, the jury returned a verdict substantially in Commil's favor, finding that Cisco directly infringed but did not induce its customers to infringe the patent, and rejecting Cisco's argument that the patent was invalid.[1] The jury awarded $3,726,207 in damages. A135-139. The court then invited Commil to seek a new trial based on a statement made by Cisco's local counsel during trial. A6036(6:5-21). The court granted Commil's motion, ordering a new trial on only those issues with which Commil was dissatisfied—indirect infringement and damages. The court denied Cisco's request for reconsideration of the new trial order and refused to certify it for interlocutory appeal. A8-16. This Court denied Cisco's petition for a writ of mandamus. A22-24.

The second jury considered only whether Cisco had induced infringement by its customers and the proper measure of damages for any such infringement

---

[1] The court granted JMOL to Cisco of no contributory infringement after Commil conceded that the accused products have substantial non-infringing uses. A19; A6004(148:7-149:24).

(Commil elected not to seek damages for direct infringement at the second trial (A2264)). The second jury found Cisco liable for indirect infringement and awarded $63,791,153 in damages. A162-164.

After denying Cisco's renewed JMOL motions, the court entered an amended judgment ordering Cisco to pay $63,791,153 in damages, $10,295,386.32 in prejudgment interest, and $17,737.98 in costs. A32-33.

## STATEMENT OF FACTS

### A.    Wireless Communication Protocols

In a wireless system, mobile devices (such as cordless phones and laptop computers) communicate with fixed "base stations" according to standardized procedures that govern the way in which data exchanged between devices is formatted, ordered, maintained, and transmitted. These procedures are referred to as "protocols." A1. Effective wireless communication requires that the transmitting device and the receiving device follow the same protocol strictly. A6262(12:10-14).[2]

This case involves two wireless communication protocols: the Bluetooth protocol, which the '395 patent describes in detail, and the WiFi (or 802.11) protocol, which the patent mentions not at all. As of April 7, 2000, the priority

---

[2] Protocol procedures include, for example, rules governing how a mobile device requests permission to connect to a base station, how a mobile device and base station "agree" on when to send messages, what radio channel to use, and when to switch from one channel to another. *See, e.g.,* A197(15:10-21).

date of the '395 patent, WiFi and Bluetooth were both widely known. A5743(138:8-14); A5763(73:14-19).

### 1.    Bluetooth

The Bluetooth protocol was designed to replace the physical cables that connect electronic devices—for example, an earpiece to a phone or a mouse to a computer. Bluetooth, like the cables it replaced, supports a dedicated, one-to-one connection between a mobile device and a base station—a connection not shared with any other device. A190(2:49-57); A6157(52:21-53:2). Because the Bluetooth protocol creates a dedicated connection (or "virtual wire" (A5936(54:1-11))) between two devices, a mobile device cannot move from one base station to another without interrupting its connection. A205(32:47-57). For instance, a mobile telephone user cannot switch a Bluetooth earpiece to another phone, or a Bluetooth mouse to another computer, without breaking the connection and starting a new one. *Id.* For this reason, Bluetooth is called a "connection-oriented" protocol. A1604; A1611.

Relatedly, the Bluetooth protocol is not designed to allow mobile devices to move between base stations during an active communication session. A190(2:50-53) (Bluetooth "does not support mobility between Base Stations"). When a Bluetooth device leaves the coverage area of a base station, the connection is lost and the device must seek a new connection. A205(32:43-44).

### 2.    WiFi

The WiFi protocol allows wireless connection throughout large areas like office buildings and college campuses.[3]  In a WiFi network, fixed wireless transmitters known as "access points" are placed throughout the area.  Access points allow users to connect to the Internet using a mobile device.  A6267-6268(33:5-34:5).  A single access point housing a single copy of the WiFi protocol can support multiple mobile devices at the same time, provided they are within range and use the WiFi protocol (A6018(43:1-5); A6268(35:3-17)), as the following graphic used at trial depicts:



Because WiFi does not give each mobile unit a separate, dedicated connection (A6157(52:21-53:1); A12110), it is referred to as a "connectionless" protocol. A1604; A1612.

---

[3] WiFi technically refers to multiple related 802.11 protocol standards. A6242(113:8-18).  The differences among these standards are not relevant here.

In contrast to Bluetooth, the ability to support a unit's mobility from one access point to another was expressly written into the WiFi standard. A12048-12049 (WiFi standard document describing that "[o]ne of the requirements of [WiFi] is *to handle mobile* as well as portable stations" and "[t]he [WiFi] architecture consists of several components that interact to provide *a wireless LAN that supports station mobility*" (emphasis added)); *see also* A12040; A6264(21:8-21). In a WiFi network, mobile devices continuously seek the access point providing the strongest connection. A6271(48:14-49:12). Access points periodically transmit "beacons" that permit mobile devices to compare the signal strength of different access points. *Id.*; A5748-5749(17:20-18:21); A5768(90:9-91:7). When a mobile device moves away from one access point and towards another, the signal from the first access point weakens while the signal from the second access point strengthens. A6271(48:14-49:12). When the mobile device determines that a second access point offers a stronger connection, it "disassociates" from the first access point and "reassociates" with the second. *Id.*; A12057-12060; *see also* A6264(21:8-21). This process of moving from one access point to another is known as a handoff.

## B.    Cisco's WiFi Products

In 2005, Cisco was a market leader in "autonomous" or "heavy" WiFi access points, so named because the access points ran the entire set of WiFi protocol

procedures. A6196(64:6-12); A6229(59:14-18). In March 2005, Cisco acquired

Airespace, Inc., which had developed "lightweight" access points that performed

only *some* of the WiFi protocol functions, with the remaining functions performed

in centralized devices called "controllers." This system allowed more efficient

management of WiFi networks. A6230-6231(65:21-66:14); A6281(87:12-88:3).

Cisco is now the major supplier of both "heavy" and "lightweight" access points.

**C.    The '395 Patent**

In late 1999, engineers Nitzan Arazi, Haim Barak, and Yaron Soffer

attempted to address Bluetooth's mobility problem. A5783(153:4-16);

A5784(154:4-21); A5796(32:25-33:18). Their provisional patent application,

assigned to a company called Commil Limited (unrelated to Appellee Commil),

issued as the '395 patent. A5784(155:2-8, 156:17-157:9); A5790(8:2-12). During

prosecution, the examiner described the group of claims that became the '395

patent as "drawn to Bluetooth technology." A12487.

The patented method is directed to "mobile computing ... devices and

communication protocols, which are not specified to handle handoffs," of which

Bluetooth is one. A165; A194(9:28-30) ("the current invention deals with short-

range communication with mobile units that have no built-in support for handoff");

*see also* A190(2:50-55). Although the inventors were aware of the WiFi protocol,

they developed their idea in connection with Bluetooth. A5790(8:13-16);

A5797(34:1-4, 35:3-10). The specification mentions Bluetooth by name over 50 times, along with a few similar protocols. *See, e.g.,* A190(1:54-63). Neither the patent nor the prosecution history ever mentions WiFi or 802.11. A6023(64:14-65:3).

The stated purpose of the '395 invention is to "provide seamless and reliable handoff of sessions" when a mobile device moves between base stations. A165; A190(1:13-15); A5687(26:18-27:7). Claim 1, the patent's sole independent claim, provides:

> In a wireless communication system comprising at least two Base Stations, at least one Switch in communication with the Base Stations, a *method of communicating* between mobile units and the Base Stations comprising:
>
>> *dividing* a short-range communication protocol into a low-level protocol for performing tasks that require accurate time synchronization and a high-level protocol which does not require accurate time synchronization; and
>>
>> *for each connection* of a mobile unit with a Base Station, *running an instance of the low-level protocol at the Base Station* connected with the mobile unit *and running an instance of the high-level protocol at the Switch*.

A209(39:20-29) (emphasis added).

The first step of the claimed method involves "dividing" the protocol into a "low-level" protocol that resides on the base station and a "high-level" protocol that resides on a "switch" associated with several base stations. A209(39:20-29); *see also* A197(15:1-7). The low-level protocol on the base station contains those procedures that "require accurate time synchronization" or, synonymously, have

"real time requirements." A197(15:3-7, 22-23). A "real time" procedure is one that requires frequent interaction between the mobile unit and the base station and therefore preferably resides on the base station, which communicates directly with the mobile unit.[4] The "high-level" protocol, by contrast, encompasses procedures that do not have real-time requirements and therefore do not depend on direct or frequent communication with the mobile unit. Under the patented method, these procedures are run on the "switch." A209(39:20-29); *see also* A198(17:3-18:13); A201(23:43-44).

The second step of the claimed method involves running a separate copy or "instance" of the low-level and high-level protocols for each connection between a base station and a mobile unit. A197(16:7-12); *see also* A209(39:25-29). This step permits the protocol dedicated to a particular communication session to "follow" the mobile device as it "roams" from one base station to another. A197(16:7-12) ("For each connection of a Base Station with a handset, there is a separate instance of the low-level protocol running at a Base Station connected to the handset, and a corresponding separate instance of the high-level protocol

---

[4] Although the patent does not explain how to determine whether a procedure has "real time" requirements, it does provide numerous examples of "real time" procedures in Bluetooth, such as procedures governing when the mobile unit and base station change radio frequencies, procedures for "authenticating" a mobile device before allowing it to join the network, and procedures for "encrypting" messages. A197(15:8-21); A198-199(Table 1).

running at the Switch."); *see also* A197(15:45-46); A206(33:6-7, 33:37-38, 34:4-5, 34:33-34).

The patent depicts the invention in Figures 8A and 8B, which show the separate ("divided") low-level and high-level protocol instances running for each mobile unit:



A174-175 (color added to show separate protocol instances). These figures also illustrate how the invention supports "roaming." Figure 8A shows two mobile units 121 and 133, which are connected to their own separate instances of the low-level protocol 280 and 281 running at the base station and the high-level protocol 283 and 284 running at the switch. *See also* A202(25:4-9). Figure 8B shows that, when mobile device 133 moves ("roams") from the coverage area of base station 124 to base station 123, the device's dedicated copy of the low-level protocol 281

is copied to base station 123, producing a new copy of the low-level protocol 281'. This transfer "enable[s] the next Base Station to transmit, after the handoff, substantially exactly as [the] previous Base Station would have transmitted if the handoff had not occurred" (A198(17:7-10)), so that the call continues uninterrupted. A192(5:49-54); A193(8:36-45); A194(10:62-64); A209(40:8-18).[5]

### D. Commil Limited's Failed Commercial Attempts

In 2002 and 2003, Commil Limited attempted to commercialize the '395 method, developing a working Bluetooth prototype and selling base stations and switches implementing a Bluetooth system called "Cellarion." A5792(14:21-17:11); A5793(20:19-21:6). The Cellarion system permitted cellular phones to conduct phone calls via a Bluetooth (rather than cellular) connection while within range of the Cellarion base stations and to move seamlessly between those base stations during the call. A5792-5793(14:21-18:24). Cellarion was never commercially successful. A5792(17:12-15); A5798(40:14-16); A6322(98:17-20).

In 2004 and 2005, Commil Limited attempted to develop a "Wi-Fi solution" "based on the technology that was described in the '395 patent." A5931(35:6-22); *see also* A5802(54:11-18). Commil did so against the advice of a WiFi consultant,

---

[5] Although Bluetooth is perhaps best known for its use connecting cellular phones to wireless earpieces, in the preferred embodiment a cordless phone handset (the "mobile unit") uses Bluetooth to connect wirelessly with fixed base stations (A193(8:52-55)) and allows the cordless handset to move from the coverage area of one base station to another without interrupting an ongoing phone call.

who advised Commil that WiFi already "'provid[ed] fast handover that ... is adequate for voice communication.'" A5799(45:3-8); A5799-5800(42:19-47:6). Nonetheless, Commil Limited invested at least 20 person-years (A5804(65:7-11); A5932(39:24-40:6)) and between $5 and $10 million (A5801(50:18-51:7); A5932(40:14-22)) and hired employees with WiFi expertise (A5801(50:1-3, 51:8-10)) in its efforts to implement the '395 patent in WiFi. *See also* A5798(39:2-6); A5799(42:19-43:17). Commil Limited nonetheless failed to demonstrate even as a *theoretical* matter (with a so-called "proof of concept") that the '395 method could work in WiFi. A6026-6027(77:1-15, 78:4-16); A5938(62:4-63:8); A12001; *see also* A5802(54:11-18); A5803(59:1-13); A5804-5805(65:25-66:5); A5931(35:6-22).

### E.    Commil USA

In March 2007, after Commil Limited proved unable to implement its invention in WiFi and its Bluetooth business failed, Commil Limited's creditors sold the '395 patent (and other intellectual property) for $400,000 to Appellee Commil USA, LLC, a non-practicing entity created to license and litigate alleged infringement of, among others, the '395 patent. A5805(69:12-13); A5819(123:4-125:4); A5821(131:11-133:25); A12548-12557. Commil sued Cisco a few months later. A1502-1504.

## F.    Claim Construction

Cisco contended that the term "short-range communication protocol" in the patented method's first step should be held indefinite or, in the alternative, construed to mean "Bluetooth, DECT, CT-2, PAC, PACS, PPP, or the 802.15 protocol"—the cable-replacement protocols identified in the patent. A1607-1608; A1816. The district court rejected Cisco's construction, defining this phrase as "a set of procedures required to initiate and maintain short-range communication between two or more devices" (A1), which could include WiFi.

The court construed the second step's requirement of "for each connection … running an instance" to require "[f]or each connection of a mobile unit with a Base Station, running at the Base Station a *copy of the low-level protocol supporting only that connection* and running at the Switch a corresponding *separate copy of the high-level protocol supporting only that connection*." A2 (emphasis added).

## G.    The First Trial

### 1.    Evidence of non-infringement

During the first trial, Cisco showed that no person using Cisco's controllers and access points ever performs the second claimed step, which requires running a separate "instance" or copy of the low-level and high-level protocols supporting each connection with a mobile device. A2. Commil's expert conceded that

Cisco's accused access points do not simultaneously run multiple "copies" of the low-level WiFi protocol. A5767(89:20-90:1); A5768(90:22-91:7); *see also* A6018(43:1-5); A6268(34:15-35:11). Rather, each access point runs a single copy of the WiFi protocol supporting multiple mobile devices. There also was no substantial evidence that Cisco's ***controllers*** (which Commil argued correspond to the "switch" in the patent) run a separate copy of the high-level protocol supporting each connection. Indeed, Cisco showed that the controllers run only a single copy of the high-level WiFi protocol. A5871(136:20-23) ("There's just one copy of the protocol up there [on the controller] as well"); A6018(43:12-17).

Cisco also provided uncontroverted evidence that, in Cisco's system, Cisco's customers did not perform the claimed method's first step of "dividing" the protocol into high-level and low-level procedures. A5769(94:17-95:7) (Commil's expert admitting that "Cisco divided the protocol"); A6290(123:23-124:4). Accordingly, because the customers themselves did not directly infringe, Cisco could not be liable for inducement.[6]

Cisco further showed that it could not intend to induce infringement, because it lacked knowledge of the existence of the '395 patent and its supposed

---

[6] The parties disputed whether Cisco alone (A5769(94:17-95:7); A6155(44:7-23)) or Cisco and an unrelated third party, Atheros Communications (A5871(134:5-13); A5906(94:18-95:5)), divided the protocol, but agreed that Cisco's customers did not divide it.

infringement.  Commil's assertion that Cisco knew of the patent before Commil

brought suit rested on the fact that—during prosecution of an unrelated Cisco

application in a different field *before* Cisco acquired Airespace's technology—a

PTO office action cited the '395 patent once, and Cisco's issued patent also cited

the '395 patent.  A12609; A12724.  Cisco also offered substantial evidence that,

after Commil's lawsuit notified Cisco of the patent, Cisco reasonably and in good

faith believed the patent to be invalid and not infringed.  *Infra* pp. 39-41.  Indeed,

Commil conceded that Cisco's access points had substantial non-infringing uses

when configured in the autonomous mode (A6119(32:11-12)), and the district

court granted JMOL of no contributory infringement on that ground (A19;

A6004(148:7-149:24)).

### 2.   Evidence of invalidity

At the first trial, Commil's expert agreed that neither the patent nor its

prosecution history refers to the WiFi protocol (A6023(64:14-65:3)), even though

it was a well-known protocol when the '395 patent was filed (A5763(73:14-19)),

and one inventor testified that he knew of the WiFi standard at the time of filing

(A5797(35:3-7)).  Commil Limited's internal documents confirmed that the

inventors knew of WiFi, but lacked even basic knowledge of how to provide

mobility in a WiFi system.  A12000 (2002 email among inventors asking "what

happen[s] if you move ... from one access point to another access point[] in a

[WiFi] network without handover. Will you have to login again, or will the application continue running without any active action by the user[?]").

Commil's expert also conceded that, whereas the '395 patent states that its claimed method provides mobility in communication protocols that do *not* provide for mobility (A165), the WiFi protocol itself *is* designed for mobility. A5763(72:12-20, 73:9-13). Commil's expert further conceded that the step of running multiple "copies" of the protocol (*supra* pp. 14-16) would not be performed in a WiFi system. A6001-6002(137:13-138:2) (simultaneously running separate copies of the WiFi protocol on a single base station "makes absolutely no legitimate sense"); *see also* A5767(89:20-23) (he "did not see two copies" of the low-level protocol that were "resident simultaneously" in Cisco's WiFi access points); A6018(43:1-5) ("At any moment in time, there's only one copy of the Wi-Fi protocol running on an access point"); A6000(132:12-133:19).

Cisco also presented evidence that the claimed method could not be implemented—and therefore was not enabled—in a WiFi system. Indeed, the inventors themselves could not implement the claimed method in a WiFi system despite hiring a WiFi expert and expending substantial time and resources in their efforts to do so. A5799(42:19-43:17); A5801(50:18-51:7); A5802(54:11-18); A5804-5805(65:7-11, 65:25-66:5); A5931(35:6-22); A5932(39:24-40:22); A5938(62:4-63:8); A6026-A6027(77:1-15, 78:4-16); A12001.

### 3.   Damages

Commil offered no evidence of damages for direct infringement. With respect to indirect infringement, Commil offered a royalty base of $1.2 billion, Cisco's total revenue from domestic sales of the accused products. A5851(56:6-20). This testimony did not take into consideration Commil's admissions that "[t]he accused products can invoke many different patents" (A5778(130:14-16)) and that the accused access points can be used in an (admittedly non-infringing) autonomous mode (A6004(148:7-14); A6119(32:11-12)). Commil also offered no evidence that customers buy Cisco's products because of the alleged ability to practice the claimed method.

Commil's expert then urged a 5% royalty rate, a figure based on summaries of non-comparable transactions involving different technology, exclusive licenses, related-party transactions, and the purchase of entire product lines. A5982-5983(58:2-64:12). Cisco's expert, relying on Cisco licenses involving WiFi technology and without the irrelevant attributes of the transactions on which Commil relied, testified that a 0.5% royalty rate would be appropriate. A6349(32:3-32:20).

### 4.   Statements by Cisco's local counsel

During his cross-examination of Commil's witness Jonathan David, Cisco's local counsel inquired about the last time Mr. David had seen Mr. Arazi, the Israeli

inventor most familiar with Commil's failed efforts to implement the '395 method in a WiFi environment and whom Commil had designated as a witness but elected not to call at trial. After Mr. David responded that he had eaten dinner with Mr. Arazi at a local Texas barbecue restaurant the night before, counsel responded "I bet not pork." A5825(46:23). The comment was inappropriate and unfortunate, though Commil did not object. After the district court questioned the comment's relevance (A5828(158:2-7)), counsel apologized to Mr. David, the court, the jury, and all present (A5838(2:14-24)). The court then instructed the jury:

> Sometimes when a lawyer injects irrelevant information into a case it's because he perceives a weakness in the merits of his case. I don't know whether that's why it happened in this case, but you can consider that as you're evaluating the testimony and the evidence in this case.

A5838(2:25-3:9). After counsel's apology and the judge's instruction, Commil made no further objection and did not request any additional relief.

Five days later, during Cisco's closing argument, Cisco's local counsel stated:

> When you find out what the truth is, you'll know exactly what to make of some very complicated evidence. You'll know how to deal with it. And when you figure out what the truth is, you'll know how to answer that verdict form. You remember the most important trial in history, which we all read about as kids, in the Bible had that very question from the judge. What is truth? What is truth?

A6038(16:9-17). Commil again did not object, although it did not hesitate to object to Cisco's closing on another occasion. A6039(18:22-24). In rebuttal,

Commil itself referenced the Bible, arguing that Cisco "want[s] you to split the baby ... that wasn't wise at the time of King Solomon." A6047(52:3-13).

### 5.    The first jury verdict and new trial order

The jury found Cisco liable for direct infringement, not liable for induced infringement, rejected Cisco's invalidity contentions, and awarded $3.7 million in damages. A135-139.[7]

After discharging the jury, the court announced that it would "entertain a Motion for New Trial" based on local counsel's statement to Mr. David. A6036(6:5-21). Commil made such a motion, but only on the issues of indirect infringement and damages. In its opposition, Cisco submitted declarations from two in-house attorneys who attended the trial, each expressing regret for the comment and stating unequivocally that Cisco did not condone the comment before or after the fact. A2142-2146.

The court granted Commil's motion, finding that the "pork" statement and generic reference to the Bible in closing "had a tendency to appeal to the prejudices of the jurors." A6-7. The court concluded that these two isolated statements "impliedly align[] Cisco's counsel's religious preference with that of the jurors and employs an 'us v. them' mentality—i.e., 'we are Christian and they

---

[7] The first jury awarded Commil damages for direct infringement even though Commil offered no evidence of any damages for direct infringement. Commil elected not to seek damages for direct infringement at the second trial. *See* A2264.

are Jewish.'" A6. The court cited no evidence that these statements provoked religiously-motivated hostility towards Commil or its witnesses and did not analyze whether the jury verdict was against the weight of the evidence, manifestly unjust, or whether Commil's own similar references would have triggered any such biases if they existed. *See, e.g.*, A5686(25:11-13) (Commil's voir dire remarks) ("This [case] begins in Israel ... the Holy Land for many religions"); A5718(40:25) (Commil's opening) ("these Israelis at Commil Limited"); *see also* A5714(24:14-21); A5718(41:13-18); A5782(147:14-15, 148:9-10, 149:5-6); A5819(122:11-12, 125:5-10, 125:11-24) (Commil's references to the inventors', Mr. David's, and Commil Limited's Israeli origins).

The court denied Cisco's motions for reconsideration and certification for interlocutory appeal. A8-16; A2152-2169; A2228-2234. This Court denied Cisco's petition for mandamus without prejudice. A23.

### H.    The Second Trial

In a series of rulings before and during the second trial, the court seriously curtailed Cisco's defense. First, the court ruled *in limine* that Cisco could not argue or offer evidence that its good-faith belief in the patent's invalidity rebutted Commil's claim of specific intent to induce infringement. A26; A6061-6062(13:3-17:9). Second, when Cisco's witness Bob O'Hara corrected an error he made at the first trial in order to clarify that he had no personal knowledge whether Cisco

was aware of the '395 patent before Commil filed suit—and after Commil thoroughly cross-examined him on the point (A6306-6307(37:20-40:11))—the court accused Mr. O'Hara of having given "false" testimony and asked, in the presence of the jury, whether he had been instructed to change his testimony to help Cisco win the case. A6315-6316(73:11-74:21). Finally, the court forbade Cisco's damages expert from offering any critique of the comparability of the licenses upon which Commil relied—even to make the same points he previously made in his expert report and during the first trial—as a supposed sanction for Cisco's reference to publicly-available documents in cross-examining Commil's damages expert. A6276-6277(66:13-70:9).

Despite these obstacles, the evidence adduced by Cisco at the second trial confirmed that, to the extent any "dividing" of the WiFi protocol occurred, that step was not performed by Cisco's customers. Commil's expert repeatedly stated that "for all acts of direct infringement," the "[d]ividing is done by Cisco" when it designs the product. A6198(70:10-13); A6198(70:17-23) ("for all aspects, Cisco does divide the protocol"); *see also* A6155(44:17-23); A6158(54:6-15); A6197(68:12-15; 68:23-69:16); A6198(70:2-9). The inventors agreed. A6321-6322(96:7-97:3, 97:23-98:16); A6323(104:23-105:18).

Commil's expert also conceded (again) that only one copy of the WiFi protocol (*i.e.*, "the entirety of the [WiFi] program") runs at each access point,

regardless of how many mobile devices communicate with it. A6204(97:3-8).

Other than a conclusory assertion by its expert that the claim element was met,

Commil offered no evidence concerning how many copies of the protocol run at

the controller at any given time. A6149(18:23-19:15); A6155(44:24-45:5).

Regarding Cisco's pre-suit knowledge of the patent, Commil again relied on

the unrelated office action and Cisco patent that cite the '395 patent. A6307-

6308(40:12-42:25). Commil also offered testimony (not presented at the first trial)

that Commil Limited had informed someone at Cisco of "its patents, very briefly"

at some point in late 2004, before Cisco acquired Airespace. A6216(6:7-10).

There was no evidence that Commil Limited specifically identified the patent-in-

suit to Cisco in this conversation or at any other time.

The second jury found that Cisco induced its customers to infringe,

awarding $63,791,153 in damages. A162-164. The court denied Cisco's post-trial

motions. A33.

## SUMMARY OF ARGUMENT

The district court committed several errors, any one of which requires

reversal.

First, no reasonable factfinder could have found that Cisco directly or

indirectly infringed. Commil's own testimony showed that a person (whether

Cisco or its customers) using Cisco's WiFi products does not perform the second

claimed step (running a separate "instance" or copy of the WiFi protocol for each mobile unit), precluding any possible infringement by Cisco or its customers. Commil's experts and the inventors also admitted that Cisco's customers did not perform the patented method's first step ("dividing" the WiFi protocol into high-level and low-level protocols), admissions that demonstrate that these customers cannot directly infringe and, *a fortiori*, Cisco could not induce them to do so. There also was no evidence that Cisco specifically intended to induce infringement. The second jury's finding that Cisco was nonetheless liable for induced infringement is partly explained by the court's erroneous instruction that Cisco could be liable on a negligence theory—the very standard the Supreme Court rejected in *Global-Tech*.

In addition, the court misconstrued the term "short-range communication protocol" to include WiFi and, in so doing, rendered the patent invalid. The patent nowhere even mentions WiFi, confining its disclosure to Bluetooth and similar connection-oriented protocols, and the inventors admitted they did not know whether the claimed method even applied to WiFi and could not make it work in a WiFi environment. So construed, the patent is invalid because it neither describes nor enables application of the claimed method to a WiFi system.

Finally, Commil's damages theory was flawed: the royalty base failed to comply with the entire market value rule, and the royalty rate was based on

inapposite licenses.

Instead of directing judgment in Cisco's favor for any of the above reasons, however, the district court committed yet another error in ordering a new trial—not on the whole case, but only on induced infringement and damages, the two aspects of the verdict unsatisfactory to Commil. But Commil did not object to either of the statements on which the court based its new trial order, and the first was the subject of a prompt apology and a strongly-worded curative instruction. These statements were insufficient grounds to order a new trial. The order of a *partial* new trial that did not include Cisco's substantial invalidity arguments also violated Cisco's Seventh Amendment rights.

The Court should reverse and direct judgment for Cisco based on the overwhelming evidence of non-infringement and invalidity and the improper damages award. At the very least, the Court should vacate the erroneous new trial order and either reinstate the first jury verdict or remand for retrial of all issues.

## ARGUMENT

## I.     STANDARD OF REVIEW

The jury's infringement finding is reviewed for substantial evidence, but errors in jury instructions are reviewed *de novo*. *Therasense, Inc. v. Becton, Dickinson & Co.*, 593 F.3d 1325, 1331 (Fed. Cir. 2010). Claim construction is reviewed *de novo*. *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1456 (Fed.

Cir. 1998) (en banc). Compliance with the written description requirement of 35 U.S.C. §112 is considered a question of fact reviewed for substantial evidence. *Tronzo v. Biomet, Inc.*, 156 F.3d 1154, 1158 (Fed. Cir. 1998).[8] Compliance with the enablement requirement is a question of law reviewed *de novo*, based on underlying facts reviewed for substantial evidence. *Automotive Techs. Int'l, Inc. v. BMW of N. Am., Inc.*, 501 F.3d 1274, 1281 (Fed. Cir. 2007).

Issues not unique to patent law are reviewed under Fifth Circuit law. *Riverwood Int'l Corp. v. R.A. Jones & Co.*, 324 F.3d 1346, 1352 (Fed. Cir. 2003). The Fifth Circuit reverses a damages award if there is "no legally sufficient evidentiary basis for a reasonable jury to find as the jury did." *International Ins. Co. v. RSR Corp.*, 426 F.3d 281, 296-297 (5th Cir. 2005). The Fifth Circuit reviews rulings on new trial motions for abuse of discretion, with more exacting review applied to orders granting a new trial than to those denying them. *Conway v. Chemical Leaman Tank Lines, Inc.*, 610 F.2d 360, 362-363 (5th Cir. 1980). Whether issues are so distinct and separable as to permit a partial retrial is a question of law addressed *de novo*. *Gasoline Prods. Co. v. Champlin Ref. Co.*, 283 U.S. 494, 496-501 (1931).

---

[8] Cisco believes compliance with the written description requirement more properly should be considered a question of law (reviewed *de novo*) that may, in some circumstances, be based on underlying facts (reviewed for substantial evidence).

## II.   NO REASONABLE FACTFINDER COULD HAVE FOUND INFRINGEMENT

Neither verdict of infringement—the first jury's finding that Cisco directly

infringes and the second jury's finding that Cisco induces its customers to

infringe—is supported by substantial evidence.  The record demonstrates that

neither Cisco nor its customers perform both steps of the claimed method.

Moreover, even if Cisco's customers could directly infringe—which they cannot—

the second jury's finding that Cisco intended to induce its customers to infringe is

unsupported.

### A.   No Substantial Evidence Established That Cisco Or Its Customers Perform Both Steps Of The Claimed Method

#### 1.   Neither Cisco nor its customers "run … an instance" of the relevant protocol "for each connection"

For Cisco to be liable for infringement, either Cisco (in the case of direct

infringement) or its customers (in the case of indirect infringement) must perform

each claimed step, including the second step of claim 1, which requires "*for each*

*connection* of a mobile unit with a Base Station, *running an instance of the low-*

*level protocol at the Base Station* connected with the mobile unit *and running an*

*instance of the high-level protocol at the Switch*." A209 (emphasis added).  As

construed, this step requires "for each connection … running at the Base Station a

copy of the low-level protocol supporting *only* that connection and running at the

Switch a corresponding separate copy of the high-level protocol supporting *only*

that connection." A2 (emphasis added).

Commil's expert conceded, however, that Cisco's access points (which Commil argued correspond to the "base stations" in the patent) run only one copy of the WiFi protocol regardless of the number of mobile units associated with that access point, and that hundreds of mobile units can be "associated" with (*i.e.*, "connected" to) an access point at once. A6204(97:3-8); *see also* A6018(43:1-5); A6019(47:6-20). Furthermore, Commil's expert testified that one function—the 802.11 "beacon," which is periodically broadcast to all mobile units by a particular access point—is a "low-level protocol" function, yet conceded that that function supports *hundreds* of mobile units at once. A5768(90:22-91:7); A6196(62:1-14). Accordingly, there was no substantial evidence that any person—whether Cisco or its customers—runs a separate copy ("instance") of the WiFi protocol on Cisco's access points "supporting only" a single connection. Indeed, Commil's expert conceded that an access point ("base station") can be simultaneously "connected" to *multiple* mobile units. A6018-6019(43:1-5; 44:10-19; 45:12-16, 47:15-20) (agreeing that WiFi access point and mobile unit are "connected" when they are "associated" and that multiple mobile units are associated with an access point simultaneously).

Despite this admission, Commil argued that use of Cisco's accused products could still meet the "running … an instance" limitation because the access points

simultaneously maintain separate information regarding each mobile device's communication "state." A6176(128:9-129:20). But the patent does not claim the maintenance of communication "states," but rather the "running" of separate *copies* of the low-level and high-level set of "procedures," with each copy supporting only one connection. A209. Keeping track of information regarding separate "states" of communication does not equate to running separate copies of the "set of procedures" for each connection. A6197(68:8-15) (Commil's expert acknowledging that "data" is "different" from "procedures").

Moreover, the testimony explaining Commil's "state" theory concerned only the access point, not the controller. A6157(52:15-18) (a "device that's inside of the Cisco access point ... operates as a state machine"); A6176(126:16-19). Even if the Court accepts Commil's "state" theory as to access points (and it should not), Commil still failed to present any evidence that the *controller* runs separate copies of the high-level WiFi protocol for each connection of a mobile unit with an access point. Indeed, Commil adduced no evidence at all about what happens at the controller when it is supporting multiple mobile units.

## 2.    Cisco's customers do not practice the "dividing" limitation

To establish indirect infringement, Commil was required to show that Cisco's customers performed each and every step of the asserted method claims. *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1304-1306 (Fed. Cir. 2006) (en banc)

("[T]he patentee always has the burden to show direct infringement for each instance of indirect infringement."). Commil failed to prove that Cisco's customers practiced the step of "dividing" the WiFi protocol.[9]

The first step of claim 1 requires "dividing a short-range communication protocol into a low-level protocol for performing tasks that require accurate time synchronization and a high-level protocol which does not require accurate time synchronization." A209. As construed, this term requires dividing the "set of procedures" required for communication. A1. To infringe, a person must divide the WiFi protocol *procedures* or, as Commil's counsel put it, *"design a short-range communication system."* A6117(23:17-25) (emphasis added). But the WiFi procedures in Cisco's products were divided, and the system "design[ed]," long before any products were sold to Cisco's customers. Rather, as Commil's expert (A6197(68:12-15); A6198(70:10-13)), the inventors (A6321(96:14-21); A6323(104:23-105:18)), and Cisco's witness (A6290(123:23-124:4)) all agreed, the WiFi procedures were "divided" not by Cisco's customers, but by *Cisco itself*

---

[9] Commil did not assert a theory of "divided" infringement under which different persons could perform some steps of the claimed method. A6191(45:4-13). Although the court's proposed instructions in the second trial initially included a divided infringement instruction (A2309), the parties agreed that divided infringement was not at issue and requested that the court omit that instruction. The jury was instructed that it could find infringement by Cisco's customers only if "a single party [ ] perform[s] each and every step of [the] claimed method." A6389(98:6-7).

when the access points and controllers were designed and manufactured.[10] The division of the WiFi procedures is hardwired into the chipset and firmware included in Cisco's WiFi products. A6280(85:4-23). Under these circumstances, Cisco's customers cannot directly infringe the patent. *See In re Ricoh Co. Patent Litig.*, 2010 WL 3562556, at *6 (N.D. Cal. Apr. 15, 2010) (where manufacturer, not customers, performed required step of designing storage of software rules in a database, customers did not directly infringe), *aff'd*, 412 F. App'x 297 (Fed. Cir. Mar. 8, 2011).

Commil's only response was that, when customers use Cisco's accused products, the access points divide *data packets*, processing some information themselves and sending other information to the switch. A6157(51:23-52:8); A6158(56:7-12). But the claim requires dividing the set of "procedures" that make up the "short-range communication protocol." A1. Processing data at different locations—*after* the "set of procedures" has already been permanently divided in the design phase—in no way divides the *protocol* itself. Indeed, Commil's expert acknowledged that dividing "data" is "different" from dividing procedures. A6197(68:8-15).

---

[10] Cisco's witnesses testified that an unrelated third party, Atheros Communications, also participated in the dividing step. A5871(134:5-13). In any event, both parties agreed that Cisco's customers did not divide the protocol.

### B. No Substantial Evidence Established That Cisco Intended To Induce Infringement

Commil separately failed to present substantial evidence that Cisco specifically intended to induce infringement. Commil was required to show "knowledge that the induced acts constitute patent infringement," which includes both knowledge of the patent and knowledge that the induced party infringed it. *Global-Tech*, 131 S. Ct. at 2068. Knowledge is satisfied by actual knowledge or "willful blindness," *i.e.*, proof that an alleged infringer "subjectively believed there was a high probability" of infringement and "took deliberate steps to avoid knowing that fact." *Id.* at 2072.

### 1. The jury was erroneously instructed

At a minimum, a new trial on inducement is required because the court, over Cisco's objection (A6369(18:17-19:1)), instructed the jury that it could find inducement if Cisco "knew *or should have known* that its actions would induce actual infringement." A6389(98:24-99:2) (emphasis added). But the Supreme Court's decision in *Global-Tech*—foreshadowed by Cisco during the charging conference (A6369(18:23-19:1)), issued just after the jury verdict, and highlighted in renewed post-verdict motions—ruled that mere negligence ("should have known") is insufficient to prove inducement. 131 S. Ct. at 2072. Indeed, the lower court in *Global-Tech* gave the very same "knew or should have known" instruction, *id.* at 2064, which the Supreme Court expressly disapproved. *See id.* at

2068, 2070-2072; *see also id.* at 2074 (Kennedy, J., dissenting). And Commil specifically highlighted the erroneous "should have known" language during summation. A6386(88:7-89:3). This error requires a new trial. *E.g., Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1283-1284 (Fed. Cir. 2000).

### 2.     No substantial evidence established specific intent to induce infringement

The court's erroneous jury instruction permitted the jury to find Cisco liable for inducement based on insufficient (indeed, practically non-existent) evidence of intent to induce infringement. In particular, Commil failed to establish that Cisco had any pre-suit knowledge of the patent or that it specifically intended to induce infringement at any time.

#### *a.     Insufficient evidence that Cisco had pre-suit knowledge of the patent*

Commil's attempt to establish Cisco's pre-suit knowledge of the patent rested on: (1) a single citation to the '395 patent in an unrelated Cisco application in a different field that issued as a patent before Cisco acquired Airespace and the accused technology (A12609; A12611; A12618; A12724), and (2) testimony during the second trial (but not the first) that Commil Limited told someone at Cisco something about Commil's patents (A6215-6217(3:13-11:25)).

The fact that the '395 patent is cited in one of Cisco's thousands of issued

patents does not provide sufficient "'knowledge' to formulate the 'intent' required for inducement." *Veritas Operating Corp. v. Microsoft Corp.*, 562 F. Supp. 2d 1141, 1285 (W.D. Wash. 2008). *Global-Tech*'s actual knowledge requirement would be meaningless if a company were presumed to have sufficient knowledge to induce infringement merely because a patent was cited by an examiner in one of its numerous patent prosecutions. *See Apeldyn Corp. v. AU Optronics Corp.*, 2011 WL 5552520, at *9 (D. Del. Nov. 15, 2011) ("There is simply no indication that constructive notice is meant to embrace the hundreds, if not thousands, of listed patents that would be generated in many cases by such an extrapolation.").

The vague testimony that Commil Limited's former CEO informed a Cisco employee in Israel of Commil Limited's patents generally—not the '395 patent specifically—during a "very brief[]" introduction to Commil Limited in 2004 (A6119-6120(33:11-34:10); A6215(3:13-11:25)) is likewise insufficient. The witness could not remember the last name of the person he spoke to, how many times they spoke, or what exactly they discussed. A6215-6217(3:13-11:25). Even if credited, the testimony did not establish that this witness informed Cisco of the '395 patent specifically. And the testimony was internally inconsistent: the conversation was supposedly triggered by Cisco "using" the claimed method "after their ... acquisition" of Airespace (A6216(6:19-25)), but the conversation took place in "late 2004," months *before* Cisco acquired Airespace in March 2005.

A12558-12562. No reasonable jury could find that Cisco knew of the patent based on this testimony.

### *b.    Insufficient evidence that Cisco intended to induce infringement*

Commil also adduced no evidence that Cisco ever intended to induce infringement. There was no evidence whatsoever of intent to induce infringement before Commil filed suit. As to Cisco's state of mind after the lawsuit began, Commil argued only that Cisco (1) marketed and sold the accused products, (2) encouraged customers to buy those products in the relevant configuration, and (3) failed to obtain a formal opinion of counsel or adequately investigate Commil's claims. A2351. But the mere marketing and sale of accused products cannot support a finding of inducement, particularly where the products have substantial non-infringing uses, as Commil conceded here. A6004(148:7-149:24); A6119(32:11-12); *see, e.g., Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1328-1329 (Fed. Cir. 2009) ("Especially where a product has substantial non-infringing uses, intent to induce infringement cannot be inferred even when the defendant has actual knowledge that some users of its product may be infringing the patent.").

Likewise, while the presence or absence of a formal opinion of counsel may be one relevant factor, *Broadcom Corp. v. Qualcomm Inc.*, 543 F.3d 683, 699-701 (Fed. Cir. 2008), the failure to obtain a formal opinion of counsel, standing alone,

cannot sustain a verdict of inducement. That is especially true where, as here, at a minimum the case was a close one, and Cisco introduced evidence of its reasonable investigation of Commil's claims and its good faith belief of non-infringement (and, in the first trial, of invalidity). *Cf. In re Seagate Tech., LLC*, 497 F.3d 1360, 1371 (Fed. Cir. 2007) (for willful infringement, "patentee must show ... that the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent"). Bob O'Hara, inventor and architect of the Airespace product, testified to his own detailed review and analysis of the patent, Commil's allegations, and the accused products after the lawsuit was filed. A6289-6291(121:12-127:4). Cisco's investigation and development of substantial non-infringement and invalidity defenses during this litigation, leading to two full jury trials, likewise support the reasonableness and good faith of Cisco's belief that it did not infringe. No reasonable jury could find that Cisco knew or subjectively believed there was a "high probability" it was inducing infringement. *Global-Tech*, 131 S. Ct. at 2072; *accord, e.g., Mikkelsen Graphic Eng'g Inc. v. Zund Am., Inc.*, 2011 WL 6122377, at *8 (E.D. Wis. Dec. 8, 2011) (defendant "must know that the acts induced constitute patent infringement," which it could not have known when "many of the issues were close calls" during the litigation). Indeed, the first jury's verdict that Cisco did ***not*** induce infringement confirms the reasonableness of Cisco's view. *Cf. Medtronic*

*Navigation, Inc. v. BrainLAB Medizinische Computersysteme GmbH*, 603 F.3d
943, 954 (Fed. Cir. 2010) (party entitled to rely on "jury's favorable verdict[] as an
indication that the party's claims were objectively reasonable," even where the
verdict was later overturned).

### 3.    The court erroneously precluded Cisco from presenting evidence of its good-faith belief of invalidity

Cisco also is entitled to a new trial because the district court improperly
precluded Cisco from arguing to the second jury that it reasonably believed the
patent invalid and, accordingly, could not have intended to induce its infringement.

This Court's cases state categorically that one cannot infringe or induce
infringement of an invalid patent. *See, e.g., Prima Tek II, L.L.C. v. Polypap,
S.A.R.L.*, 412 F.3d 1284, 1291 (Fed. Cir. 2005) ("there can be no ... induced
infringement of invalid patent claims"); *Richdel, Inc. v. Sunspool Corp.*, 714 F.2d
1573, 1580 (Fed. Cir. 1983) ("The claim being invalid there is nothing to be
infringed."). Courts have accordingly permitted alleged infringers to introduce
evidence of a good-faith belief that the asserted patent was invalid in defense of a
claim of induced infringement. *See DataQuill Ltd. v. High Tech Computer Corp.*,
2011 WL 6013022, at *10 (S.D. Cal. Dec. 1, 2011) (good-faith belief of invalidity
presented triable issue of fact as to intent to induce infringement); *VNUS Med.
Techs., Inc. v. Diomed Holdings, Inc.*, 2007 WL 2900532, at *1 (N.D. Cal. Oct. 2,
2007) (triable issue of fact as to intent based on "opinion of counsel ... [that] the

- 41 -

patents were invalid"); *Kolmes v. World Elastic Corp.*, 1995 WL 918081, at *10

(M.D.N.C. Sept. 18, 1995) (no intent to induce infringement where defendants

"had a good faith belief in the invalidity" of the patent-in-suit); *see also* Lemley,

*Inducing Patent Infringement*, 39 U.C. Davis L. Rev. 225, 243 (2005) ("[I]t is not

reasonable to assume that merely because a defendant is aware of the existence of

a patent, he intended to infringe it. He may believe the patent invalid[.]"). Indeed,

Commil itself recognized, when it sought a partial new trial, that "Cisco may argue

that it believed the '395 patent was invalid as a defense to the element of specific

intent." A2215.

While the probative value of the overwhelming evidence establishing

Cisco's good-faith belief of invalidity (A6365(2:15-3:12); A2322-2326) was for

the jury to determine, if credited, it would have been sufficient to allow the jury to

return a verdict for Cisco. Cisco was entitled to have the jury consider that

evidence. *Davidson Oil Country Supply Co. v. Klockner, Inc.*, 908 F.2d 1238,

1245 (5th Cir. 1990) (ordering new trial where "excluded evidence was clearly

relevant" and "its exclusion seriously hindered the presentation" of the case).

## III.    THE DISTRICT COURT ERRED IN ITS CLAIM CONSTRUCTION AND IN NOT RULING THE PATENT INVALID AS CONSTRUED

### A.    The Court Erroneously Construed "Short-Range Communication Protocol" To Include WiFi

The court construed the claim term "short-range communication protocol"

(A209) as "a set of procedures required to initiate and maintain short-range communication between two or more devices." A1. The court thereby rejected Cisco's argument that "short-range communication protocol" does not include the WiFi protocol (A1602-1605; A1607-1613) and should be limited to the connection-oriented protocols listed in the specification—Bluetooth, DECT, CT-2, PAC, PACS, PPP, or the 802.15 protocols (A190(1:44-59); A191(3:23-24); A191(Table 1); A208(38:49-52); A209(39:3-5)). The specification, prosecution history, and extrinsic evidence all confirm that Cisco's construction was correct.

As this Court made clear in *SciMed Life Systems, Inc. v. Advanced Cardiovascular Systems, Inc.*, 242 F.3d 1337 (Fed. Cir. 2001), facially broad claim language cannot overcome "the written description['s] ... guidance as to the meaning of the claims," which "dictat[es] the manner in which the claims are to be construed." *Id.* at 1344 (where the only catheters used in the art were coaxial or side-by-side, and specification discussed only coaxial catheter despite inventors' awareness of side-by-side catheters, this "lead[s] to the inescapable conclusion" that only coaxial catheter is claimed). "Whether an invention is fairly claimed more broadly than the 'preferred embodiment'" depends, *inter alia*, upon "the content of the specification" and "the context in which the embodiment is described." *Wang Labs., Inc. v. America Online, Inc.*, 197 F.3d 1377, 1381, 1383 (Fed. Cir. 1999) (limiting the term "frame" to "character-based" protocols and

excluding "bit-mapped" protocols, even though ordinary meaning included both, because the patent "consistently illustrates 'frame' only with respect to a character-based protocol"); *see also Kinetic Concepts, Inc. v. Blue Sky Med. Group, Inc.*, 554 F.3d 1010, 1018-1019 (Fed. Cir. 2009); *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (en banc).

Here, the patent specification confirms that the claimed "short-range communication protocol" is limited to Bluetooth and the other connection-oriented protocols identified in the patent. The patent's glossary lists only Bluetooth as a short-range communication protocol. A191(3:5-6). The invention's stated purpose is to provide for mobility in communication protocols that "are *not* specified to handle handoffs" (A165 (emphasis added)), like Bluetooth and the other enumerated protocols. By contrast, the WiFi protocol *is* specified to handle handoffs. A12048-12049 (describing WiFi as designed "to handle *mobile* as well as portable stations" and to "*support[] station mobility*" (emphasis added)). The patent's complete silence regarding WiFi—particularly in contrast to its extensive description of how to implement the claimed method in Bluetooth (*see infra* pp. 51-52)—further evinces a deliberate decision not to claim a WiFi embodiment. This conclusion is reinforced by the fact that, at the time the '395 patent was filed, the WiFi protocol was one of the most important wireless protocols and the inventors were aware of it, yet the patent does not mention it at all. A5763(73:14-

19); A5797(34:1-4).

This is, accordingly, a situation where the specification "consistently, and without exception" describes embodiments having characteristics that are critical to the invention. *Curtiss-Wright Control Flow Corp. v. Velan, Inc.*, 438 F.3d 1374, 1379 (Fed. Cir. 2006). In such situations, patentees may not extend their monopoly to matter lacking those characteristics. *Id.* (vacating construction broader than "the overall context of the ... specification" permitted); *Nystrom v. Trex Co.*, 424 F.3d 1136, 1143-1145 (Fed. Cir. 2005) (construing term "board" as "wood cut from a log" because the patent "consistently" used the term in that way and "frame[d] the invention in the context of wood decking materials cut from logs," and patentee "is not entitled to a claim construction divorced from the context of the written description"); *SciMed*, 242 F.3d at 1341 ("Where the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question.").

The prosecution history also supports limiting the claims to Bluetooth and similar "virtual wire" protocols. The patent examiner was required to "give [a] short description of [the] total extent of the subject matter claimed in each group" of claims. MPEP §817 (7th ed., Feb. 2000 rev.). The examiner described the

group of claims that became the '395 patent as "drawn to Bluetooth technology" and stated that the invention "has separate utility such as supporting Bluetooth wireless technology in wireless communication systems." A12487. By contrast, the prosecution history nowhere mentioned WiFi. Likewise, extrinsic evidence, including the inventors' failed attempts to implement their claimed method in a WiFi embodiment (*supra* pp. 16-17), further confirms that the invention is limited to Bluetooth and similar protocols. *See Wang*, 197 F.3d at 1382-1383.

Cisco's proposed construction also is supported by the principle that claims should be construed to preserve validity. *Generation II Orthotics Inc. v. Med. Tech. Inc.*, 263 F.3d 1356, 1365 (Fed. Cir. 2001). The district court's construction renders the patent invalid under 35 U.S.C. §112. *Infra* pp. 47-52. Rather than invalidate the patent, the Court should simply confine it to what was actually invented, namely a method for use with Bluetooth and the other enumerated connection-oriented protocols.

## B. The Court Erroneously Concluded That The Term "Short-Range" Is Not Indefinite

If the Court declines to limit the term "short-range communication protocol" to the enumerated protocols, the patent provides no guidance regarding which communication protocols are "short range" and which are not, and the district court's claim construction should be overturned because the term is facially indefinite. *See, e.g., Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342,

1351 (Fed. Cir. 2005) ("When a word of degree is used the district court must determine whether the patent's specification provides some standard for measuring that degree"). Although the patent limits "short" to "relatively smaller coverage areas" than cellular base stations (which have a range of "multiple miles" (A5743(139:11-17))), the patent provides no guidance regarding *how much* smaller a protocol's range must be to qualify as "short" (A166(Fig.1); A193(8:26)), other than its reference to the Bluetooth protocol, which has a radius of no more than 30 feet (A5521; A5770(98:3-7)). WiFi, by comparison, has an average range of several hundred feet and, depending on broadcast conditions, an actual range of up to several miles. A5743(139:22-24); A5888(25:17-22).

## C.    As Construed, The Patent Is Invalid

If construed to encompass WiFi, the patent is invalid, because it neither describes nor enables a method usable in a WiFi system. *See Liebel-Flarsheim Co. v. Medrad, Inc.*, 481 F.3d 1371, 1380 (Fed. Cir. 2007) ("The irony of this situation is that Liebel successfully pressed to have its claims include a jacketless system, but, having won that battle, it then had to show that such a claim was fully enabled, a challenge it could not meet. The motto, 'beware of what one asks for,' might be applicable here.").

### 1.    The claims lack sufficient written description

As Commil's expert agreed, neither the patent nor its prosecution history

mentions WiFi (A6023(63:23-64:25)), even though WiFi was "one of the two most well-known protocols" when the '395 patent was filed (A5763(73:14-19)) and the inventors knew of WiFi at the time of filing (A5790(8:13-16)). Nor does the patent suggest that the inventors ever contemplated, much less "had possession of," a method usable in a WiFi system. *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc). Indeed, the patent confirms the opposite. The patent's elaborate description of how to implement the method in a Bluetooth embodiment (*see infra* pp. 51-52) illustrates the level of detail required to convey possession of the invention. Given the fundamental differences between Bluetooth and WiFi, a disclosure that entirely ignores WiFi cannot possibly convey possession of a WiFi embodiment.

The invention's stated purpose is to provide for mobility in communication protocols that are "*not* specified to handle handoffs" (A165 (emphasis added); A191(3:5)), whereas WiFi *is* designed for mobility, as Commil's expert conceded during both trials. A5763(72:12-20, 73:9-13); A6187(28:13-15). The specification also expressly requires simultaneously running multiple protocol "instances" or copies, with each copy supporting a separate connection to a mobile device. *Supra* pp. 12-16. Running a "separate copy" of the low-level and high-level protocols supporting each connection makes sense in the context of Bluetooth, because Bluetooth supports a dedicated, one-to-one connection between

a mobile device and a base station. A190(2:35-39, 2:49-57); A208(38:49-52). But this concept makes no sense in a WiFi system, in which a single instance of the protocol on the base station supports multiple mobile devices. In fact, Commil's expert conceded that simultaneously running separate copies of the WiFi protocol on a single base station (as the application of the claimed method would require) "would consume an incredible amount of power," "would change your entire hardware design," and would "slow down the entire process," such that "[i]t makes absolutely no legitimate sense to design a product that way." A6000(132:12-133:19); A6001-6002(137:13-138:2); *see also* A6001(134:23-135:11).

The inventors were careful to enumerate specific "short-range communication protocol[s]" as to which they possessed their claimed invention, and all of them—Bluetooth, 802.15, PAC, PACS, DECT, PPP, and CT-2—are undisputedly "connection-oriented" in that they are "designed for short-range communication as a cable replacement." A190(2:49-52); *see also* A190(1:55-59); A191(3:23-24); A208(38:49-52); A209(39:3-5); A6135(96:8-19). The patent's glossary defines Bluetooth (and only Bluetooth) as a "short-range communication ... protocol." A191(3:5-6). During prosecution, the patent office characterized the claims that issued as the '395 patent as "drawn to Bluetooth technology." A12487; A12490. No reasonable factfinder could have found that a person of skill in the art, reading the specification, would have concluded that the inventors possessed

an invention operable in a WiFi environment.[11]

## 2.    The claims are not enabled

The patent separately fails to meet Section 112's enablement requirement. The specification nowhere teaches how the supposedly novel method—dividing a protocol into low-level procedures that require time synchronization and high-level procedures that do not, and running an instance of the low-level and high-level protocols "for each connection"—could be practiced in a WiFi system that does not simultaneously run multiple copies of the protocol. *Supra* pp. 32-33. Commil's expert attempted an explanation at trial, which was speculative at best.[12]

---

[11] In denying JMOL, the district court cited Cisco's expert's statements on cross-examination that he "didn't say [the patent] was invalid" and "d[id]n't know" whether the patent was valid. A36 (citing A5945(91:13-25)). But the expert testified that the written description requirement "was not met" (A5938(65:22-24)) and that the patent was not enabled for a WiFi implementation (A5938(63:17-64:9)). He also clarified on redirect that his opinion regarding non-enablement and lack of written description "leads to the conclusion the patent is not valid." A5953(125:17-18). The statements the court cited would at most allow the jury to disbelieve Cisco's expert; they do not contradict or eliminate the objective evidence that the specification lacked sufficient written description to support broadly-construed claims. *Cf. Verdegaal Bros., Inc. v. Union Oil Co. of Cal.*, 814 F.2d 628, 632 (Fed. Cir. 1987) (reversing denial of JMOL because, although jury may have discarded expert testimony regarding what a prior art reference taught, that "does not eliminate the reference itself as evidence or its uncontradicted disclosure"). Testimony of the inventors and Commil's expert, as well as the specification itself, amply showed that the inventors did not possess or describe a method usable with WiFi.

[12] "I'd look at which is time critical, time—accurate time is required, real-time is required, and I look at those particular portions of the protocol that aren't requiring real-time, and I divide it right there. The ones that are real-time must be, … practiced and found at the access point, so I design the system that way. And

Moreover "[i]t is the specification, not the knowledge of one skilled in the art, that must supply the novel aspects of an invention in order to constitute adequate enablement." *Genentech, Inc. v. Novo Nordisk, A/S*, 108 F.3d 1361, 1366 (Fed. Cir. 1997). "Conclusory expert assertions" cannot overcome the substantial evidence Cisco presented that the claimed method was not enabled for WiFi. *Sitrick v. Dreamworks, LLC*, 516 F.3d 993, 1001 (Fed. Cir. 2008).

The patent's complete silence regarding WiFi contrasts markedly with its elaborate teachings about Bluetooth, which occupy four full columns of the patent. A190(2:35-57); A198-200(18:15-21:46, Tables 1-2); A205(32:47-60); A208(38:40-53); A209(39:30-62). A detailed table explains how to "divide" 24 Bluetooth tasks into "low-level" and "high-level" protocols based on whether the tasks "require accurate time synchronization." A198-199(Table 1; 18:24-26). Another explains how to "synchronize" instances of the Bluetooth protocol by listing eleven parameters, along with an indication of what "synchronization method" is required for each. A199(19:66-20:46); A199-200(Table 2). The lengthy disclosure needed to enable a Bluetooth embodiment highlights the inadequacy (indeed, the complete absence) of an enabling disclosure regarding any WiFi embodiment. *Automotive Techs.*, 501 F.3d at 1284 ("If such a disclosure is

those that I determine not to have to require real-time protocol communication can then be at the user's decision either placed at the controller or at the access point." A5753(33:3-24); A5754-5755(37:2-40:18).

needed to enable making and using a mechanical side impact sensor, why is not a similar disclosure needed to enable making and using an electronic side impact sensor[?]").

This is reinforced by the inventors' own inability to implement the patent's teachings in WiFi. The inventors—indisputably extraordinarily skilled in the art (A5936(55:7-24); A6026(74:21-75:2))—failed to implement a "Wi-Fi solution" based on the patent, despite devoting significant effort and resources. A5800(47:19-25); A5938(62:4-63:8); A6026-A6027(77:1-15, 78:4-16); A12001; *see also* A5798(39:2-6); A5799(42:19-43:17); A5801(50:18-51:7); A5802(54:11-18); A5804-5805(65:7-11, 65:25-66:5); A5931(35:6-22); A5932(39:24-40:22). Indeed, they failed to establish via "proof of concept" that the claimed method could even *theoretically* work in WiFi. A5938(62:4-63:8); A6026-A6027(77:1-15, 78:4-16); A12001. That is "strong evidence" of non-enablement. *Ormco Corp. v. Align Tech., Inc.*, 498 F.3d 1307, 1319 (Fed. Cir. 2007) ("If an inventor attempts but fails to enable his invention in a commercial product that purports to be an embodiment of the patented invention, that is strong evidence that the patent specification lacks enablement."); *see also Enzo Biochem, Inc. v. Calgene, Inc.*, 188 F.3d 1362, 1372-1375 (Fed. Cir. 1999) (inventor's failed attempts to practice the invention showed non-enablement).

## IV.     THE DAMAGES AWARD IS UNSUSTAINABLE

### A.     Commil's Royalty Base Violated The Entire Market Value Rule

Commil offered the entire market value of Cisco's controllers and access

points—over $1.2 billion—as a royalty base. A6220(24:19-25:2). Those complex

products incorporate numerous non-infringing features, such as compliance with

WiFi wireless standards, encryption, security, and others. A6242-6243(112:20-

116:14); A6283-6285(96:11-103:3); A6285-6286(104:1-106:25). Accordingly, the

jury could only reasonably "assess damages based on the entire market value of the

accused product" if Commil demonstrated that the claimed methods "create[d] the

basis for customer demand or substantially create[d] the value" of Cisco's

products. *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318-1319 (Fed.

Cir. 2011); *see also* A6239(98:22-24); A6243(116:17-22).

Commil failed to meet that standard for at least four independent reasons.

First, a 2004 market survey showed that *security*, rather than any aspect of the

claimed method, was "the number one" feature for Cisco customers.

A6245(123:8-21); *see also* A6255(164:16-25). Bob O'Hara, who designed the

products, testified without contradiction that numerous other factors were essential

to customer demand. A6283-6285(96:11-103:3). Although Commil claimed that

the divided protocol was "a driving force" behind product sales (A6294(138:21-

139:8)), "important," or "a big deal" (A6306(34:4-35:8)), this does not show that

the patented method was "*the* basis for customer demand." *Uniloc*, 632 F.3d at

1318 (emphasis added). Because the products' value arose from a combination of

many different features, the patented method was not of such "paramount

importance that it substantially created the value of the component parts." *Rite-*

*Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1549 (Fed. Cir. 1995) (en banc).

Second, Commil "exacerbated the situation" when it repeatedly "implied a

relationship between the entire market value of [Cisco's] products and the patent."

*Uniloc*, 632 F.3d at 1320; *see* A6374(40:17-19) ("The sales of just the products

that embody the patented architecture feature ... are 1,275,000,000[.]"); *see also*

A6118(29:20-21) ("those billion dollars of sales"); A6119(30:5-7); A6122(43:14-

15). Commil went even further, mischaracterizing Cisco's controllers and access

points as "infringing products," even though Commil asserted only *method* claims.

A6116(21:15-21); A6220(24:21-25); A6231(66:6-7). Commil's repeated emphasis

of this theme was "in clear derogation of the entire market value rule." *Uniloc*,

632 F.3d at 1321.

Commil subsequently attempted to avoid the entire market value rule by

recasting the claimed invention as "cover[ing] ... a wireless communication *system*

comprising at least two base stations, at least one switch in communication with

the base stations." A2331 (emphasis added, internal quotation marks omitted); *see*

*also* A2362 ("infringing products"). But the patent does not cover a "system" or

"products"; it is limited to a particular *method* for communicating "[i]n a wireless communication system." A209. Commil could not use as a royalty base the entire value of unclaimed "products" in an unclaimed "system" that included many unpatented features. It was required to assign a value to the ability to divide a protocol according to the specific *method* claimed, and concededly did not do so. A6247-6248(133:19-134:8). Nor was there evidence of how many customers were using the products to practice the claimed method; rather, Commil admitted (and the court found) that the products had substantial non-infringing uses. A19; A6119(32:11-12).

Third, Commil cannot escape the entire market value rule by claiming that it accused the "smallest saleable unit[s]." A2334. Even if the accused products actually were the smallest saleable units (an argument never substantiated by evidence), that would not absolve Commil from complying with the entire market value rule. If the smallest product sold contains unpatented features and there is no proof that the claimed invention drives demand for that entire product, then the patentee must still "give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features." *Garretson v. Clark*, 111 U.S. 120, 121 (1884); *see also Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1337-1338 (Fed. Cir. 2009) (patentee could not use entire value of Microsoft's Outlook software as royalty base, even though

there was no indication that any smaller saleable item incorporated the claimed invention (a "date-picker" tool)); *Cornell Univ. v. Hewlett-Packard Co.*, 609 F. Supp. 2d 279, 285, 288-289 (N.D.N.Y. 2009) (Rader, J.) (improper to include unpatented components in royalty base without showing "a connection between consumer demand for that product and the patented invention").[13]

Finally, Commil's suggestion that the patent "substantially created" the value of the controllers and access points because those products "would not exist" without the patented method (A6247(132:14-15)) likewise fails. Even if that assertion were true, this Court has never ruled that the entire market value rule is satisfied merely because a patented feature is somehow essential to a product's existence. Complex products have *numerous* features that make essential contributions to their existence and value; a patent covering *one* such feature cannot command the value contributed by the others. *See Lucent*, 580 F.3d at 1337 (purpose of entire market value rule is "determining the correct (or at least approximately correct) value of the patented invention, when it is but one part or feature among many"). Cisco's products would not succeed if they were not, for example, WiFi compliant (A6283-6286(96:11-106:25)), yet Commil's royalty base

---

[13] Commil's expert admitted that even after "com[ing] down to the smallest salable unit that embodies the technology," if there was still "other value that was unassociated with the patented feature, then the entire market value rule would say that you should apportion the value to try to get to the value that's associated with the patented feature." A6247(130:14-21).

ascribed no value to that. The Court's precedents do not permit damages "unrelated to the claimed invention" that do not "compensat[e] for infringement but punish[] beyond the reach of the statute." *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010).

## B.    Commil's Royalty Rate Was Unsupported

Commil's royalty *rate* evidence was likewise flawed, relying on four supposedly "comparable" agreements, none of which had any "relationship to the claimed invention." *ResQNet.com*, 594 F.3d at 870. Moreover, Commil's expert based this rate on a summary of the "comparable" licenses' terms provided by a commercial service; he never reviewed a complete version of any of these four licenses. A6249(138:17-25). What little evidence was offered about the actual license terms demonstrated that the agreements were "radically different from the hypothetical agreement under consideration" or that it was impossible "to ascertain from the evidence presented the subject matter of the agreements" such that the jury cannot "have adequately evaluated the[ir] probative value." *Lucent*, 580 F.3d at 1327-1328.

Although Commil advocated a royalty rate of 5%, it relied on only one agreement with a rate that high. A6228(55:15-56:2). Commil's expert conceded, moreover, that that agreement provided an *exclusive* license, whereas the hypothetical negotiation would produce a (less expensive) *non-exclusive* license.

A6248(136:4-15, 137:14-16); *see Trell v. Marlee Electronics Corp.*, 912 F.2d 1443, 1447 (Fed. Cir. 1990) (vacating royalty award due to "apparent failure to consider the fact that the [asserted] license was exclusive"). He also conceded that this agreement covered the purchase of an entire product line (A6249(141:2-16)), as did each of the licenses he relied on (A12506-12519; A12520-12543; A12544-12547), thus "convey[ing] rights more broad in scope than those covered by [Commil's] patent." *ResQNet.com*, 594 F.3d at 871.[14]

The other licenses were similarly inapt. A license carrying a 2.5% rate was likewise exclusive (A6251(148:18-25)), another carrying a 3% rate was a related-party transaction (A6252(152:11-25, 153:14-22)), and the fourth, carrying a 1% rate, was only a small part of a large acquisition (A6254(158:6-10)). Commil's expert also lacked key information about the terms of the licenses on which he relied (*i.e.*, whether they were exclusive, involved related parties, or involved capped royalty amounts (A6251-6252(149:19-153:22); A6253(156:3-25)).[15]

---

[14] The royalty in this license was also capped at $500,000 (A6250(145:7-12)) and it was a related-party transaction (A6250(143:23-144:9)).

[15] Cisco's damages expert would have expanded on Commil's concessions about the flaws of these "comparable" licenses but for yet another improper ruling by the district court. Concluding that Cisco had produced certain publicly-available documents relating to those agreements too late, the court not only excluded the documents, but prevented Cisco's expert "from offering any testimony that's critical of the four license agreements that [Commil] relied on." A6276(69:13-15). As a result, Cisco's expert was unable to present conclusions that were disclosed in his expert report and presented at length in the first trial. *See*

These shortcomings require this Court to reject the proffered agreements, especially as a basis for choosing the *highest* rate (5%) disclosed in any of them. This is particularly so where Commil Limited was prepared to sell the patent-in-suit (and eight others) for only $1.2 million in 2004—less than a year before the hypothetical negotiation (A6235(82:19-83:16))—and where the patent (as well as another and twelve U.S. and foreign patent applications) were later sold for only $400,000 in 2007 (A6237(91:2-22)). There is no evidence, much less substantial evidence, that a hypothetical negotiation over a patent that was previously valued no higher than $1.2 million, and sold in a portfolio worth a third of that price, would have yielded a 5% royalty rate for a *non-exclusive license*, especially given that Commil identified no such agreement at all, let alone one "link[ed] ... to the infringed patent." *ResQNet.com*, 594 F.3d at 871.

## V.    THE DISTRICT COURT ERRED IN GRANTING A PARTIAL NEW TRIAL

### A.    The Court Erred In Granting A New Trial Based On Two Isolated Statements That Did Not Affect The Jury's Verdict

A new trial is authorized only if "after considering counsel's trial tactics as a whole, the evidence presented, and the ultimate verdict, the court concludes that 'manifest injustice' would result by allowing the verdict to stand." *Johnson v. Ford Motor Co.*, 988 F.2d 573, 582 (5th Cir. 1993). This exacting standard was

A5982-5983(58:3-64:9); A6295(142:6-23).

not met here.

The court based the partial new trial order on its conclusion that local counsel's cross-examination question of Mr. David and closing argument reference to the Bible were improper. Cisco does not deny—and has repeatedly acknowledged—that counsel's cross-examination statement was improper (A2142-2146; A5828(158:1-6); A5838(2:17-24)), and that the court was within its authority to ask counsel to apologize (which he did) and to issue a curative instruction (which it did). But two isolated statements in the heat of a five-day trial are no basis for disregarding a jury verdict and ordering a new trial. Moreover, the district court did not consider the overall context of the trial, evidence, and verdict, nor did it determine whether the jury's consideration of the case was in fact affected by the improper statements—a difficult conclusion to reach given that the first jury found almost entirely in Commil's favor.

In the Fifth Circuit, "a new trial will not be granted, even if counsel's remarks are improper, unless after considering the record as a whole the court concludes that manifest injustice would result from letting the verdict stand." *Gautreaux v. Scurlock Marine, Inc.*, 84 F.3d 776, 783 (5th Cir. 1996). This is particularly the case where the statements drew no objection from the opposing party: "[I]mproper argument may be the basis for a new trial where no objection has been raised only 'where the interest of substantial justice is at stake.'" *Hall v.*

*Freese*, 735 F.2d 956, 961 (5th Cir. 1984) (quoting *Edwards v. Sears, Roebuck & Co.*, 512 F.2d 276, 286 (5th Cir. 1975)); *see also United States v. Morin*, 627 F.3d 985 (5th Cir. 2010).

Here the improper cross-examination question was followed by a prompt apology and an unsolicited curative instruction that was more than sufficient to counteract any possible prejudice to Commil. The new trial order also assumed, without citing any evidence, that these two statements provoked religiously-motivated hostility towards Commil or its witnesses, but ignored the fact that it was Commil's own counsel who first, and repeatedly, referenced religion and Israel before the jury. *See* A5714(24:14-21); A5718(41:13-18); A5782(147:14-15, 148:9-10, 149:5-6); A5819(122:11-12, 125:5-10, 125:11-24). Moreover, the court ignored the fact that the first jury found in Commil's favor on all but one issue and awarded $3.7 million in damages (A135-139), and apparently agreed that the jury was able to discharge its duties impartially with regard to the invalidity and direct infringement issues, on which it denied JMOL, "giving proper deference to the jury's findings" (A19). The court did not attempt to explain how the jury could be impartial with respect to some issues but not others. Finally, the court did not even mention, let alone analyze, the evidence relating to indirect infringement and damages, and never explained why the jury's supposed prejudice would manifest itself only with respect to these two issues, much less how the jury's finding of no

indirect infringement was against the weight of the evidence or how the damage award was in any way inappropriate.[16]

Where, as here, there is no indication that improper comments had any effect on the jury, the Fifth Circuit has found such comments insufficient to order a new trial. For example, the Fifth Circuit disapproved statements about the opposing party's ethnicity and what "we" will tolerate in the United States, but affirmed denial of a new trial because the improper comments did not "permeate[] counsel's argument" and "[i]n light of the entire record and the jury's ultimate verdict," no "manifest injustice" occurred. *Alaniz v. Zamora-Quezada*, 591 F.3d 761, 778-779 (5th Cir. 2009); *see also Mills v. Beech Aircraft Corp.*, 886 F.2d 758, 765 (5th Cir. 1989). *Hall v. Freese*, the case on which the district court relied in support of its new trial order (A7), is not to the contrary; in *Hall*, the court refused to order a new trial "on the basis of [improper] remarks alone," ordering a new trial only "because after reading the record, evaluating the evidence, reviewing the tactics of counsel, considering the unfair argument of counsel, and evaluating the ultimate verdict of the jury," it found that "manifest injustice" would result by allowing the verdict to

---

[16] The court refused to rule on Cisco's JMOL motions on indirect infringement and damages, concluding that these motions were moot in light of the new trial order. A17. This was also error; a grant of a new trial does not decide the completely different question whether a reasonable factfinder *could* have found in Commil's favor, regardless of any alleged prejudice. *Cf.* Fed. R. Civ. P. 50(c)(1).

stand. 735 F.2d at 961-962. The district court here conducted no such inquiry.

There was no reason to think that the first jury's verdict resulted from improper prejudice, as opposed to a permissible evaluation of the evidence. Especially given the Fifth Circuit's "somewhat broader review ... [of] orders that [g]rant new trials" in order "to assure that the judge does not simply substitute his judgment for that of the jury, thus depriving the litigants of their right to trial by jury," *Conway*, 610 F.2d at 362-363, the district court's unsupported new trial ruling was an abuse of discretion.

### B.    The Court Erred In Forbidding Retrial Of Invalidity And Direct Infringement

Even if ordering a new trial had been proper—and it was not—the district court erred in limiting the retrial to indirect infringement and damages, and not the closely-related issues of direct infringement and validity. Partial retrials violate the Seventh Amendment "unless it *clearly* appears that the issue to be retried is so *distinct and separable* from the others that a trial of it alone may be had without injustice." *Gasoline Prods.*, 283 U.S. at 500 (emphasis added). Accordingly, "where the issues subject to retrial are so interwoven with other issues in the case that they cannot be submitted to the jury ... without confusion and uncertainty, which would amount to a denial of a fair trial, then it is proper to grant a new trial on all of the issues raised." *Anderson v. Siemens Corp.*, 335 F.3d 466, 475-476 (5th Cir. 2003).

In this case, indirect infringement and damages are not "distinct and separable" from direct infringement and validity—they are inextricably intertwined. "[A]rguments against infringement are indistinguishably woven with the factual underpinnings of the validity and enforceability determinations." *Witco Chem. Corp. v. Peachtree Doors, Inc.*, 787 F.2d 1545, 1549 (Fed. Cir. 1986). Non-infringement and invalidity are particularly interrelated here, where Commil's inducement claim required it to show that Cisco was aware that the patent was infringed, which required knowledge of the patent's validity. *Supra* pp. 41-42. Validity was anything but "distinct and separable" from Cisco's defense of Commil's indirect infringement claim. Indeed, in arguing that Cisco should be prevented from presenting evidence of its good-faith belief of the patent's invalidity in the second trial, Commil expressed concern that "the jurors will hear Cisco devote a significant amount of time to attacking the validity of the patent but will then receive a verdict form that makes no mention of validity" (A2297), only underscoring the unfairness and confusion that resulted from the partial new trial.

The district court was also wrong to conclude that Cisco waived its constitutional challenge to the partial new trial. A11-12. Courts "do not presume acquiescence in the loss of fundamental rights." *Ohio Bell Tel. Co. v. Public Utilities Comm'n*, 301 U.S. 292, 307 (1937); *see also Fuentes v. Shevin*, 407 U.S. 67, 95 (1972) ("[A] waiver of constitutional rights in any context must, at the very

least, be clear."). Where, as here, an alleged waiver concerns the core

constitutional right to trial by jury, "courts indulge every reasonable presumption

against waiver." *Aetna Ins. Co. v. Kennedy*, 301 U.S. 389, 393 (1937); *see also*

*Johnson v. Zerbst*, 304 U.S. 458, 464 (1938). Cisco explicitly opposed Commil's

new trial motion on the ground that, to the extent counsel's statements prejudiced

the jury at all, the effect could not have been limited to only a few of several

intertwined issues. A2055. Once the court ordered a new trial that clearly violated

Cisco's rights, Cisco promptly moved for reconsideration asserting the

constitutional violation. A2152-2171. Accordingly, this Court can and should

correct the district court's erroneous grant of a partial new trial.

## CONCLUSION

This Court should reverse the district court's judgment and direct judgment

of non-infringement, invalidity, and/or no damages. In the alternative, this Court

should set the new trial order aside and direct judgment on the first jury verdict, or

else direct retrial of all issues.

Respectfully submitted,

HENRY B. GUTMAN
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017
(212) 455-2000

JEFFREY E. OSTROW
HARRISON J. FRAHN IV
PATRICK E. KING
JONATHAN SANDERS
SIMPSON THACHER & BARTLETT LLP
2550 Hanover Street
Palo Alto, CA 94304
(650) 251-5000

WILLIAM F. LEE
MARK C. FLEMING
JONATHAN W. ANDRON
FELICIA H. ELLSWORTH
WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000

WILLIAM G. MCELWAIN
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, DC 20006
(202) 663-6000

*Counsel for Defendant-Appellant Cisco Systems, Inc.*

February 15, 2012

# ADDENDUM

# Table of Contents

| Tab | Description | Pages |
|-----|-------------|-------|
| 1 | Claim Construction Order (Nov. 6, 2009) | A1-A3 |
| 2 | Memorandum Opinion and Order granting Motion for New Trial (Dec. 29, 2010) | A4-A7 |
| 3 | Memorandum Opinion and Order denying Motion for Reconsideration or Clarification of New Trial Order (Feb. 23, 2011) | A8-A16 |
| 4 | Order regarding Cisco's Motions for Judgment as a Matter of Law (Feb. 25, 2011) | A17-A21 |
| 5 | Order regarding Motions *in Limine* (Apr. 1, 2011) | A25-A27 |
| 6 | Final Judgment (May 20, 2011) | A30-A31 |
| 7 | Amended Final Judgment (Sept. 28, 2011) | A32-A33 |
| 8 | Memorandum Opinion and Order addressing post-judgment motions (Sept. 28, 2011) | A34-A36 |
| 9 | Jury Verdict Form (May 17, 2010) | A135-A139 |
| 10 | Jury Verdict Form (Apr. 8, 2011) | A162- A164 |
| 11 | United States Patent No. 6,430,395 | A165- A209 |

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

MARSHALL DIVISION

| | | |
|---|---|---|
| COMMIL USA, LLC | § | |
| Vs. | § | CIVIL ACTION NO. 2:07CV341 |
| CISCO SYSTEMS, INC. | § | |

## ORDER

The court issues this order to resolve the parties' claim construction disputes and to facilitate the parties' trial preparation.

1.      The court defines "mobile unit" as "a wireless communication device."

2.      The court defines "Base Station" to mean "transmitting/receiving station in a wireless local network that is fixed in location."

3.      The court defines "Switch" as "an apparatus for routing telephone calls." The patentee acted as his own lexicographer, and the court adopts the definition found in the glossary. *See Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1380 (Fed. Cir. 2009)("Here, Martek explicitly defined the term 'animal' in the '244 patent . . . . That definition controls.").

4.      The court defines "communication protocol" as "a set of procedures required to initiate and maintain communication between two or more devices."

5.      The court defines "a short-range communication protocol" to mean "a set of procedures required to initiate and maintain short-range communication between two or more devices." The court concludes that one of skill in the art would be able to ascertain the boundaries of the claim and

that the use of the term "short-range" in the claim does not render the claim insolubly ambiguous.

6.     The court defines "accurate time synchronization" to mean "the state of two devices, each having an internal clock, wherein the calculated time of one clock is equivalent to the other clock's time with a precision commonly found in such devices."

7.     The court rejects the parties' efforts to define the terms "low-level protocol" and "high-level protocol" in the abstract, as the balance of the claim language sufficiently defines these terms. The court rejects the defendants' argument that the terms are defined by where the communication protocol is located. Rather, a "low-level protocol for performing tasks that require accurate time synchronization" means "a protocol for performing tasks that require accurate time synchronization or real time capabilities." A "high level protocol which does not require accurate time synchronization" means "a protocol for performing tasks that do not require accurate time synchronization or real time capabilities."

8.     The court defines "connected" to mean "in wireless communication with."

9.     The court defines "for each connection of a mobile unit with a Base Station, running an instance of the low-level protocol at the Base Station connected with the mobile unit and running an instance of the high-level protocol at the Switch" to mean "for each connection of a mobile unit with a Base Station, running at the Base Station a copy of the low-level protocol supporting only that connection and running at the Switch a corresponding separate copy of the high-level protocol supporting only that connection." The language of the claim requires the running of an instance "*for each connection* of a mobile unit with a Base Station." '395 patent, claim 1 (emphasis added). The claim language, read in light of the specification, supports the defendants' construction of this limitation. *See* '395 patent, 15:39-52; Fig. 8A.

2

**A2**

10.     The phrase "handling of many instances of the protocol" appears in dependent claim 3.  In view of the other constructions provided herein, the court concludes that this claim language needs no further construction.

        SIGNED this 6th day of November, 2009.


                                    CHARLES EVERINGHAM IV
                                    UNITED STATES MAGISTRATE JUDGE

3

**A3**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| COMMIL USA, LLC | § | |
| | § | |
| vs. | § | CASE NO. 2:07-CV-341 |
| | § | |
| CISCO SYSTEMS, INC. | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the court is the plaintiff Commil USA, LLC's ("Commil") motion for new trial on issues of indirect infringement and damages (Dkt. No. 353). Commil argues that, during the trial of this case, the defendant Cisco System, Inc.'s ("Cisco") counsel made various comments that served to engender prejudice against Commil's owner and the inventors of the patent-in-suit. Commil contends that these statements prejudiced its right to a fair trial. As such, Commil requests that the court grant a new trial on the issues of indirect infringement and damages. After carefully considering the parties' arguments, the court is of the opinion that Cisco's counsel's statements regarding religious preferences were improper, and as such, the court GRANTS Commil's motion for new trial.

I.      **Background**

On May 11, 2010, a jury trial commenced in this case. On May 17, 2010, the case was submitted to the jury, and the jury returned a verdict finding that U.S. Patent No. 6,430,395 ("'395 Patent") was valid and that Cisco had directly infringed the patent. The jury, however, did not find that Cisco had induced infringement of the '395 Patent. The jury awarded Commil $3,726,207 to compensate for Cisco's direct infringement. On June 21, 2010, Commil filed this motion for new trial on the issues of indirect infringement and damages.

## II.    Legal Standard

Pursuant to Federal Rule of Civil Procedure 59(a) the court "may, on motion, grant a new trial on all or some of the issues–and to any party . . . after a jury trial for any reason for which a new trial has heretofore been granted in an action at law in federal court . . ." FED. R. CIV. P. 59(a). The regional circuit law applies to motions for new trials. *See Riverwood Intern. Court v. R.A. Jones & Co., Inc.*, 324 F.3d 1346, 1352 (Fed. Cir. 2003). In the Fifth Circuit, "[t]he decision to grant or deny a motion for a new trial is within the discretion of the trial court and will not be disturbed absent an abuse of discretion or a misapprehension of the law." *Prytania Park Hotel, Ltd. v. General Star Indem. Co.*, 179 F.3d 169, 173 (5th Cir. 1999).

The Fifth Circuit has explained that "awards influenced by passion and prejudice are the antithesis of a fair trial." *Whitehead v. Food Max of Miss., Inc.*, 163 F.3d 265, 276 (5th Cir. 1998). In *Hall v. Freese*, the Fifth Circuit concluded that irrelevant attorney argument meant to appeal to the jury's biases and prejudices about a particular person's status justified a new trial. *Hall v. Freese*, 735 F.2d 956 (5th Cir. 1984). The court, however, warned that when no objection is raised during trial, improper attorney argument may be the basis for a new trial only 'where the interest of substantial justice is at stake.'" *Id.* at 961 (quoting *Edwards v. Sears, Roebuck & Co.*, 512 F.2d 276, 286 (5th Cir. 1975)). In determining whether to grant a new trial based on improper attorney argument, the court must consider "the comments of counsel, the counsel's trial tactics as a whole, the evidence presented, and the ultimate verdict." *Alaniz v. Zamora-Quezada*, 591 F.3d 761, 776 (5th Cir. 2009) (quoting *Mills v. Beech Aircraft Corp.*, 886 F.2d 758, 765 (5th Cir. 1989)). The court need not find that each individual statement was so improper as to justify a new trial, but only that the totality of the remarks prejudiced the jury's findings. *Whitehead*, 163 F.3d at 278.

2

**A5**

III.   **Analysis**

Commil bases its motion for new trial on, among other things, inappropriate comments made by Cisco's counsel during trial. Jonathan David, one of the owners of Commil and its client representative, is Jewish. While cross-examining Mr. David, Cisco's counsel inquired whether Mr. David had met with Nitzan Arazi, one of the inventors on the '395 Patent, while in Marshall, Texas for the trial. Mr. David responded affirmatively, explaining that they had had dinner at a barbeque restaurant, to which Cisco's counsel inexplicably responded: "I bet not pork." Trial Transcript, May 12, 2010 (morning session), at 146:23. When the court asked Cisco's counsel to explain the relevance of his comment, Cisco's counsel admitted that it had no relevance to any issue in the case. *Id.* at 158:2-6. Thereafter, Cisco's counsel apologized to the witness, and the court gave a curative instruction.

Although Cisco's counsel acknowledged that his pork comment was inappropriate, he nevertheless proceeded to make further remarks regarding religious practices. Cisco's counsel's closing argument began:

> Ladies and Gentlemen of the Jury, you are, in this case, truth-seekers. You are charged with the most important job in this courtroom, and that's determining the truth
>
> . . .
>
> And when you figure out what the truth is, you'll know how to answer that verdict form. You remember the most important trial in history, which we all read about as kids, in the Bible had that very question from the judge. What is truth?

Trial Transcript, May 17, 2010 (afternoon session), at p. 16:1-16. Cisco's counsel was referring to the trial of Jesus, which was presided over by Pontius Pilate. This argument, when read in context with Cisco's counsel's comment regarding Mr. David and Mr. Arazi's religious heritage, impliedly aligns Cisco's counsel's religious preference with that of the jurors and employs an "us v. them" mentality – i.e., "we are Christian and they are Jewish."

3

**A6**

When these comments are considered as a whole, the court concludes that the comments prejudiced the jury's findings regarding indirect infringement and damages. These comments had a tendency to appeal to the prejudices of the jurors. *See Hall*, 735 F.2d at 960-61. As such, even though no objections were made to these remarks, the court is convinced that the jury's verdict is inconsistent with substantial justice, and Commil's motion for new trial is GRANTED.

## IV.    Conclusion

For the forgoing reasons, the court GRANTS Commil's motion for new trial on the issues of indirect infringement and damages (Dkt. No. 353). Jury selection for the new trial on indirect infringement and damages is set for April 4, 2011 at 9:00 a.m., and the pre-trial conference is set for March 24, 2011 at 9:30 a.m.

SIGNED this 29th day of December, 2010.

CHARLES EVERINGHAM IV
UNITED STATES MAGISTRATE JUDGE

4

A7

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

COMMIL USA, LLC                  §
                                 §
vs.                              §            CASE NO. 2:07-CV-341
                                 §
CISCO SYSTEMS, INC.              §

## MEMORANDUM OPINION AND ORDER

### I.    Introduction

Pending before the court are defendant Cisco Systems, Inc.'s ("Cisco") motions for: (1) reconsideration or, in the alternative, clarification of the court's order granting a new trial on the issues of indirect infringement and damages (Dkt. No. 362); and (2) certification of the new trial order for interlocutory appeal (Dkt. No. 368). For the reasons discussed below, the court DENIES the motions.

### II.   Factual and Procedural Background

On December 29, 2010, the court issued a memorandum opinion and order granting plaintiff Commil USA, LLC's ("Commil") motion for new trial on the issues of indirect infringement and damages. The court concluded that Cisco's counsel's statements regarding religious preference were improper and that the jury's verdict was inconsistent with substantial justice. The court incorporates by reference the factual and procedural background as discussed in its December 29, 2010 opinion.

### III.  Discussion

#### A.    Reconsideration

Motions for reconsideration serve a very limited purpose: "allowing a party to correct manifest errors of law or fact or to present newly discovered evidence." *Templet v. HydroChem*

*Inc.*, 367 F.3d 473, 479 (5th Cir. 2004) (quoting *Waltman v. Int'l Paper Co.*, 875 F.2d 468, 473 (5th Cir. 1989)); *AMP Plus, Inc. v. Texas Instruments, Inc.*, No. Civ.A.3:04CV2636-R, 2006 WL 522108 at *2 (N.D. Tex. 2006) (quoting *Texas Instruments, Inc. v. Hyundai Elecs. Indus., Co.*, 50 F.Supp.2d 619, 621 (E.D. Tex. 1999)). A Rule 59(e) motion for reconsideration "calls into question the correctness of a judgment." *Templet*, 367 F.3d at 479 (quoting *In re Transtexas Gas Corp.*, 303 F.3d 571, 581 (5th Cir. 2002)). Such a motion "is not the proper vehicle for rehashing evidence, legal theories, or arguments that could have been offered or raised before the entry of judgment." *Id.* (citing *Simon v. United States*, 891 F.2d 1154, 1159 (5th Cir.1990). "Reconsideration of a judgment after its entry is an extraordinary remedy that should be used sparingly." *Id.*

Rule 60(b) sets out five specific bases for granting relief from a final order: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence; (3) fraud, misrepresentation or misconduct of an adverse party; (4) the judgment is void; and (5) satisfaction, discharge or release of the judgment. FED. R. CIV. P. 60(b). In addition, Rule 60(b)(6) provides that a court may relieve a party from a final judgment for "any other reason justifying relief from the operation of the judgment." FED. R. CIV. P. 60(b)(6). This "any other reason" clause is a "grand reservoir of equitable power" to do justice in a case when relief is not warranted by the five enumerated grounds – such relief "will be granted only if 'extraordinary circumstances' are present." *AMP Plus*, 2006 WL 522108 at *2 (quoting *Batts v. Tow-Motor Forklift Co.*, 66 F.3d 743, 747 (5th Cir. 1995)).

In its motion for reconsideration, Cisco seeks reconsideration under Rules 59(e) and 60(b)(6) of the court's order granting a new trial. Cisco argues that the court committed numerous manifest legal errors in its order. First, Cisco argues that the court's order is

inconsistent with the Fifth Circuit's recent decision in *U.S. v. Morin*, 627 F.3d 985, 1000 (5th Cir. 2010). Second, Cisco argues that the court's finding of partial prejudice (i.e., the court concluded that the jury's verdict was tainted only as to indirect infringement and damages – not direct infringement and invalidity) is belied by the factual record and conflicts with binding precedent. Finally, Cisco argues that if the court does not grant its motion for reconsideration, then the court should clarify the scope of its new trial order by: (1) ordering Commil to refrain from making reference to the damages verdict rendered in the first trial; (2) preventing Commil from reasserting the contributory infringement claims it withdrew during the first trial; and (3) confirming that the court will not instruct the jury that certain issues have already been decided in another trial.

      i.    *The Fifth Circuit's Decision in Morin*

Cisco argues that the Fifth Circuit's recent decision in *U.S. v. Morin*, 627 F.3d 985, 1000 (5th Cir. 2010), requires that the court deny Commil's motion for new trial. In *Morin*, the court addressed whether to grant a new trial based on an unsubstantiated suggestion that the defendant had contacted "'other drug dealers.'" *Id.* Despite finding that the prosecutor's question was "obviously improper," the Fifth Circuit declined to disturb the district court's conclusion that the question did not affect the defendant's substantial rights. The court first reiterated the long-standing principle that "the trial judge's on-the-scene assessment of the prejudicial effect [of an improper remark], if any, carries considerable weight." *Id.* (quoting *United States v. Munoz*, 150 F.3d 401, 415 (5th Cir.1998)). The court then explained that the record in *Morin* supported the district court's conclusion because the prosecutor's improper comment "was a solitary, isolated event." *Id.* Moreover, the court noted that the prosecutor "never attempted to raise the line of questioning again and did not refer to the question in closing." *Id.* Finally, the court found that

3

**A10**

the trial judge "further 'mitigated the prejudicial effect' of the question through general instructions admonishing the jury that the remarks of the attorneys are not evidence and that the jurors must base their decision on evidence." *Id.* (quoting *Munoz*, 150 F.3d at 415). After considering the totality of the evidence arrayed against Morin and giving considerable weight to the trial judge's conclusions regarding the prejudicial effect of the prosecutor's remark, the court concluded that the "isolated question did not affect the jury's verdict." *Id.*

The court is not persuaded that the Fifth Circuit's decision in *Morin* requires that this court reconsider its decision to grant a new trial in this case. As the *Morin* court noted, this court is in the best position to evaluate the prejudicial effect of Cisco's counsel's improper comments on Commil's substantial rights and the jury's verdict. The court did just that and concluded that the prejudicial effect warranted a new trial. As such, the court concludes that the totality of the record justifies this court's decision to grant a new trial.

      ii.   *Partial Prejudice*

As the court explained in its order granting a new trial, the jury found for Commil on validity and direct infringement and awarded Commil 3.7 million in damages. The jury, however, found that Cisco did not induce infringement of the patent-in-suit. Commil requested that the court evaluate the prejudicial effect of Cisco's counsel's improper religious comments on the issues of induced infringement and damages. The court did so and granted Commil's motion for new trial on those issues.

Cisco's argument that the record does not support the court's conclusion that Cisco's counsel's improper statements prejudiced only the issues of induced infringement and damages was already rejected by the court when it granted the motion for new trial. *AMP Plus*, 2006 WL 522108 at *2 ("a motion for reconsideration is not 'the proper vehicle for rehashing old

4

**A11**

arguments'"). As mentioned above, this court is in the best position to evaluate the prejudicial effect of Cisco's counsel's improper religious comments on Commil's substantial rights and the jury's verdict. *The court is not persuaded that it committed a manifest error of law or fact in granting the partial new trial.* Therefore, the court denies Cisco's motion for reconsideration on the grounds that the court's finding of partial prejudice is unsupported by the record. *Id.*

Furthermore, the court concludes that Cisco waived its arguments[1] that controlling precedent precludes the court's finding of partial prejudice. *Templet*, 367 F.3d at 479 (stating that a motion for reconsideration "is not the proper vehicle for rehashing evidence, legal theories, or arguments that could have been offered or raised before the entry of judgment.") As pointed out by Commil in its reply brief to its motion for new trial (Dkt. No. 355), Cisco's response to the motion for new trial never contested Commil's contention that if the court granted a new trial, that trial should be limited to the issues of indirect infringement and damages. In addition, Cisco forwent its opportunity to file a surreply brief, where it had another chance to make the very arguments it now advances in its motion for reconsideration. *See* Local Rule CV-7(f). As such, the court rejects Cisco's argument that the court should reconsider its decision to grant a partial new trial on the grounds that the court's decision is in conflict with binding precedent.[2]

    iii.   *Clarification of New Trial Order*

In its request for clarification, Cisco asks the court to issue an order: (1) directing Commil to refrain from making reference to the damages verdict rendered in the first trial; (2)

---

[1] This includes Cisco's arguments that: (1) Federal Circuit case law precludes a finding of partial prejudice with respect to related infringement and validity issues; (2) binding Fifth Circuit case law precludes a finding of partial prejudice whenever the issues are inextricably "interwoven"; and (3) binding Fifth Circuit case law precludes a finding of partial prejudice where the jury has rendered a compromise verdict.

[2] In its motion for reconsideration, Cisco includes what is seemingly a motion for judgment as a matter of law, arguing that any new trial on inducement would be futile as a matter of law. To the extent that Cisco seeks affirmative relief in the form of a judgment as a matter of law, such relief is improper at this juncture.

preventing Commil from reasserting the contributory infringement claims it withdrew during the first trial; and (3) confirming that the court will not instruct the jury that certain issues have already been decided in the first trial. Although Commil represents that it will not reference the prior jury's verdict on damages and will not revive its claim for contributory infringement, Commil argues that it is premature to take up these issues and suggests that they can be more properly addressed in a motion in limine or at the final pre-trial conference. The court agrees with Commil and concludes that the court will be in the best position to address these issues at the final pre-trial conference.

### B.    Certification

In its motion for certification, Cisco argues that the court's order granting a new trial is subject to immediate appeal under 28 U.S.C. § 1292(b). An order is appropriate for certification if (1) it involves a controlling question of law, (2) as to which there is substantial ground for difference of opinion, and (3) an immediate appeal may materially advance the ultimate termination of the litigation. *Litton Systems, Inc. v. Raytheon Co.*, Misc. No. 344, 1992 WL 276681, *2 (Fed. Cir. 1992); *see also Clark-Dietz and Associates-Engineers, Inc. v. Basic Const. Co.*, 702 F.2d 67, 69 (5th Cir. 1983). Satisfying these three statutory criteria is not always sufficient, "as district court judges have unfettered discretion to deny certification even when all three are satisfied." *Marsall v. Portland*, No. CV-01-1014-ST, 2004 WL 1774532, at *1 (D. Or. Aug. 9, 2004) (internal quotations omitted); *see also Gallimore v. Miss. Pac. R.R.*, 635 F.2d 1165, 1168 (5th Cir. 1981) ("[t]his court's denial of...[a petition for certification]...may be for any of a number of reasons largely unrelated to the perceived merits of the order sought to be appealed from, particularly in the context of interlocutory appeals from orders granting new trials.")

6

**A13**

Cisco contends that the court's order involves multiple controlling questions of law as to which there are substantial grounds for difference of opinion, including: (1) whether the court's grant of a new trial on only two of many closely related issues is inconsistent with controlling precedent; (2) whether it is permissible to instruct the new jury that Cisco has already been found to directly infringe the patent-in-suit or that the patent has already been deemed valid; and (3) whether the court's grant of a new trial is appropriate in light of *Morin*, 627 F.3d at 1000.

First, considering that the court has concluded that Cisco waived its argument that the court's grant of a partial new trial is contrary to controlling precedent, the court denies Cisco's motion to certify this issue for appeal. Second, the court is not convinced that any issues regarding the court's prospective jury instructions are subject to substantial grounds for difference of opinion. Generally, substantial grounds for difference of opinion are found where:

> a trial court rules in a manner which appears contrary to the rulings of all Courts of Appeals which have reached the issue, if the circuits are in dispute on the question and the Court of Appeals of the circuit has not spoken on the point, if complicated questions arise under foreign law, or if novel and difficult questions of first impression are presented.

*DuPree v. Kaye*, Civil Action No. 3:07-CV-0768-B ECF, 2008 WL 294532, *3 (N.D. Tex. 2008) (citing 24 AM. JUR. 2D APPELLATE REVIEW § 123 (2007)). Courts have even found "a question of first impression, standing alone, insufficient to demonstrate a substantial ground for difference of opinion." *In re Flor*, 79 F.3d 281, 284 (2nd Cir. 1996). The satisfaction of this requirement is reserved for "difficult and pivotal questions of law not settled by controlling authority." *Caraballo-Seda v. Municipality of Hormigueros*, 395 F.3d 7, 9 (1st Cir. 2005). The court is not persuaded that the present case meets this requirement, and therefore, denies Cisco's motion to certify any issues regarding the court's prospective jury instructions.

7

**A14**

Finally, because the issue of whether the court's grant of a partial new trial was appropriate in light of *Morin* does not involve a pure question of law, the court denies Cisco's motion to certify the issue for interlocutory appeal. *U.S. v. Morin*, 627 F.3d 985, 1000 (5th Cir. 2010). Certification is proper only in circumstances involving a pure issue of law – i.e., a question the appellate court can efficiently decide without making an intensive inquiry into the record. *See Pittway Corp. v. Fynetics, Inc.*, 9 F.3d 977 (Fed. Cir. 1993) ("[f]or proper certification, it is necessary 'that the order involve a clear-cut question of law against a background of determined and immutable facts.'"); *Raber v. Pittway Corp.*, 17 F.3d 1444 (Fed. Cir. 1993) ([g]iven the limited applicability of the question and its connection with the facts of this case, we do not consider this order appropriate for immediate review...."); *Smith v. AET Inc., Ltd.*, Civil Action Nos. C-07-123, C-07-124, C-07-126, 2007 WL 1644060, *6 (S.D. Tex. 2007) (concluding that the orders were not appropriate for interlocutory review because the "arguments set forth in regard to both appealed orders are heavily fact-based and necessarily involve a review of the factual record."). The issue of whether the <u>facts</u> of *Morin* are sufficiently similar to the <u>facts</u> of this case is a prime example of an issue that would require the appellate court to make an intensive inquiry into the record of this case. Cisco's argument to the contrary is untenable in light of the fact that it spent a substantial portion of its motion for reconsideration *exploring the facts of Morin and then applying those facts to the record in this case.* As such, the court denies Cisco's motion for certification of this issue.

**IV.    Conclusion**

For the foregoing reasons, the court DENIES Cisco's motions for: (1) reconsideration or, in the alternative, clarification of the court's order granting a new trial on the issues of indirect infringement and damages (Dkt. No. 362); and (2) certification of the new trial order for

8

interlocutory appeal (Dkt. No. 368).  The court is not persuaded that it committed a manifest

error of law in granting Commil's motion for partial new trial on the issues of indirect

infringement and damages.  Furthermore, the court is not convinced that the issues presented for

appeal meet the requirements of 28 U.S.C. § 1292(b).

SIGNED this 23rd day of February, 2011.


CHARLES EVERINGHAM IV
UNITED STATES MAGISTRATE JUDGE

9

**A16**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| COMMIL USA, LLC | § | |
| | § | |
| vs. | § | CASE NO. 2:07-CV-341 |
| | § | |
| CISCO SYSTEMS, INC. | § | |

## ORDER

### I.   INTRODUCTION

Pending before the court are defendant Cisco Systems, Inc.'s ("Cisco") motions for judgment as a matter of law ("JMOL") of non-infringement (Dkt. Nos. 323 and 334) and invalidity (Dkt. No. 333). Also pending before the court are Cisco's motions for JMOL on damages (Dkt. Nos. 324 and 332).[1] The motions are GRANTED-in-part and DENIED-in-part. The court DENIES Cisco's motions for JMOL on the issues of direct infringement and validity because the court concludes that sufficient evidence supports the jury's verdict on these issues. Furthermore, considering that the court has granted a new trial on the issues of indirect infringement and damages (Dkt. No. 361), the court DENIES Cisco's motions for JMOL on those issues as moot. The court, however, GRANTS Cisco's motion for JMOL on the issue of contributory infringement.

### II.   FACTUAL AND PROCEDURAL BACKGROUND

On May 11, 2010, a jury trial commenced in this case. On May 17, 2010, the case was submitted to the jury, and the jury returned a verdict finding that Cisco had directly infringed U.S. Patent No. 6,430,395 ("'395 Patent"). The jury, however, did not find that Cisco had

---

[1] Cisco filed its first two motions for JMOL on the issues of non-infringement and damages on May 13, 2010 at the close of Commil's case-in-chief (Dkt. Nos. 324 and 323). The court denied those motions, except with respect to contributory infringement (Dkt. No. 350 at 93). Cisco then renewed its motions for JMOL on the issues of non-infringement and damages, and filed its motion for JMOL on invalidity, on May 17, 2010. (Dkt. Nos. 332, 333, and 334).

induced infringement of the '395 Patent. Furthermore, the jury failed to find the '395 Patent invalid. The jury awarded Commil $3,726,207 to compensate for Cisco's direct infringement.

## III.    LEGAL STANDARD

JMOL may be granted only if "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on [an] issue." FED. R. CIV. P. 50(a)(1). A motion for JMOL is a procedural issue not unique to patent law; thus, such motions are reviewed under the law of the regional circuit. *Summit Tech., Inc. v. Nidek Co.*, 363 F.3d 1219, 1223 (Fed. Cir. 2004). In the Fifth Circuit, JMOL may not be granted unless "there is no legally sufficient evidentiary basis for a reasonable jury to find as the jury did." *Hiltgen v. Sumrall*, 47 F.3d 695, 700 (5th Cir. 1995) (internal citation omitted). In ruling on a renewed motion for JMOL, the court may allow judgment on the verdict, if the jury returned a verdict, order a new trial, or direct the entry of judgment as a matter of law. FED. R. CIV. P. 50(b). The court reviews all the evidence in the record and must draw all reasonable inferences in favor of the nonmoving party; however, a court may not make credibility determinations or weigh the evidence, as those are solely functions of the jury. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000).

## IV.    DISCUSSION

### A.    Non-Infringement

Cisco argues that it is entitled to JMOL that it does not directly infringe the asserted claims of the '395 Patent and that it did not induce or contribute to infringement thereof (Dkt. Nos. 323 and 334). Cisco contends that the evidence demonstrates that its products do not practice every step of the method claimed in the '395 Patent because: (i) for each connection of a mobile device with an access point, the accused Cisco products do not run a separate copy of the

2

**A18**

low-level protocol at the access point and a separate copy of the high-level protocol at the controller supporting only that connection; (ii) 802.11 plus LWAPP/CAPWAP is not a "short-range communication protocol"; and (iii) Cisco's products do not split the accused protocol based on accurate time synchronization or real-time requirements. Furthermore, Cisco contends that even if its products did meet each of the limitations of the asserted claims of the '395 Patent, the evidence establishes that there is no single, direct infringer and Commil did not meet its burden of proof of showing that Cisco and its customers jointly infringe the claims of the '395 Patent. Finally, Cisco argues that Commil failed to put forth sufficient evidence to support a verdict of indirect infringement.

The court has reviewed the arguments of counsel and the evidence in the record. Giving proper deference to the jury's findings, the court concludes that Cisco has not shown that JMOL of non-infringement is warranted. Furthermore, the court has granted Commil's motion for new trial on the issue of indirect infringement (Dkt. No. 361). As such, the court denies Cisco's motion for JMOL that it did not induce infringement of the '395 Patent as moot. The court, however, concluded during the initial trial that there was no legally sufficient evidentiary basis for a reasonable jury to find contributory infringement and, therefore, granted Cisco's motion for JMOL on that issue. Therefore, the court grants Cisco's renewed motion for JMOL on the issue of contributory infringement.

B.    **Validity**

Cisco argues that it is entitled to JMOL that all asserted claims of the '395 Patent are invalid for failure to comply with the written description and enablement requirements of 35 U.S.C. § 112 ¶ 1 (Dkt. No. 333). Section 112 requires that the patent specification "contain a written description of the invention, and of the manner and process of making and using it, in

3

**A19**

such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same." The Federal Circuit recently reaffirmed that this portion of § 112 contains two independent requirements: the written description requirement and the enablement requirement. *See generally Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336 (Fed. Cir. 2010). The written description requirement is tested by asking whether the specification "reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Ariad*, 598 F.3d at 1351 (citing *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1563 (Fed. Cir. 1991)). The enablement requirement of § 112 requires that the disclosure in the specification enable one of skill in the art to make and use the full scope of the claimed invention without undue experimentation. *In re Wright*, 999 F.2d 1557, 1561 (Fed. Cir. 1993).

Cisco argues that the '395 Patent does not satisfy the requirements of § 112 because (1) it fails to adequately describe the full scope of the claimed invention, such that one of skill in the art would appreciate that the inventors had possession of the invention at the time the '395 Patent application was filed, and (2) it fails to enable the full scope of the claimed invention such that one of ordinary skill in the art would have been able to make and use the invention based on the teaching of the specification without undue experimentation. According to Cisco, clear and convincing evidence presented at trial shows that the '395 Patent fails to meet the written description and enablement requirements, and therefore, no reasonable juror could find the '395 Patent to be valid.

The court is not persuaded by Cisco's invalidity arguments. The court has carefully considered the arguments of counsel and the evidence in the record and concludes that the jury had sufficient evidence to support its verdict that the '395 Patent meets the written description

4

**A20**

and enablement requirements of § 112.  As such, the court denies Cisco's motion for JMOL that the '395 Patent is invalid.

### C.    Damages

Finally, Cisco argues that it is entitled to JMOL on damages (Dkt. Nos. 324 and 332). The court has granted Commil's motion for new trial on the issue of damages (Dkt. No. 361). Therefore, the court denies Cisco's motion for JMOL on damages as moot.

## V.    CONCLUSION

Cisco's motions for JMOL are GRANTED-in-part and DENIED-in-part.  The court has found that sufficient evidence supports the jury's verdict of direct infringement and validity, and therefore, the court DENIES Cisco's motions for JMOL on those issues.  Furthermore, because the court has granted Commil's motion for new trial on the issues of indirect infringement and damages, the court DENIES Cisco's motions for JMOL on those issues.  The court, however, GRANTS Cisco's motion for JMOL on the issue of contributory infringement.

SIGNED this 25th day of February, 2011.

CHARLES EVERINGHAM IV
UNITED STATES MAGISTRATE JUDGE

5

A21

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

COMMIL USA, LLC                   §
                                  §
vs.                               §            CASE NO. 2:07-CV-341
                                  §
CISCO SYSTEMS, INC.               §

## ORDER

Pending before the court are the parties' motions in limine (Dkt. Nos. 383 and 384) and

Commil's motion for leave to exceed the fifteen page limit imposed on its motion in limine (Dkt.

No. 385). The court GRANTS Commil's motion to exceed the fifteen page limit on its motion in

limine. The court's rulings with regard to the parties' various motions in limine are detailed

below.

**Plaintiff's Motions in Limine:**

- *Motions Number 1 – 3*: Granted-in-Part and Denied-in-Part. The parties are not permitted

  to argue that the patent-in-suit is limited to telephone calls, Telephony, or Bluetooth. The

  parties' damages experts, however, can opine as to the primary application of the patent-

  in-suit.

- *Motion Number 4*: Granted-in-Part and Denied-in-Part. The motion is granted to the

  extent that Cisco may not argue that it does not directly infringe the patent-in-suit. Cisco

  may, however, present evidence that it had a good faith belief that it did not infringe the

  patent-in-suit. Furthermore, Cisco may adduce evidence and argue that its consumers do

  not directly infringe the patent-in-suit. Finally, Cisco may argue that it had a good-faith

  belief that its customers did not directly infringe the patent-in-suit and that it did not

  induce its customers to engage in any such infringement.

- *Motion Number 5*: Denied.

- *Motion Number 6*: Granted. Cisco may not adduce any evidence that it had a good faith belief that the patent was invalid.

- *Motion Number 7*: Carried.

- *Motion Number 8*: Carried.

- *Motion Number 9*: Denied.

- *Motion Number 10*: Granted.

- *Motion Number 11*: Granted.

- *Motion Number 12*: Granted.

- *Motion Number 13*: Granted-in-Part and Denied-in-Part.  Granted to the extent that Cisco may not refer to Commil as a "patent troll."

- *Motion Number 14*: Denied.

- *Motion Number 15*: Granted.

- *Motion Number 16*: Denied.

- *Motion Number 17*: Granted.

**Defendant's Motions in Limine:**

- *Motion Number 1*: Carried.

- *Motion Number 2*: Granted.

- *Motion Number 3*: Granted-in-Part and Denied-in-Part.   The motion is granted with respect to subparts "b" and "c."  The motion, however, is denied with respect to subpart "a" dealing with the display of the patent-in-suit.

- *Motion Number 4*: Denied.

- *Motion Number 5*: Denied.

**A26**

- *Motion Number 6*: Carried.

- *Motion Number 7*: Granted.

- *Motion Number 8*: Denied.

SIGNED this 1st day of April, 2011.


CHARLES EVERINGHAM IV
UNITED STATES MAGISTRATE JUDGE

3

**A27**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| COMMIL USA, LLC | § | |
| | § | |
| vs. | § | CASE NO. 2:07-CV-341 |
| | § | |
| CISCO SYSTEMS, INC. | § | |

## FINAL JUDGMENT

On May 11, 2010, a jury trial commenced in this case. On May 17, 2010, the case was submitted to the jury, and the jury returned a verdict finding that defendant Cisco Systems, Inc. ("Cisco") had directly infringed claims 1, 4, and 6 of U.S. Patent No. 6,430,395 ("'395 Patent") (*See* Dkt. No. 335). The jury, however, did not find that Cisco had induced infringement of the '395 Patent. Furthermore, the jury failed to find the '395 Patent invalid. The jury awarded plaintiff Commil USA, LLC ("Commil") $3,726,207 to compensate for Cisco's direct infringement.

Subsequent thereto, Commil filed a motion for new trial on the issues of induced infringement and damages and the court granted Commil's motion (Dkt. No. 361). The new trial began on April 5, 2011. On April 8, 2011, the case was submitted to the jury, and the jury returned a verdict finding that Cisco had induced infringement of claims 1, 4, and 6 of the '395 Patent (Dkt. No. 422). The jury awarded Commil $63,791,153 to compensate for Cisco's induced infringement.

Accordingly, it is ORDERED, ADJUDGED, AND DECREED that Cisco directly infringed and induced infringement of claims 1, 4, and 6 of the '395 Patent and that those claims are valid. It is further ORDERED, ADJUDGED, AND DECREED that Commil recover from Cisco the amount of Sixty-three Million Seven Hundred Ninety-one Thousand One Hundred

Fifty Three Dollars ($63,791,153) in actual damages.  The court severs all claims for future damages and directs Commil to file a new complaint with the clerk of court within fourteen (14) days from the date of this judgment should Commil desire to seek an award of future royalties.

All other motions are DENIED.  Costs of court are taxed against Cisco.  This is FINAL JUDGMENT.

SIGNED this 20th day of May, 2011.


CHARLES EVERINGHAM IV
UNITED STATES MAGISTRATE JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| COMMIL USA, LLC | § | |
| | § | |
| vs. | § | CASE NO. 2:07-CV-341 |
| | § | |
| CISCO SYSTEMS, INC. | § | |

## AMENDED FINAL JUDGMENT

On May 11, 2010, a jury trial commenced in this case. On May 17, 2010, the case was submitted to the jury, and the jury returned a verdict finding that defendant Cisco Systems, Inc. ("Cisco") had directly infringed claims 1, 4, and 6 of U.S. Patent No. 6,430,395 ("'395 Patent") (*See* Dkt. No. 335). The jury, however, did not find that Cisco had induced infringement of the '395 Patent. Furthermore, the jury failed to find the '395 Patent invalid. The jury awarded plaintiff Commil USA, LLC ("Commil") $3,726,207 to compensate for Cisco's direct infringement.

Subsequent thereto, Commil filed a motion for new trial on the issues of induced infringement and damages and the court granted Commil's motion (Dkt. No. 361). The new trial began on April 5, 2011. On April 8, 2011, the case was submitted to the jury, and the jury returned a verdict finding that Cisco had induced infringement of claims 1, 4, and 6 of the '395 Patent (Dkt. No. 422). The jury awarded Commil $63,791,153 to compensate for Cisco's induced infringement.

Accordingly, it is ORDERED, ADJUDGED, AND DECREED that Cisco directly infringed and induced infringement of claims 1, 4, and 6 of the '395 Patent and that those claims are valid. It is further ORDERED, ADJUDGED, AND DECREED that Commil recover from Cisco the amount of Sixty-three Million Seven Hundred Ninety-one Thousand One Hundred

A32

Fifty Three Dollars ($63,791,153) in actual damages.

It is further ORDERED, ADJUDGED, AND DECREED that Commil recover from Cisco prejudgment interest in the amount of Ten Million Two Hundred Ninety-five Thousand Three Hundred Eighty-six Dollars and Thirty-two Cents ($10,295,386.32).

It is further ORDERED, ADJUDGED, AND DECREED that Commil recover from Cisco post-judgment interest at the lawful federal rate.

It is further ORDERED, ADJUDGED, AND DECREED that Commil recover from Cisco the amount of Seventeen Thousand Seven Hundred Thirty Seven Dollars and Ninety Eight Cents ($17,737.98) as costs.

This is a FINAL JUDGMENT.  All other pending motions are DENIED.

SIGNED this 28th day of September, 2011.


CHARLES EVERINGHAM IV
UNITED STATES MAGISTRATE JUDGE

2

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| COMMIL USA, LLC | § | |
| vs. | § | CIVIL ACTION NO. 2:07-CV-341 |
| CISCO SYSTEMS, INC. | § | |

## MEMORANDUM OPINION AND ORDER

This memorandum opinion addresses various post-judgment motions filed by the parties.

1.    The plaintiff's motion to amend final judgment (Dkt. No. 440) to include an award of pre-judgment interest and court costs is GRANTED.  In its discretion, the court awards pre-judgment interest in the amount of $10,295,386.32, which is the amount sought by Plaintiff, including the daily rate since the motion was filed.  Historically, rather than using a higher rate and distributing the interest over the entire damages period, the court has utilized a low interest rate and computed the interest to run from the date of first infringement on the entire damages award.  *See, e.g., Medtronic Vascular, Inc. v. Boston Scientific Corp.*, No. 2-06-CV-78 (TJW), 2009 WL 175696 (E.D. Tex. January 23, 2009).  This methodology should provide full compensation to the plaintiff.  Cisco's methodology would apply the same low rate, but it would distribute the interest over the entire time of the hypothetical license.  In the court's view, this would be insufficient to "ensure the patent owner is placed in as good a position as he would have been in had the infringer entered into a reasonable royalty agreement." [1] *General Motors Corp. v. Devex*, 461 U.S. 648, 655-56 (1983).  The judgment shall also bear interest at the lawful federal rate and shall include an award of court costs.

---

[1]    Had Cisco entered a license, Plaintiff might have earned a higher rate of interest than under the commercial paper rate.  To illustrate, under Cisco's proposed methodology, the total award of pre-judgment interest at the rate set by the Texas pre-judgment interest statute would have approached ten million dollars.

To clarify the procedure for claims of future damages, the court severs any claim for future damages and directs the plaintiff to file a new suit in cause number 2:11-CV-417 to recover damages accruing since January 29, 2011. The complaint shall be filed within fourteen (14) days from the date of entry of this order. Any filing fees and *pro hac vice* fees are waived as to the new cause number. That case is stayed pending the disposition of any appeal in the present case, except that Cisco shall file quarterly sales reports for the period beginning January 30, 2011, identifying the number of units sold with regard to Cisco's products found to infringe the '395 patent and the gross sales revenue for such units in the United States, and made in the United States and sold abroad during the respective periods. Cisco is granted leave to make such filings under seal in the new case with a copy to plaintiff's counsel. The clerk shall docket a copy of this order in the new case.

2.    Commil's amended bill of costs (Dkt. No. 461) is APPROVED-in-PART and REJECTED-in-PART. The court awards costs in the amount set forth in Exhibit A to Cisco's objections to Commil's amended bill of costs (Dkt. No. 470). Local Rule 54(b)(2) requires that if there is a contested bill of costs containing areas of legitimate disputes, the "party seeking costs must file a bill of costs indicating areas of agreement and disagreement." Commil's bill of costs fails to comply with this rule. Rather than strike the bill of costs in its entirety, however, the court sustains all of Cisco's objections to the amended bill of costs. The court taxes costs in the amount of $17,737.98.

3.    Cisco's renewed motion for judgment as a matter of law or, in the alternative, for a new trial on non-infringement (Dkt No. 466) is DENIED. The court is persuaded that sufficient evidence supports the jury's verdict in this case. Likewise, Cisco's renewed motion for judgment as a matter of law or alternatively a new trial on invalidity (Dkt. No. 467) is DENIED.

The original jury had a sufficient reason for rejecting Cisco's invalidity positions, and sufficient evidence supports that verdict. Cisco's invalidity expert testified to the first jury "I didn't say it was invalid" and also stated "I don't know" when asked whether the '395 patent was valid. *See* Dkt. No. 348 at 91. The verdict was not so against the great weight of the evidence that a new trial is justified. Finally, Cisco's renewed motion for judgment as a matter of law on damages or, in the alternative, for a new trial or to modify the judgment and for remittitur (Dkt. No. 468) is DENIED. Sufficient evidence supports the jury's damages award in this case.

4.      Cisco's motion for new trial (Dkt. No. 469) is DENIED. The court is not persuaded it erred when it granted a partial new trial in this case for the reasons previously outlined in the record of this case. The exclusions of portions of the damages expert's testimony and the proffered substantive exhibits were proper for the reasons outlined in the record. The court also does not find its questioning of Cisco's witness to merit a new trial. Finally, as to the court's jury instructions, Cisco has not shown that a new trial is warranted. Accordingly, the motion for new trial is denied.

        SIGNED this 28th day of September, 2011.


                                         CHARLES EVERINGHAM IV
                                         UNITED STATES MAGISTRATE JUDGE


**A36**

## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | | |
|---|---|---|
| COMMIL USA, LLC | § | |
| | § | |
| vs. | § | CASE NO. 2:07-CV-341-CE |
| | § | |
| CISCO SYSTEMS, INC. | § | |

## VERDICT FORM

**QUESTION NO. 1:**

Do you find that Commil has proven, by a preponderance of the evidence, that Cisco has directly infringed claims 1, 4, and 6 of U.S. Patent No. 6,430,395 ("the '395 patent")?

For Cisco's accused products, answer "Yes" or "No" for each claim.

Claim 1:    _____YES_____

Claim 4:    _____YES_____

Claim 6:    _____YES_____

2

A136

**QUESTION NO. 2:**

Do you find that Commil has proven, by a preponderance of the evidence, that Cisco has

induced infringement of claims 1, 4, and 6 of U.S. Patent No. 6,430,395 ("the '395 patent")?

For Cisco's accused products, answer "Yes" or "No" for each claim.

Claim 1: _____ *NO* _____

Claim 4: _____ *NO* _____

Claim 6: _____ *NO* _____

3

**QUESTION NO. 3**

Do you find that Cisco has proven, by clear and convincing evidence, that any of the following claims of the '395 patent are invalid for lack of enablement or for failure to satisfy the written description requirement?  "Yes" means the claims are invalid, and "No" means the claims are not invalid.

A.       Because it is not enabled?

Answer "Yes" or "No" for each claim.

Claim 1:      _NO_____

Claim 4:      _NO_____

Claim 6:      _NO_____

B.       Because it lacks a sufficient written description?

Answer "Yes" or "No" for each claim.

Claim 1:      _NO_____

Claim 4:      _NO_____

Claim 6:      _NO_____

4

**A138**

*If you have found any of the claims infringed and valid (i.e., you have answered "yes" to any of the claims in question numbers 1 or 2 and "no" to both sections of question number 3 for the corresponding claim), then answer question number 4.  Otherwise, do not answer the following question; the jury foreperson should instead sign and date this Verdict Form and return it to the Security Officer.*

**QUESTION NO. 4:**

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate the plaintiff as a reasonable royalty for any infringement you have found?

Answer in dollars and cents, if any, for a reasonable royalty.

Answer:  $3,726,207.

Signed this _17_ day of May, 2010.

5

**A139**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

COMMIL USA, LLC                    §
                                   §
vs.                                §        CASE NO. 2:07-CV-341-CE
                                   §
CISCO SYSTEMS, INC.                §

**VERDICT FORM**

**QUESTION NO. 1:**

Do you find that Commil has proven, by a preponderance of the evidence, that Cisco has induced infringement of claim 1, 4, or 6 of U.S. Patent No. 6,430,395 ("the '395 patent")?

For Cisco's accused products, answer "Yes" or "No" for each claim.

Claim 1: _____yes_____

Claim 4: _____yes_____

Claim 6: _____yes_____

2

*If you have found any of the claims infringed (i.e., you have answered "yes" to any of the claims in question number 1), then answer question number 2. Otherwise, do not answer the following question; the jury foreperson should instead sign and date this Verdict Form and return it to the Security Officer.*

**QUESTION NO. 2:**

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate

the plaintiff as a reasonable royalty for any infringement you have found?

Answer in dollars and cents, if any, for a reasonable royalty.

Answer: $63,791,153.

Signed this _8th_ day of April, 2011.

3

A164



US006430395B2

(12) **United States Patent**　　　(10) Patent No.: **US 6,430,395 B2**
Arazi et al.　　　　　　　　　　　(45) Date of Patent:　　Aug. 6, 2002

(54) **WIRELESS PRIVATE BRANCH EXCHANGE (WPBX) AND COMMUNICATING BETWEEN MOBILE UNITS AND BASE STATIONS**

(75) Inventors: **Nitzan Arazi**, Ramat Hasharon; **Yaron Soffer**, Nes-Ziona; **Haim Barak**, Kfar Saba, all of (IL).

(73) Assignee: **Commil Ltd.**, Ramat Hasharon (IL).

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: 09/784,109

(22) Filed: Feb. 16, 2001

**Related U.S. Application Data**

(60) Provisional application No. 60/195,219, filed on Apr. 7, 2000, and provisional application No. 60/208,306, filed on Jun. 1, 2000.

(51) Int. Cl.[7] ................................................. H04B 5/00
(52) U.S. Cl. ......................... 455/41; 455/426; 455/432; 455/562; 370/347; 370/466
(58) Field of Search ........................... 455/555, 561, 455/560, 41, 436, 554, 426, 562, 446, 449, 432, 557, 502; 370/331, 347, 466, 467, 469; 709/268, 223

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 5,353,331 A | 10/1994 | Emery et al. |
| 5,469,496 A | 11/1995 | Emery et al. |
| 5,506,887 A | 4/1996 | Emery et al. |
| 5,579,379 A | 11/1996 | D'Amico et al. |
| 5,610,972 A | 3/1997 | Emery et al. |
| 5,664,005 A | 9/1997 | Emery et al. |
| 5,734,699 A | 3/1998 | Lu et al. |
| 5,758,281 A | 5/1998 | Emery et al. |
| 5,818,824 A | 10/1998 | Lu et al. |
| 5,845,211 A | 12/1998 | Roach |

| | | | |
|---|---|---|---|
| 5,887,256 A | 3/1999 | Lu et al. | |
| 5,896,375 A | * | 4/1999 | Dent et al. ............... 370/347 |
| 5,911,120 A | 6/1999 | Jarett et al. | |
| 5,913,163 A | 6/1999 | Johansson | |
| 5,960,344 A | 9/1999 | Mahany ................. 455/432 |
| 5,999,813 A | 12/1999 | Lu et al. | |
| 6,005,856 A | 12/1999 | Jensen et al. | |
| 6,011,978 A | 1/2000 | Emery et al. | |
| 6,021,138 A | 2/2000 | Lee | |
| 6,047,177 A | 4/2000 | Wickman | |
| 6,058,106 A | 5/2000 | Cudak et al. | |
| 6,069,588 A | 5/2000 | O'Neill | |
| 6,163,546 A | * | 12/2000 | Sipila ................. 370/466 |
| 6,175,860 B1 | * | 1/2001 | Gaucher .............. 709/208 |
| 6,226,515 B1 | * | 5/2001 | Pauli et al. ........... 455/426 |

* cited by examiner

*Primary Examiner*—Tracy Legree
(74) *Attorney, Agent, or Firm*—Mark M. Friedman

(57) **ABSTRACT**

Methods to create a cellular-like communication system, such as a Wireless Private Branch Exchange (WPBX), which includes mobile devices such as standard cordless phones (handsets), particularly mobile devices utilizing the Bluetooth short-range wireless communication protocol. The methods provide seamless and reliable handoff of sessions between Base Stations while the mobile device is moving between picocells, by implementing a high-level of synchronization between the Base Stations and the Switch. Base Stations of picocells having small coverage areas communicate with the handsets. The communication protocol is divided into a low-level protocol performed by the Base Stations and a high-level protocol performed by the Switch connected to all the Base Stations. The methods support mobile computing or telephony devices and communication protocols, which are not specified to handle handoffs of sessions while moving between Base Stations coverage areas in a data, voice or telephony wireless network.

**12 Claims, 24 Drawing Sheets**



Commil USA, LLC v. Cisco Systems, Inc. and Aruba Networks, Inc

**DTX 0501**

Case No. 2:07-CV-341-CE

DTX 0501-0001



Figure 1

Figure 2

DTX 0501-0002

Figure 3A



Figure 3B



DTX 0501-0003

Figure 4



Figure 22



DTX 0501-0004



Fig. 5

DTX 0501-0005

Fig. 5
(Continued)



Fig. 6



DTX 0501-0007

Fig. 7



Fig. 7
(Continued)



DTX 0501-0009

## Figure 8A



A174

## Figure 8B



DTX 0501-0011



Figure 9A

Figure 9B

Figure 9C

DTX 0501-0012



Figure 10



Figure 11

A177

Fig. 12





Fig. 13

U.S. Patent

Aug. 6, 2002

Sheet 14 of 24

US 6,430,395 B2

DTX 0501-0015

Figure 14A





Figure 14B



Figure 14C



Figure 14D

DTX 0501-0017





DTX 0501-0018



Fig. 16A

DTX 0501-0019

Fig. 16B



DTX 0501-0020



Figure 17A



Figure 17B



Figure 18



Figure 19

DTX 0501-0022



Figure 20



Figure 21

DTX 0501-0023



Fig. 23

DTX 0501-0024

Figure 24



US 6,430,395 B2

## 1

# WIRELESS PRIVATE BRANCH EXCHANGE (WPBX) AND COMMUNICATING BETWEEN MOBILE UNITS AND BASE STATIONS

This application claims benefit of Provisional No. 60/195,219 filed Apr. 7, 2000 and claims benefit of Provisional No. 60/208,306 filed Jun. 1, 2000.

## TECHNICAL FIELD OF THE INVENTION

The invention relates to wireless communications systems having a plurality of mobile units (devices) having the ability to connect short-range with a plurality of Base Stations, and techniques for handing off a mobile unit from one Base Station to another when the mobile unit moves between areas of coverage of neighboring Base Stations.

## BACKGROUND OF THE INVENTION

The effective range of a mobile device, such as a cordless handset, from its Base Station is limited by its transmission power and by the receiver sensitivity of the mobile device and the Base Station. Wireless Private Branch Exchange (WPBX) systems address this limitation by using more than one Base Station (BS). The area that a Base Station covers is called a cell. In the main, hereinafter, mobile units (devices) that are cordless (telephone) handsets are discussed.

In a WPBX, the Base Stations are interconnected in order to allow handsets that are in different cells to communicate with one another. When a handset moves from one cell to another during a call, the handoff (or handover) of communication from one Base Station to another Base Station enables uninterrupted communication. A central unit that is usually called the "Switch" is connected to all the Base Stations. The Switch controls the operation of the system, routes the call to Base Stations and to Gateways, which connect the WPBX to external communication systems. The transmission power of a cordless handset in the WPBX is usually lower than the transmission power of the handset of a standard cellular system, which results in a WPBX for cordless handsets having much smaller cells (referred to as mini-cells, or micro-cells or picocells) than the cells of a standard cellular system.

Some cordless handsets use communication protocols that are also used in cellular system, but they transmit in a lower power than a mobile (cellular) handset. For examples protocols in use are GSM and IS-136. According to these protocols the handoff between cells is performed by collaboration of the cordless handset, the Base Stations and the Switch. These handsets can connect to the WPBX when they are in its coverage area, and can also connect to any other cellular system that supports the communication protocol that they are using.

Some handsets use communication protocols that were designed especially to allow communication with WPBX. Some examples are DECT, CT-2, PAC, and PACS. The handset is usually a dedicated handset that is used only in the area covered by the WBPX.

Some handsets have dual mode support. For example a handset may communicate with the WPBX using DECT, and may allow communication with other cellular systems using GSM.

Some WPBXs use standard cordless handsets. These handsets have no special mechanism to support the handoff between cells. In these systems the Switch and the Base Stations perform the handoff, and the handset is not aware

## 2

of (does not participate actively in) the handoff process. When a standard cordless handset moves from one cell to another the Switch routes the call to another cell. Since cordless phones use "simple" protocols, for example an analog fixed transmission, when the call is routed to the new cell, the cordless phone automatically will receive it.

During the last years short-range communication protocols have become much more complicated. Very low power is used in order to allow many systems to operate in close vicinity. Complex transmissions methods like frequency hopping and spread spectrum are used in order to overcome interference, and improve the communication quality. Digital communication methods are used allowing communication of data and voice on the same system. Error correction encoders are used in order to improve reliability. Security and privacy of the communication is improved with the use of Digital authentication and encryption.

Short-range communication systems are used for many purposes. A growing trend for short-range communication usage is Personal Area Network (PAN) devices and applications, among such is the "all in one handset" and applications. Such type of handset supports standard cellular communication, and also has the ability to communicate with personal area network devices that are in its near vicinity, using short-range communication. Some PAN short-range communication standards were not designed to allow mobility, i.e. they were not designed to allow handoff in between Base Stations in general and during an active session in particular. This limits a session via such device to be linked to a single Base Station and therefore to very limited area.

The "Bluetooth" standard is a short-range wireless communication standard that has many uses for voice applications and telephony (e.g. cordless phone, wireless headsets) and also for data applications (laptop to personal computer communication, wireless local area network Gateways etc.). The Bluetooth wireless technology is implemented using a universal radio interface in the 2.45 GHz frequency band that enables portable electronic devices to connect and communicate wirelessly via short-range, ad hoc networks. Each unit can simultaneously communicate with up to seven other units per piconet. Moreover, each unit can simultaneously belong to several piconets.

Bluetooth connection is planned to be standard feature in future cellular handsets, Personal Digital Assistants (PDAs), Palmtop and Laptop computers. The Bluetooth standard does not support mobility between Base Stations, since it was primarily designed for short-range communication as a cable replacement. A cellular handset with Bluetooth wireless technology will be able to operate as a cordless phone, but only in the near vicinity of a single Base Station. The same limitation applies to mobile personal data devices such as PDA's and mobile computers.

## GLOSSARY

Unless otherwise noted, or as may be evident from the context of their usage, any terms, abbreviations, acronyms or scientific symbols and notations used herein are to be given their ordinary meaning in the technical discipline to which the invention most nearly pertains. The following glossary of terms is intended to lend clarity and consistency to the various descriptions contained herein, as well as in prior art documents:

DTX 0501-0026

US 6,430,395 B2

3

| ATM | Asynchronous Transfer Mode |
|---|---|
| BER | Bit Error Rate |
| Bluetooth | short-range wireless communications standard/interface protocol |
| BS | Base Station |
| CPU | Central Processing Unit |
| CRC | Cyclic Redundancy Check |
| CT-2 | a communication protocol |
| DECT | Digital Enhanced Cordless Telephone communication protocol |
| DN | Destination Number |
| ECHO | a response to a PING |
| FIFO | First In, First Out |
| FTP | File Transfer Protocol |
| Gateway | an interface for communications between dissimilar services |
| GHz | GigaHertz |
| GSM | Global System for Mobile Communication |
| handoff | transfer of mobile devices from one Base Station to another Base Station |
| ID | Identification (number) |
| IEEE 802.2 | Ethernet protocol |
| IS-136 | communication protocol |
| ISDN | Integrated Services Digital Network |
| ITU-T 802.15 | a communication standard similar to the Bluetooth standard |
| ITU-T Q.931 | a telephony protocol for call setup |
| IVR | Interactive Voice Response |
| LAN | Local Area Network |
| LMSE | Least Mean Square Error |
| MSC | Mobile Switching Center (MSC) |
| PAC | a communication protocol |
| PACS | a communication protocol |
| PAN | Personal Area Network |
| PBX | Private Branch Exchange |
| PABX | Private Automatic Branch Exchange (also referred to as PBX) |
| PDA | Personal Digital (or Data) Assistant |
| picocell | a coverage area of a short-range Base Station |
| PING | a command which is sent, soliciting a response |
| PPP | Point-To-Point Protocol |
| PSTN | Public Switched Telephone Network |
| RF | Radio Frequency |
| SNR | Signal-to-Noise Ratio |
| Switch | Apparatus for routing telephone calls |
| TOD | Time Of Day |
| WAP | Wireless Application Protocol |
| WPBX | Wireless Private Branch Exchange |

## SUMMARY OF THE INVENTION

A general object of the invention is to provide a technique for allowing mobile units (devices) such as standard cordless telephone handsets and PDA (Personal Digital Assistant), laptop or notebook computers or similar devices that support wireless communication (such as Bluetooth wireless technology) to seamlessly connect to a Wireless Private Branch Exchange (WPBX), or to a standard (wired) PBX or to a LAN or to a cellular telephone network or to a standard wired telephone network, thereby avoiding the use of special (typically expensive) handsets or attachments or software or hardware agents, with the abovementioned mobile devices.

According to the present invention there is provided, in a wireless communication system comprising at least two Base Stations, at least one Switch in communication with the Base Stations, a method of communicating between mobile units and the Base Stations comprising: dividing a communication protocol into a low-level protocol for performing tasks that require accurate time synchronization and a high-level protocol which does not require accurate time synchronization; and for each connection of a mobile unit with a Base Station, running an instance of the low-level protocol at the Base Station connected with the mobile unit and running an instance of the high-level protocol at the Switch.

4

According to the present invention there is provided, in a wireless communication system comprising a Base Station connected with a mobile unit, a method of synchronizing at least one neighboring Base Station to the Base Station connected with the mobile unit comprising: from the Base Station connected with the mobile unit, sending call parameters and rough synchronization information to the at least one neighboring Base Station; and at the at least one neighboring Base Station, monitoring transmissions of at least one of: the Base Station connected with the mobile unit; the mobile unit; and a beacon signal from a beacon transmitter which is within range of the at least one neighboring Base Station and the Base Station connected with the mobile unit.

According to the present invention there is provided, in a wireless communication system comprising a plurality of Base Stations and at least one Switch in communication with the Base Stations, a method of synchronizing at least one neighboring Base Station to a Base Station connected with a mobile unit comprising: from the Base Station connected with the mobile unit, periodically transmitting during a selected time interval with higher transmission power than during normal transmission; and receiving the transmission with higher transmission power at the least one neighboring Base Station.

According to the present invention there is provided, in a wireless communication system comprising a Base Station connected with a mobile unit, a method of detecting the presence of a specific mobile unit in a coverage area of at least one neighboring Base Station, comprising: the Base Station connected with the mobile unit provides, to the at least one neighboring Base Station, information about the connection with the mobile unit, including rough TOD and a device address for the mobile unit; at the at least one neighboring Base Station, receiving information and generating a list of frequencies in which the mobile unit is likely to transmit; and at the at least one neighboring Base Station, checking for a signal transmitted by the mobile unit.

According to the present invention there is provided a method for detecting a mobile unit by a Base Station, wherein frequency-hopping is used to communicate between Base Stations and mobile units, comprising: at a Base Station that is connected to a mobile unit, periodically yielding a hop; and during the hop which has been yielded by the Base Station connected with the mobile unit, communicating with the mobile unit from at least one neighboring Base Station.

According to the present invention there is provided, in a wireless communication system comprising a Base Station connected with a mobile unit, a method of detecting a handset by at least one Base Station which is waiting for the mobile unit to enter its coverage area, comprising: from the at least one Base Station waiting for the mobile unit to enter its coverage area and the Base Station connected with the mobile unit, sending a PING command to the mobile unit; and at the Base Station waiting for the mobile unit to enter its coverage area, receiving an ECHO reply from the mobile unit.

According to the present invention there is provided, in a wireless communication system comprising at least two Base Stations, at least one Switch in communication with the Base Stations, and at least one mobile unit, a method of communicating with the mobile unit and a neighboring Base Station, comprising: smoothing a plurality of signals received from a handset by a plurality of Base Stations; comparing the

A191

US 6,430,395 B2

5

signals with one another; and selecting a Base Station for handoff based on signal quality.

According to the present invention there is provided, in a wireless communication system comprising at least two Base Stations and at least one Switch in communication with the Base Stations, a method of performing handoff of a session from a Base Station connected with a mobile unit to a neighboring Base Station, wherein an instance of a low-level communications protocol is running at the Base Station connected with the mobile unit, comprising: at the Switch, determining when to perform handoff to a selected one of the neighboring Base Stations; at the selected one of the neighboring Base Stations, creating a copy of the low-level communications protocol, including at least a synchronized time of day (TOD) parameter; from the Switch, sending a command to stop communication with the mobile unit at a specified TOD to the Base Station connected with the mobile unit and sending a command to start communication with the mobile unit at the specified TOD to the selected one of the neighboring Base Stations; and updating session status tables in the Switch and in the Base Stations.

According to the present invention there is provided, in a wireless communication system comprising a Base Station connected with a mobile unit, a method of detecting and synchronizing with the mobile unit prior to receiving a handoff of a session with the mobile unit, comprising: from the Base Station connected with the mobile unit, sending rough synchronization information to at least one neighboring Base Station; at the neighboring Base Station, performing a wide-range search for "target" signals having the correct timing for a mobile unit, based on the rough synchronization information provided by the Base Station which is connected with the mobile unit; narrowing the search for an actual signal from the mobile unit; acquiring the target signal; and synchronizing the neighboring Base Station to the Base Station connected with the mobile unit.

According to the present invention, a system comprises one or more mobile units such as standard cordless handsets, two or more Base Stations, and at least one Switch. The Base Stations are connected to one another and to the Switch. The handsets communicate directly with the Base Stations, rather than with one another.

According to an aspect of the present invention, the Base Stations and Switch communicate directly with one another, rather than, for example, over the PSTN. However, the system may interface with the PSTN, the Internet or a LAN, or with a PBX via a Gateway.

According to a feature of the present invention, a method is provided for handing off calls from a one Base Station to another (neighboring) Base Station, with mobile units (e.g., standard cordless handsets) that do not support connection to more than one Base Station and that do not support mobility with seamless handoff between Base Stations. This is an important feature because the mobile device uses complicated digital communication methods, so simple handoff methods that only the Switch supports are inadequate. Rather, the Switch and Base Stations cooperate with one another for the handoff operation. Accurate synchronization of Base Stations facilitates handoff. Advantageously, the handoff operation does not require explicit cooperation between the mobile device and the Base Stations.

According to an aspect of the present invention, a method is provided for dividing the short-range communication protocol that is used by the handset between high-level protocols which do not need accurate time synchronization and low-level protocols which have strict time synchroni-

6

zation requirements (require accurate time synchronization). The low-level protocols are performed by the Base Stations, and the high-level protocols are performed in the Switch. This enables handoff to be performed even when complex (e.g. frequency hopping, encryption, authentication) and multi-level protocols are used. This also reduces the synchronization requirements between Base Stations.

According to an aspect of the present invention, a method is provided for accurately synchronizing the Base Stations and, more particularly, for synchronizing the Base Stations when frequency-hopping communication is used.

According to an aspect of the present invention, a method is provided for detecting the presence of a mobile device in the coverage area of a Base Station (i.e., its picocell).

According to an aspect of the present invention, a method is provided for determining when to perform handoff of a session (i.e., a phone call, a data link, etc.), and to which Base Station to hand the session, by measuring signal quality at the Base Stations. This method is effective, even when complex transmission methods are used.

The methods disclosed herein are not limited to the communication of a certain type of data. Hence, they can be utilized for telephony applications and for data applications.

Other objects, features and advantages of the invention will become apparent in light of the following description thereof.

BRIEF DESCRIPTION OF THE DRAWINGS

Reference will be made in detail to preferred embodiments of the invention, examples of which may be illustrated in the accompanying drawing figures. The figures are intended to be illustrative, not limiting. Although the invention is generally described in the context of these preferred embodiments, it should be understood that it is not intended to limit the spirit and scope of the invention to these particular embodiments.

In flowcharts presented herein, rectangular boxes generally represent a sequential step being performed, a diamond shaped box generally represents a decision step (test) having two mutually-exclusive results ("Y"=Yes; "N"=No), and an empty circle is not a step or a test, but is merely a graphical junction point at which two or more paths in the flowchart converge.

The structure, operation, and advantages of the present preferred embodiment of the invention will become further apparent upon consideration of the following description, taken in conjunction with the accompanying figures, wherein:

FIG. 1 is a diagram of a cellular system covering a relatively large area and a Wireless Private Branch Exchange (WPBX) system covering a relatively smaller area, illustrating that a cellular handset can communicate with a Base Station of the cellular system and also with Base Stations of the WPBX;

FIG. 2 is a schematic block diagram illustrating main components and architecture of a WPBX system, suitable for use as the WPBX system of FIG. 1;

FIG. 3A is a schematic block diagram of a communications system incorporating a WPBX, such as the WPBX of FIG. 2, with the addition of a Gateway connecting the WPBX to the Public Switched Telephone Network (PSTN);

FIG. 3B is a schematic block diagram of a communications system incorporating a WPBX, such as the WPBX of FIG. 2, with the addition of a Gateway connecting the WPBX to a Private Branch Exchange (PBX);

FIG. 4 is a schematic block diagram illustrating an architecture for a WPBX, with the Base Stations, the Switch and the Gateway interconnected by a local area network (LAN);

DTX 0501-0028

US 6,430,395 B2

7

FIG. 5 is a flowchart illustrating a procedure for call "setup" at an originating Base Station of a WPBX;

FIG. 6 is a flowchart illustrating a procedure for call "setup" at a receiving Base Station of a WPBX;

FIG. 7 is a flowchart illustrating a procedure for call "setup" at a Switch of a WPBX;

FIGS. 8A and 8B are schematic block diagrams illustrating an architecture for dividing the communication protocol into low-level and high-level protocols for implementation in the Base Stations and in the Switch, respectively, of a WPBX particularly during a handoff, according to the invention;

FIGS. 9A, 9B and 9C are schematic block diagrams illustrating rough and fine synchronization of Base Stations in a WPBX, particularly during a handoff, according to the invention;

FIG. 10 is a graph of a Base Station's transmission power, during hops, illustrating that once in every K hops the energy that the Base Station transmits may be increased to allow other Base Stations that normally do not receive transmissions from the transmitting Base Station to synchronize to the transmitting Base Station, according to the invention;

FIG. 11 is a schematic block diagram illustrating an architecture for major components of a Base Station, according to the invention;

FIG. 12 is a flowchart illustrating a "call routing task" that runs in the Switch in order to isolate the high-level protocols from the occurrence of the handoff, according to the invention;

FIG. 13 is a schematic block diagram illustrating a passive method for detecting arrival of a handset in a Base Station's coverage area during a call, according to the invention;

FIG. 14A is a diagram illustrating a handset communicating with one Base Station, and six other neighboring Base Stations waiting for the handset to enter their coverage area, according to the invention;

FIGS. 14B, 14C and 14D are graphs illustrating transmissions by the Base Station communicating with the handsets, and by the neighboring Base stations, according to the invention;

FIGS. 15A and 15B are diagrams illustrating detection of a handset by a Base Station in communication with the handset and a neighboring Base Station, according to the invention;

FIG. 16A is a flowchart illustrating a procedure that Base Stations may use to detect a handset that enters their coverage area, according to the invention;

FIG. 16B is a flowchart illustrating a procedure that Base Stations may use to determine that a handset connected to them is moving into the coverage area of another Base Station, according to the invention;

FIG. 17A is a schematic block diagram illustrating a method for making a handoff decision, performed in the central Switch, when a passive detection method is used, according to the invention;

FIG. 17B is a schematic block diagram illustrating a method for making a handoff decision, performed in the central Switch, when an active detection method is used, according to the invention;

FIG. 18 is a schematic block diagram of a Base Station comprising a central processing unit (CPU), front end processors, memory, TOD synchronization and handset detection unit, and an interface to a local area network (LAN), according to the invention;

FIG. 19 is a schematic block diagram illustrating the front-end processor of the Base Station of FIG. 18, which comprises a base-band processor and a radio frequency (RF) front end, according to the invention;

8

FIG. 20 is a schematic block diagram illustrating the structure of a detector and fine TOD estimator, based on a matching correlator, according to the invention;

FIG. 21 is a schematic block diagram of an implementation for the Time-Frequency Correlator of FIG. 20, according to the invention;

FIG. 22 is a diagram illustrating an implementation of a WPBX system with two Switches, according to the invention.

FIG. 23 is a flow chart illustrating a procedure for transmitting "PING" commands to a handset and receiving "ECHO" responses from the handset, when the Base Station originating the "PING" command is the same Base Station the handset is currently connected to, according to the invention; and

FIG. 24 is a schematic block diagram of a system utilizing the methods of the current invention to support mobility of personal data devices as well as wireless handsets, according to the invention.

DETAILED DESCRIPTION OF THE
INVENTION

FIG. 1 illustrates the basic components and operation of an exemplary, overall communication system 100. A Base Station 101 of a cellular system covers a cell 111 having a relatively large coverage area 111. (The Base Station 101 is shown off-center in its coverage area 111, and the coverage area 111 is shown as elliptical rather than circular, for illustrative clarity.) Base Stations 107, 108 and 109 of a WPBX system cover cells 102, 103 and 104, respectively, each having relatively smaller coverage areas. (The Base Stations 107, 108 and 109 are shown off-center in their respective coverage areas 102, 103 and 104, for illustrative clarity.) Sometimes, these smaller cells 102, 103 and 104 are referred to as "microcells", or "picocells" or "minicells".

A mobile handset 110 can communicate with the cellular Base Station 101 via a communication link 105 and, when it is in the coverage area of the WPBX, it also can use short-range communication link 106, to communicate with one of its Base Stations 107, 108 and 109. In this manner, a standard cellular handset 110, that is enhanced (additionally equipped) with a short-range communication link (e.g. Bluetooth wireless technology) can connect with the WPBX system whenever it is in range of one of the WPBX Base Stations 107, 108 and 109.

The WPBX system can also operate when there is no cellular coverage at all. And the handset 110 can be an ordinary cordless telephone handset. Therefore, the cellular Base Station 101 shown in FIG. 1 is optional, insofar as the WPBX system of the present invention is involved. In the main hereinafter, a handset which is an otherwise ordinary cordless telephone handset, equipped with a short-range communication link (e.g. Bluetooth wireless link) will be used to describe the invention.

In an office environment, a WPBX system improves availability of employees, who carry mobile handsets, and therefore reduces operational cost and increases productivity. In the home environment, a WPBX system enables the use of the standard cellular handsets instead of special cordless phones.

In the present invention, when the handset is the same as the cellular handset, the cost of equipment is lower than the cost of a standard WPBX which requires dedicated handsets. Since the WPBX handles calls between handsets connected to it, the communication charges are lower than when standard cellular communication is used for all the calls.

DTX 0501-0029

9

The handset 110 may indicate to the user that more then one service is available. The user decides which service to use (Cellular or WPBX). The ability to choose between services is a well-known feature in many mobile phones.

It should be understood that the handset 110 is merely an example of a "mobile unit" which can be any of a number of telephony, voice, computing or data devices which communicate via Base Stations, as described in greater detail hereinbelow. As used herein, "Mobile Units" are devices communicating wirelessly with (also referred to as "connected to") Base Stations.

As illustrated in FIG. 1 (and ignoring the cellular Base Station 101 and link 105) the handset 110 is currently communicating with (connected to) the Base Station 108. The Base Stations 107 and 109 are each referred to as "neighboring" Base Stations since they are each adjacent to the Base Station 108 that the handset is currently connected to. The present invention deals largely with how communication with a Mobile Unit such as a handset is handed off (or passed off) from a one Base Station to another (neighboring) Base Station when the handset moves from one minicell to another minicell.

FIG. 2 illustrates the main components and architecture of a WPBX system 200 suitable for use as the WPBX system of FIG. 1. The architecture of a WPBX system generally resembles the architecture of a cellular system. However, as described in greater detail hereinbelow, the function that each component performs is different, since the current invention deals with short-range communication with mobile units that have no built-in support for handoff.

The WPBX 200 comprises a plurality (three shown) of Base Stations 123, 124, 125. A handset 121 communicates via a short-range communication link 122 (e.g. Bluetooth wireless link) with Base Station #1 123. Base Station #2 124 and Base Station #3 125 are ready to receive the call should handset 121 move into their coverage area. At the same time, the other Base Stations may participate in the call with other handsets. For example, Base Station #2 124 communicates via a short-range communication link 134 (e.g. Bluetooth wireless link) with a handset 133. The handsets 121 and 133 may communicate with each other via the WPBX (as opposed to directly with one another), as described in greater detail hereinbelow.

Communication links 126, 127, 128 connect the Base Stations 123, 124, 125 with one another, as illustrated. These communications links transfer data between the Base Stations 123, 124, 125, including voice communication, data communication, connection status information and synchronization information, as described in greater detail hereinbelow, and may be RF links or land lines (e.g., copper wires, optical fibers, etc.).

Communication links 130, 131, 132 connect the Base Stations 123, 124, 125, respectively, with a Central Switch (hereinafter "Switch") 129. These communication links enable the Switch 129 to control the operation of the Base Stations and to participate in the higher levels of the communication protocols, as described in greater detail hereinbelow, and may be RF links or land lines.

FIG. 3A illustrates the addition of a Gateway 135 to the WPBX system 200 of FIG. 2. The Gateway 135 connects the Switch 129 to a Public Switched Telephone Network (PSTN) 136. This enables the WPBX system 200 to receive incoming calls from and to send outgoing calls to other telecommunication systems (not shown) which are connected to the PSTN. The Gateway 135 may be implemented in any suitable manner, such as in hardware and/or software.

10

As used herein, a "Gateway" is a logical or physical connection between two different communication networks. The term implies a need for conversion of some aspect of the information or communication in order to operate, as contrasted with a "port" which implies a point not requiring significant conversion of the message or information. Gateways are well known.

FIG. 3B illustrates the addition of a Gateway 137 to the WPBX system 200 of FIG. 2. The Gateway 137 connects the Switch 129 to a standard Private Branch Exchange (PBX) 138. This enables the WPBX system 200 to receive incoming calls from and to send outgoing calls to standard telephone sets 139 connected to the PBX 138. As illustrated, the PBX 138 is interfaced with the PSTN 136. Thus, the WPBX system 200 can also communicate with other telecommunication systems (not shown) which are connected to the PSTN.

Having dedicated connections for all the Base Stations 123, 124, 125 and the Switch 129, such as illustrated in FIG. 2, hereinabove, is generally not cost-effective. Rather, when real time interaction or synchronization is not required, a shared local network, for example a local area network such as the IEEE 802.2 Ethernet, can connect these units in a cost-effective manner.

FIG. 4 illustrates a plurality (three shown) of Base Stations 123, 124 and 125 (compare FIG. 2) connected via a communications link which is a Local Area Network (LAN) 140 which handles the transfer of information between the Base Stations 123, 124, and 125, the Switch 129 and, in this example, the Gateway 135 to the PSTN 136. Using a standard local area network (LAN) as the communication backbone allows simple integration with other telephony application servers (not shown), such as IVR (interactive voice response), voice loggers, voice mail and billing systems. The LAN 140 can be either wired, or wireless.

FIGS. 2, 3A, 3B and 4 therefore illustrate, in a general manner, a number of ways in which the main components of a WPBX can be connected with one another, and interfaced with other communications systems (PSTN, PBX, etc.).

For office WPBX applications the Switch 129 may be a standard computer that has the processing power required for handling the switching of hundreds of calls simultaneously. It should support operation in a multi-server environment. This can be achieved with standard server hardware. For home WPBX applications, the Switch 129 may be a part of one Base Station, or a part of several Base Stations.

Call Setup Procedures

FIGS. 5, 6 and 7 illustrate call setup procedures for a single call at an "originating" Base Station (e.g., 123), at a "receiving" Base Station (e.g., 124), and at the Switch (e.g., 129), respectively. Call setup between the handset (e.g., 121) and the Base Station it is connected to (e.g., 123) is suitably performed according to standard telephony protocols, for example ITU-T Q.931. A similar protocol is a part of the Bluetooth protocol stack. However, the present invention is not limited to a specific protocol for call setup.

FIG. 5 illustrates a call setup procedure performed by an originating Base Station (e.g. 123) when a handset (e.g., 121) that is connected to it, tries to initiate a call. As shown in the step 151, the handset that is originating the call sends a destination number (DN). In a next step 152, the originating Base Station (e.g., 123) checks whether the destination handset (e.g., 133) is in its "Base Station Connection Table"—in other words, whether the destination handset is in the originating Base Station's coverage area. If not (step

US 6,430,395 B2

11

152, "N"), in a step 160 the destination number (DN) is sent via the communications link (e.g., LAN 140) to the central WPBX Switch (e.g., 129). The originating Base Station then sets a timeout (step 161), and waits for a reply from the Switch. The timeout set in the step 161 is suitably on the order of up to 5 seconds. Next, it is determined in a step 162 whether there is a timeout.

If there is a timeout (step 162, "Y"), the Base Station sends a busy indication (suitably a tone) to the originating handset (step 177), and the Switch is updated about the failure of the call (step 178). If, there is not a timeout (step 162, "N"), the originating Base Station receives (from the Switch) the address of a destination Base Station (step 163). The originating Base Station then calls the destination Base Station (step 164), and it also calls all the neighbors (neighboring Base Stations) of the destination Base Station (step 180). Then the originating Base Station sets a timeout (step 165) and waits for a reply from the called Base Station (and its neighbors). Calling more than one destination Base Station is preferred in order to overcome uncertainties during handoff. The timeout set in the step 165 is suitably on the order of up to 5 seconds. Next, it is determined in a step 166 whether there is a timeout.

If there is a timeout (step 166, "Y"), the Base Station sends a busy tone to the originating handset (step 177), and the Switch is updated about the failure of the call (step 178). If, there is not a timeout (step 166, "N"), and a reply from the destination Base Station is received, the originating Base Station checks if the call is connected (step 167), and then connects the originating handset (step 168), and updates the Switch about the success of the call (step 169).

If, in the step 163 the address of a destination Base Station is not received (N), it is determined (step 170) whether the destination of the call is the Switch itself. If so (step 170, "Y"), a procedure similar to that for sending a call to another Base Station is implemented, except that the call is sent to the Switch (step 171) and not to another Base Station. Then the originating Base Station sets a timeout (step 172) and waits for the Switch to reply (step 173). The timeout is suitably on the order of up to 5 seconds. Next, it is determined in the step 173 whether there is a timeout.

If there is a timeout (step 173, "Y"), the Base Station sends a busy tone to the originating handset (step 177), and the Switch is updated about the failure of the call (step 178). If the Switch responds that the call is connected, there is not a timeout (step 173, "N"), and the originating Base Station connects the handset (step 175), and updates the Switch (step 176) about the status of the call.

If it is determined that the destination handset is in the originating Base Station's coverage area (step 152, "Y"), and a busy signal is not returned (step 153, "N"), the originating Base Station then attempts (step 154) to connect the call to the destination handset, and also to all the neighboring Base Stations (step 181). Again, the calling of neighboring Base Stations is preferred in order to overcome uncertainties, such as the handset moving, during the call setup. Then the originating Base Station performs a procedure similar to that described hereinabove of setting a timeout (step 155), waiting for the Switch to reply (step 156), connecting (step 158) or disconnecting (step 177) the call, and updating the Switch (steps 159 or 178).

In summary, the call setup procedure performed by an originating Base Station (e.g., 123) is that, first, the originating Base Station determines whether a call request from an originating handset (e.g., 121) is:

a. to a DN in the originating Base Station's coverage area (e.g., step 152), in which case the originating Base

12

Station attempts (step 181) to also connect the call to its neighboring Base Stations; or

b. to a DN in another Base Station's coverage area (e.g., step 164), in which case the originating Base Station attempts (step 180) to also connect the call to Base Stations which are neighbors of the destination Base Station; or

c. to a DN outside of the WPBX coverage area and is to be routed through a Gateway (see FIG. 7) associated with the Switch (steps 170, 171).

In each case, the originating Base Station then:

d. sets a timeout (steps 155, 165, 172);

e. waits for the Switch to reply (steps 156, 166, 173) that the call is connected (steps 157, 167, 174)

f. connects the originating handset (steps 158, 168, 175);

g. updates the Switch (steps 159, 169, 176) about the status of the call; and

h. waits (step 179) for a new event (a new call setup).

FIG. 6 illustrates the call setup procedure performed at a destination Base Station (e.g., 124) which is receiving a call, whether it be from another Base Station or from the Switch. When the destination Base Station receives a request (step 201) to connect a call to a handset (e.g., 133) which is reportedly within its coverage area, it first checks (step 202) whether the handset is already communicating with (connected to) it. If the handset is already connected to the Base Station (step 202, "Y"), the Base Station tries to connect the call to the handset. A timeout is set (step 203), again on the order of up to 5 seconds, and the Base Station waits (step 204).

If a time-out occurs (step 204, "Y"), or if a timeout does not occur (step 204, "N") but the call was unable to connect (step 205, "N"), the destination Base Station returns an indication (step 208) of call setup failure ("unable to connect") to the originating Base Station (or to the Switch, as the case may be). If, however, the connection succeeds (step 205, "Y") the Base Station returns an indication (step 206) of successful call setup ("call connected") to the originating Base Station. In either case (call connected, unable to connect), the destination Base Station sends similar indications (steps 211, 212, respectively) to all the neighboring Base Stations of the originating Base Station. Again, sending the reply to the neighboring Base Stations is to overcome uncertainties during handoff. In both cases the Switch is updated at steps 207 and 209, respectively. Finally the Base Station waits (step 210) for a new event (a new call setup).

FIG. 7 illustrates the call setup procedure performed at the Switch (e.g., 129). The Switch handles two types of messages, one is a request to establish a new call, and the other is an update to the status of the call. In a step 231, it is determined whether the request is for a new call (step 231, "Y") or a request to update a call (step 231, "N").

If the arriving message is a request to update a call (step 231, "N"), an update of the "Calls Table" is generally required (step 254, "Y"). The Switch checks if it receives indication that the call is connected (step 255). If the call is connected, (step 255, "Y"), the status of the call is updated in the Calls Table (step 256). Otherwise (step 255, "N"), the call is removed from the Calls Table (step 257).

If the arriving message is a request to initiate a new call (step 231, "Y"), the Switch checks if the call is intended to a handset connected to the WPBX (step 232). This is done by checking its "Connections Table". If the call is intended to connect to outside the WPBX (e.g., via the PSTN 136), the Switch checks (step 233) if the destination number (DN)

US 6,430,395 B2

13

is a legal (valid) number. If the DN is a valid number (step 233, "Y"), in a step 234 the Switch transfers the call to the Gateway (e.g., 135), sets a timeout (step 235) and waits (step 236). If not (step 233, "N"), the program exits.

If the connection via the Gateway succeeds (step 236, "N"), it is whether the call is connected determined (step 237). If the call is connected, (step 237, "Y"), the Switch requests from the originating Base Station to transfer the call to the Switch(step 238), and waits for connection with originating Base Station (steps 239, 240). If connection succeeds, and the call is connected (step 242, "Y"), the call is added to the "Calls Table" (step 243), and the call is routed to the Gateway (step 244). If connection fails (step 240, "Y"; or step 242, "N"), the connection with the Gateway is disconnected (step 241).

If the call destination is one of the Base Stations (step 259), its source may be another Base Station (step 249), or the Gateway (step 245). If the source is another Base Station, the Switch send to the originating Base Station the address of the destination Base Station, and adds the call to the "Calls Table". If the call arrived from the Gateway the Switch tries to connect the call to the destination Base Station (step 245). If is succeeds the call is added to the "Calls Table" (step 252), the call is transferred to the destination (step 253). If it fails the connection with the Gateway is disconnected.

The procedure described in FIG. 7 is also applicable to the case when more than one Gateway connects to the WPBX to the PSTN—for example, in a case where two branch offices share a single WPBX, and each has its own independent connection to the PSTN. The main difference would be that when the Switch handles an outgoing call, it will determine to which Gateway to send the call. This can either be done randomly, or can be pre-determined. The handling of the incoming calls would proceed as set forth above in FIG. 7.

FIGS. 5, 6 and 7 have illustrated a call setup procedure for the handling of a single call. When either the Base Stations or the Switch need to handle more than one call, several instances of these procedures can be run in parallel. For that purpose, both Base Station software and Switch software are preferably based on a real time operating system that supports multi-tasking. For each new call, a new task will be created, and the task will perform the procedures described in FIGS. 5, 6 and 7. The task will be closed when its procedure is completed.

In systems with a very large number of Base Stations, due to limited processing power of each Switch, it may be preferable to divide the Switch into two or more units. Dividing the Switch into several units can also improve the reliability of the WPBX, by eliminating the possibility of having a single point of failure shutting down the entire system.

FIG. 22 illustrates the division of the Base Stations, into two groups: a first group (Group A) 1050 comprising a plurality (four shown) of Base Stations 1050a, 1050b, 1050c and 1050d; and a second group (Group B) 1051 comprising a plurality (four shown) of Base Stations 1051 a, 105 1b, 1051c, 1051d. The Base Stations of Group A are connected to a first Switch (Switch A) 1052, and the Base Stations of Group B are connected to a second Switch (Switch B) 1053. The Base Stations and the Switches function according to the procedures described in FIGS. 5, 6 and 7. All the Switches mirror all the status tables of the other Switches, i.e. by having copies of each other's "Calls Table" and "Connections Table". When a Switch updates one of its status tables, it sends the information to all the other

14

Switches, and they update their tables accordingly. In order for this process to be reliable, the other Switches will send an indication that the message was received. If the originating Switch does not receive such a reply within $T_1$ milliseconds, it will retransmit the message. The retransmission will be repeated up to P times. For example $T_1$ shall be equal to 100, and P shall be equal to 5.

It is within the scope of the invention that more than two Switches, and corresponding more than two groups of Base Stations can be employed. As described hereinabove, all of the Switches would mirror and update each other's status tables. The description of two Switches 1052 and 1053 is intended to be exemplary rather than limiting.

### Calls Table

The Switch (129) maintains the "Calls Table", which contains the status and information about all the active calls being handled by the WPBX. The "Calls Table" comprises the following information:

1) Each active call has a unique "Call Identification number".
2) The origin of the call, which can be either "Internal" or "External".
3) The destination of the call, which can be either "Internal" or "External".
4) "Calling Number Identification (CNID)", the number of the calling party, if available.
5) Destination Number (DN), the number of the answering party if available.
6) "Originating Base Station Identification" for calls from internal origin
7) "Destination Base Station Identification " for calls with internal destination,
8) Status of call—initiated, connected, disconnected.
9) Additional information for billing, performance analysis, such as call starts time, number of handoffs, time since last handoff, etc.

The "Originating Base Station Identification" and the "Destination Base Station Identification" are updated when a handset moves from one Base Station to another. The Switch updates these fields when it determines that the handoff should occur. During handoff, for a short time, there may be uncertainty about the validity of these fields. The Base Stations compensate for the uncertainty by "multicasting" the call setup messages to a group of Base Stations, as described hereinabove with respect to FIGS. 5 and 6 (see, e.g., steps 180, 181, 211, 212).

The procedures described above do not limit the WPBX from handling all unique telephony features that the Gateway and the handsets can support. For example, multiple connections can be created between handsets, and between handsets and the Gateway, when each connection is treated as a separate call. Another example is "Caller ID", that the Gateway can send to a handset. Another example is a "Hook-Flash" (momentary disconnect) that the handset can pass to the Gateway. The WPBX acts as a transparent relay for all these telephony features.

### High-Level and Low-Level Protocols

In the descriptions set forth hereinabove, it has generally been assumed that:

1. Each Base Station knows which handsets are in its coverage range.
2. The Switch is aware of the connections of all the Base Stations.
3. Connections appear static to users and also to the high-level call setup procedures described above.

DTX 0501-0032

US 6,430,395 B2

15

A method to achieve mobility, which fulfills these three assumptions is described in detail, hereinbelow.

According to the invention, the short-range communication protocol stack is divided into two parts:

low-level protocols performing real time tasks, and

high-level protocols that do not have real time requirements.

For example in the Bluetooth short-range communication protocol stack, the low-level protocols are the radio frequency (RF) transmitter and the base-band controller. The base-band controller performs real time control over the RF, since the Bluetooth protocol utilizes frequency-hopping transmission. The base-band protocol also determines, for each time slot of transmission (i.e. each frequency hop), what information will be transmitted. The base-band protocol also deals with voice coding, error correction, encryption and authentication. For example, higher level protocols of the Bluetooth stack include the "Link Manager" which determines what information will go through the channels created by the "Base-Band", and determines the state of operation (e.g. Active, Polling, Parked).

The low-level protocols that require real time capabilities are performed in the Base Station. The higher-level protocols are performed at the Switch. (However, as described hereinbelow, certain high-level protocols can also be performed in the Base Station, even though they do not require real time capabilities.) The Switch handles the routing of data from the higher-level protocols to the lower level protocols. (A call routing task (282) is described in greater detail hereinbelow.) Therefore, the higher-level protocols do not need to "know" in which Base Station the lower level protocol that they are controlling is being performed.

FIGS. 8A and 8B illustrate an example of a WPBX system 800 with two handsets 121 and 133, two Base Stations 123 and 124, and one Switch 129. In this example, two calls are being handled. Gateways (e.g., 135, 137) are omitted, for illustrative clarity. As mentioned hereinabove (see, e.g., FIG. 22), the Switch can be divided into several units.

As illustrated in FIG. 8A, the handset 121 is currently communicating with (connected to) the Base Station 123, and the handset 133 is currently communicating with the Base Station 124. An instance 280 of the low-level protocol is running on the Base Station 123, and another instance 281 of the low-level protocol is running on the Base Station 124. Each instance of the low-level protocol supports only one call. In a similar manner, the Switch 129 handles an instance 283 of the high-level protocol for the call with the handset 121, and another instance 284 of the high-level protocol for the call with the handset 133. A single call routing task 282 handles the data that is transferred between the instances of the low-level protocols and the high-level protocols to the correct destination.

As illustrated in FIG. 8B, the call routing task 282 routes data arriving from instance 280 of the low-level protocol to instance 283 of the high-level protocol, and from the instance 281 of the low-level protocol to the instance 284 of the high-level protocol. Since interaction between the high-level-protocol and low-level protocol, is normally relatively rare (e.g. call setup), there are no strict real time requirements from the call routing task. The call routing task 282 is described in greater detail hereinbelow, with respect to FIG. 12.

As illustrated in FIG. 8B, the handset 133 is shown as having moved to the area covered by the Base Station 123. The Base Station 123 will handle the communication with the handset 133, by creating a copy 281 of the instance 281 of the low-level protocol, that previously ran on Base Station

16

124. This allows the handset 133 to continue communication without "knowing" that a changeover of Base Stations has occurred. The call routing task 282 will now route the data arriving from the instance 281' of the low-level protocol running on Base Station 123 to the instance 284 of the high-level protocol 284 which is running on the Switch 129.

For each connection of a Base Station with a handset, there is a separate instance of the low-level protocol running at a Base Station connected to the handset, and a corresponding separate instance of the high-level protocol running at the Switch. These instances are created, on an as-needed basis, when a connection is initiated. Preferably, a real time multi-tasking operating system is used in order to allow handling of many instances of the protocols simultaneously in the Base Stations and in the Switch. The procedures that the Switch uses during initiation of a connection and later, during handoff, are discussed in greater detail hereinbelow.

Synchronization of Base Stations During a Handoff

There follows a description of procedures that are performed during handoff of a call from one Base Station to another Base Station. The Base Station with which a handset is currently connected is termed the "current" Base Station. The Base Station to which a handset is being handed off is termed the "next" Base Station, and is typically a "neighboring" Base Station. Once the handoff has occurred, this neighboring/next Base Station becomes the "current" Base Station and the Base Station from which the handset has moved becomes the "previous" Base Station.

According to an aspect of the invention, the handsets do not need to be (and preferably are not) specially equipped or enabled to support mobility (i.e. handoff). Therefore, when a handset moves from one Base Station to another, the current and the next Base Stations are responsible for continuing the communication with the handset, preferably with no noticeable interruption in the communication, and the next Base Station to which the handset has moved should transmit substantially exactly as the previous Base Station from which the handset has moved would have transmitted. For purposes of the discussion of this example, it is assumed that it is known from which Base Station the handset has moved and to which Base Station the handset is moving, and that the exact timing of handoff is also known. These issues are discussed in greater detail hereinbelow.

FIGS. 9A, 9B and 9C illustrate, in a general manner, a handoff taking place between two Base Stations 123, 124 and a single handset 121 of a WPBX.

FIG. 9A illustrates the handset 121 communicating with (connected to) a Base Station (Base Station #1) 123 via a short-range communication link 122 (e.g. Bluetooth wireless link). The "current" Base Station 123 sends call parameters and rough synchronization information over the LAN 140 to the neighboring Base Stations, a one of which is shown as Base Station #2 124. In this manner, the neighboring Base Stations "know" that they are "candidate" Base Stations for receiving a handoff of the call from the current Base Station. The information which is broadcast by the current Base Station to the candidate next Base Stations includes low-level communications protocol states and parameters, discussed in greater detail hereinbelow. This communication from the Base Station 123 to the Base Stations 124 is indicated by the arrow 141, and the information contained therein is used to achieve rough (coarse) synchronization between the Base Stations. Since this information does not need to be accurate in time, it can be

US 6,430,395 B2

**17**

transmitted over the data link (e.g., LAN 140) connecting all of the Base Stations.

FIG. 9B illustrates a handoff as it is about to take place. Here, the handset 121 is situated in an area covered by both Base Stations 123 and 124. Base Station 124 uses this situation to achieve exact (fine) synchronization with the current Base Station 123. This will enable the next Base Station 124 to transmit, after the handoff, substantially exactly as previous Base Station 123 would have transmitted if the handoff had not occurred. A method for effecting this fine synchronization between neighboring Base Stations is discussed in greater detail hereinbelow.

An important parameter of synchronization is Time Of Day (TOD), which can be determined with virtually any desired level of precision (e.g., microseconds). As described in greater detail hereinbelow, in order to achieve fine synchronization of TOD, the Base Station 124 that is waiting for the handset 121 may passively monitor the transmissions of either the handset 121, or of the Base Station 123 that is currently connected with the handset. In FIG. 9B, the two possible fine synchronization signals that the candidate next Base Station #2 124 can monitor are shown, a signal 142 originating from the Base Station #1 123, and another signal 143 originating from the handset 121.

FIG. 9C illustrates that synchronization of the Base Stations 123 and 124 may alternatively be achieved by use of

**18**

a beacon signal from a beacon transmitter 299 which is within range of current and next Base Stations, in which case precise (fine) synchronization for the low-level protocols can also be achieved. The beacon transmitter 299 transmits a beacon signal 144 to both of the Base Stations 123 and 124 to achieve synchronization of the Base Stations. This method allows for the synchronization of many Base Stations, although only two are illustrated in this figure. In this case, there is no need to transmit synchronization information over the LAN 140. Only call parameters (e.g., low-level protocol) need to be communicated between the current Base Station and The neighboring candidate next Base Stations, as indicated by the arrow 141.

Bluetooth Short-Range Wireless Communication Protocol

As discussed hereinabove, a short-range communication protocol with the handset can be divided into lower-level protocols which the Base Stations handle, since they have real time requirements, and higher-level protocols which the Switch handles since they do not require real time requirements. Bluetooth wireless technology is an example of such a short-range communication protocol. In Table 1, a division of the Bluetooth short range wireless protocol into such low-level and high-level protocols is presented.

TABLE 1

| Communications Protocols | | | |
|---|---|---|---|
| Element (Protocol Name) | Description of Protocol (Bluetooth Protocol) | Real time requirements | Level/ Where |
| Radio Frequency (RF) | Defines the modulation scheme and the frequency range | Control of radio frequency in real time required, modulates each symbol | Low/ Base Station |
| Base-band | Frequency control, channel definition, transmission/ reception control, encryption, error correction, authentication. | Control frequency hopping in real time. Determines what packet will be sent at each hop. Encryption/Error correction for each hop. Accurate time synchronization | Low/ Base Station |
| Link Manager | Link setup and control | None | Low or High Base station or Switch |
| Host Controller Interface | Communication between protocol stack and lower level implementation | None | Low or High Base station or Switch |
| Logical link manager | High level protocol multiplexing, packet segmentation and Reassembly, quality of service management | None | High/ Switch |
| Service discovery | Locating a service available by a Bluetooth device | None | High/ Switch |
| RF COMM | A subset of the ETSI TS 07.10 standard, emulation of serial port over the Logical link manager | None | High/ Switch |
| Ird Interoperability | Interoperability for applications over Bluetooth and infra-red protocols | None | High/ Switch |
| Telephony control protocol | Call control signaling and establishment of speech and data calls between Bluetooth devices. | none | High/ Switch |

DTX 0501-0034

US 6,430,395 B2

| 19 | 20 |

TABLE 1-continued

Communication Protocols

| Element (Protocol Name) | Description of Protocol (Bluetooth Protocol) | Real time requirements | Level/ Where |
|---|---|---|---|
| Interoperability requirements for Bluetooth technology as WAP bearer | Bluetooth protocol with PPP as communication bearer for WAP | none | High/ Switch |
| Host control Interface | Command interface to the base-band controller and link manager, and access to status information | none | High/ Switch |
| Generic Access Protocol | Generic procedures for Discovery of services and connection of Bluetooth devices | none | High/ Switch |
| Service discovery application profile | Procedures for an application in a Bluetooth device to discover the services in other Bluetooth devices | none | High/ Switch |
| Cordless Telephony Profile | Procedures in an all in one handset | none | High/ Switch |
| Intercom Profile | Support for intercom feature in an all in one handset | none | High/ Switch |
| Serial Proj Profile | Procedure for emulation of serial cable | none | High/ Switch |
| Headset Profile | Headset use over Bluetooth wireless link | none | High/ Switch |
| Dial up Networking Profile | Support for dial up networking in a device with Bluetooth wireless technology | none | High/ Switch |
| FAX Profile | Support for fax transmission or reception on a device with Bluetooth wireless technology | none | High/ Switch |
| LAN Access Profile | Defines how device with Bluetooth wireless technology can access a LAN with PPP | none | High/ Switch |
| Generic Object Exchange Profile | Defines the possibility of Generic Object Exchange | none | High/ Switch |
| Object Push Profile | Support for object push model | none | High/ Switch |
| File Transfer Profile | Support for file transfer | none | High/ Switch |
| Synchronization Profile | Synchronization of Bluetooth enabled device, e.g. PDAs laptops | none | High/ Switch |

Table 1 shows the elements of the Bluetooth protocol, generally, as currently implemented. Other profiles may be added in the future (or may have already been added), and it is anticipated that these profiles will be high-level protocols, which do not have strict real time requirements.

As shown in Table 1, the Link Manager and the Host Controller Interface can be implemented in either the Base Station or in the Switch. Although the Link Manager and Host Controller Interface, do not require real time performance, they may readily be implemented in the baseband controller of the Base-Station. It is within the scope of the invention that any of the high-level protocols can also be implemented in the Base Station as part of the low-level protocol, but then they will take part in the handoff.

According to the inventive technique of dividing the low-level and high-level protocols, the high-level protocols are "buffered" from the occurrence of handoff by the Base Stations and the routing task that runs on the Switch. Therefore, the present invention allows mobility of any device with Bluetooth wireless technology that supports any of the high-level protocols (e.g. LAN access, WAP, FAX, FTP). The solution for mobility of cordless phones, described hereinabove, is only an example of how the methods can be utilized.

As described hereinabove with respect to FIGS. 8A and 8B, different instances of the low-level protocols that rep-

resent the same connection (e.g., 281, 281') need to be synchronized. Table 2, presents elements (parameters) of the low-level protocols that the Base Stations will synchronize. For each element, it also shows whether rough or fine synchronization is required. Again, the protocols are described, by way of example, in the context of the Bluetooth short-range communication protocol.

Rough synchronization may be achieved via the local area network (see, e.g., LAN 140, FIGS. 9A and 9B) connecting the Base Stations. Fine synchronization may be achieved by other methods described in greater detail hereinbelow.

TABLE 2

Low-Level Protocol Synchronization

| Element/ Parameter | Description | Synchronization method |
|---|---|---|
| device address | The unique address of the Base Station, determines the hopping sequence, effects the encryption and authentication keys. | Via LAN |

**A199**

US 6,430,395 B2

| 21 | 22 |

TABLE 2-continued

Low-Level Protocol Synchronization

| Element/ Parameter | Description | Synchronization method |
|---|---|---|
| TOD | Time Of Day, measured in micro-seconds, it determines the exact timing of the hopping sequence | Rough synchronization via LAN, fine synchronization by other methods |
| SCO | Synchronous voice channels allocation | Via LAN |
| FEC | Forward error correction parameters | Via LAN |
| Encryption key | Use to encrypt data and voice | Via LAN |
| Authentication key | Used to initiate a connection | Via LAN |
| Voice coding | Method of voice coding: CVSD or PCM | Via LAN |
| AM_ADDR | Address of member in a picocell | Via LAN |
| PM_ADDR | Address of a parked member (energy saving mode, when the handset is inactive) | Via LAN |
| ACL | Definition of the asynchronous data link | Via LAN |
| FIFO | Data FIFOs | Flush of data, and using flow control to halt data during handoff |

All the parameters listed in Table 2, except for the TOD, can be sent prior to handoff, thorough the local area network (e.g., LAN 140), or any other communication link connecting the Base Stations. As described hereinabove with respect to FIG. 9A, rough (coarse) TOD can also be sent through the LAN.

If one of the other parts of the Bluetooth protocol stack is also implemented in the Base Station, then it will also take part in the handoff. Synchronizing the instances of the same protocols in different Base Stations is done as described above, by sending internal state parameters via the local area network (LAN 140). For example: by implementing the Link Manager and Host Controller Interface in the Base Station, the internal state parameters of these protocols will be broadcast to the neighboring Base Stations, by the Base Station that is connected to the handset.

## Fine Synchronization

As mentioned hereinabove, in order to achieve fine synchronization of TOD, the Base Station that is waiting for the handset, should passively monitor the transmission of the handset and/or the Base Station that is currently connected with the handset. In FIG. 9B, the two possible signals that the receiving (next) Base Station 124 can monitor are shown, one originating from Base Station 123, and the other originating from the handset 121 which is currently connected to the Base Station 123.

According to the invention, the next Base Station 124 can be finely synchronized by receiving synchronization signals from the current Base Station 123. Normally, the Base Station 124 does not receive signals from the Base Station 123. Therefore, to facilitate the Base Station 124 receiving synchronization signals from the Base Station 123, Base Station 123 periodically transmits with higher transmission power than during normal transmission. This allows the Base Station 124 to receive transmissions from Base Station 123, without a substantial increase in spectral contamina-

tion. The inventive technique is described in the context of frequency-hopping. Frequency-hopping techniques are well known, including techniques that change frequency with each hop.

FIG. 10 illustrates a technique for controlling the transmission power of a Base Station (e.g., 123) that is currently connected with the handset, for a plurality (series) of successive hops 290. The vertical axis of the graph is the Base Station's transmission power (in arbitrary units), and the horizontal axis is time. $T_h$ is the duration of a hop 290. In this example, the hops 290 all have equal duration. $T_h$ is the time interval between successive hops (or "hop time slot") and, in this example, the intervals between successive hops are constant (evenly spaced in time). The normal transmission power for each hop 290 is $P_0$. For example, in a short-range communication system, the normal transmission power $P_0$ of a Base Station is suitably on the order of a hundreds of milliwatts.

According to the invention, in order to effect synchronization between a Base Station and its neighboring Base Stations, every Kth hop 290' is a "synchronization" hop that is transmitted with increased power $P_1$. $P_1$ is suitably substantially (e.g., 2–10 times) greater than $P_0$. In the case that the transmitter changes the transmission frequency in each hop, every Kth (synchronization) hop will also be transmitted at a different frequency.

Alternatively, it is within the scope of the invention that a variable time interval (Tp) is provided between the synchronization hops 290' that are transmitted with high power $P_1$. For example a changing K (that shall be denoted by K(n)), i.e. K for hop number 'n'), can be generated by a pseudo random sequence such as a maximal length shift register sequence. Pseudo random sequences are well known for use in communication systems.

In the case that a beacon transmitter (e.g., 299) is used (in addition to signals received from the Base Station and handset) to synchronize the Base Stations (see, e.g., FIG. 9C), it can suitably transmit the beacon signal once in K hops, and K can either be constant or it can be changed over time (variable), as described above.

## Low-Level Synchronization at the Base Station

FIG. 11 illustrates major components of a Base Station 1100 waiting for handoff, and a method of accurately synchronizing the TOD at the Base Station to the TOD of the Base Station which the handset is about to leave, including:

Time Clock 310;

TOD counter 303;

Antenna 301;

Receiver 305;

Frequency Hopping Generator 304;

Emulator 307;

Correlation Detector 308; and

Adder (ADD) 309;

all connected as illustrated in the figure and as discussed hereinbelow.

As described hereinabove with respect to FIG. 9A, a rough TOD from the Base Station currently connected with the handset is available to the (next) Base Station waiting for a handoff on a communication link such as the LAN 140. This rough TOD is provided to the TOD counter 303 (e.g., via an interface to the LAN 140). A Time Clock 310 generates clock signals for incrementing the TOD counter 303. The output of the TOD counter 303 is therefore a rough estimate of the TOD ("TOD Estimate"). There is an uncertainty (margin of error) "Tu" between the rough estimate of TOD and the actual TOD, and which depends on the

DTX 0501-0036

US 6,430,395 B2

23

24

transmission latencies thorough the LAN 140. "Tô" is readily calculated for a given WPBX system, according to its physical configuration.

From the rough estimate of the TOD output by the TOD counter and the device address ("Commonly denoted by Media Access Control Address, or MAC address"), a frequency-hopping list is generated by a frequency-hopping generator 304 and supplied to an emulator 307 which emulates the output of the receiver 305. In a window with size of $2\text{OT}_h$, a single frequency from the hopping sequence is chosen, and the receiver 305 will wait on this frequency for duration of $2\text{-T}_h$. Once in a period of $2\text{-T}_h$, the receiver 305 will switch frequency, in response to a signal generated by the frequency-hopping generator 304. Opening an acquisition window of $2\text{-T}_h$ ensures that during this time duration the receiver 305 will capture at least one hop. A correlator/detector 308 receives the receiver's output (e.g. a base-band or intermediate frequency signal) and an emulation 307 of the signal that should appear at the receiver's output. The output of the receiver 305 can be emulated, since a rough estimate of the TOD is available, and also from the hopping frequency list, and the receiver frequency list. The emulator 307 continuously checks for a match between receiver frequency and the hopping frequency and, when it finds a match, it reports the frequency and the time (rough TOD) to the correlator/detector 308. By comparing the actual received signal with the emulation that is based on the rough TOD, the correlator 308 computes (and outputs) a fine estimate of the TOD offset (i.e., the error between the TOD estimate and the actual TOD), and provides this to Adder 309, which also receives the rough TOD estimate from the TOD counter 303 and generates a signal ("Fine TOD") indicative of the actual TOD. Correlator-based time offset measurement is a standard estimation method that is described in many textbooks, and an example of its implementation is described in greater detail hereinbelow. Since the Base Station to which the call is to be handed "knows" which call it is going to receive, and it has received the call parameter (via the LAN), and is able to accurately estimate the TOD, it will be able to perform a seamless handoff, transmitting substantially exactly as the Base Station that the handset is about to leave. As mentioned above, an iteration of the low-level protocol (e.g., 281) to be prepared at the receiving Base Station in anticipation of the handoff.

Call Routing Task (282)

The higher-level protocols are run at the Switch, and are therefore "ignorant" of the handoff processes. At the Switch the "call routing task" 282 (FIGS. 8A, 8B) isolates the high-level protocols from the changing environment. The "call routing task" 282 maintains the "Connections Table", which contains information about all the connections between handsets and Base Stations. Maintaining the Connections Table is described in greater detail hereinbelow. The following sections describe an example of how the Connections Table is used by the "call routing task" 282.

The following information is included in the Connections Table:
1) Handset ID
2) Current Base Station ID
3) Handle (of instance) of high-level protocols
4) Handle (of instance) of low-level protocols
5) Number of candidate Base Stations for handoff
6) List of candidate Base Stations for handoff
7) List of Handoff status for each candidate Base Station (i.e., Idle/Started)

The messages that the high-level protocol (that runs on the Switch) and the low-level protocol (that runs on the Base Station), send each other have the following format:
1) Message Header
   Origin:
   from low-level protocol
   from high-level protocol
   Handset ID
   Base Station ID
   Low-Level Protocol Handle in the Base Station (number of instance of low-level protocol)
   High-Level Protocol Handle in the Switch, (number of instance of high-level protocol)
   HEC (header error correction)
2) Message Data
3) CRC (Cyclic Redundancy Check)

FIG. 12 illustrates a method of implementing the "call routing task" 282 which was mentioned hereinabove with respect to FIG. 9A. The "call routing task" 282 is performed in the Switch 129.

In a first step 351, the call routing task 282 waits for a message from one of the high-level protocol instances running on the Switch 129 or from one of the low-level protocol instances running on the Base Stations (e.g., 123). Then, in a step 352, it is determined where the call came from.

If the message arrived from one of the Base Stations (step 352, "Y"), the call parameters are compared with the Connections Table (step 353) and the message is sent (step 354) to the instance of the high-level protocol running on the Switch (129).

If the message arrived from the Switch (step 352, "N") the ID of the sending low-level protocol instance is located (step 353) in the "Connections Table", and the message is sent (step 354) to an instance of a corresponding low-level protocol. If the message arrived from one of the high-level protocols (step 352, "N"), it is determined (step 360) whether a handoff has begun (is in progress). If a handoff is not in progress (step 360, "N"), the call parameters are compared with the Connections Table (step 358) and the message is sent to the Base Station on which the destination low-level protocol instance is running (step 359). If a handoff is in progress (step 360, "Y") the call parameters are compared with the Connections Table (step 355) and the message is sent to the Base Station on which the destination low-level protocol instance is running (step 356). The message is also sent (step 357) to all the Base Stations that are candidates for handoff—e.g., neighboring Base Stations. The Base Stations receiving the message can then check if they are running the destination low-level protocol and, if not, the message is simply discarded. The procedure shown in FIG. 12 handles a single message. By using a multi-tasking operating system, it is possible to run several instances of these procedures, and thus handle more than one message simultaneously.

Detecting a Handset

The methods described thus far enable the communication protocols to continue operation when a handoff occurs. They rely on the ability to determine, which handset is in the coverage area of which Base Station, where a handset is moving, and when is the best time to perform handoff. By definition, handoff occurs between only two Base Stations, but for a certain time prior to the actual occurrence of the handoff there may be more than one Base Station that are candidates for handoff. Determining the candidates for

**A201**

25

handoff, which Base Station will actually participate in handoff and when to perform handoff requires collaboration of the Base Stations and the Switch.

As is evident from the discussions hereinabove, the handsets do not actively participate in the handoff operations. Therefore, the Base Stations will determine which handsets are in their coverage range, by either passively capturing transmission information, or by "tricking" the handset to transmit information that can be used for that purpose.

As discussed hereinabove, each Base Station will transmit, to all the neighboring Base Stations, information about the calls that are taking place in its coverage area. This information will include all the call parameters that can be sent through a low bandwidth communication link, such as the shared local area network (e.g., LAN 140). This information is sufficient for detecting which handset is moving from one of the neighboring Base Stations into the coverage area of a Base Station.

FIG. 13 illustrates major components of a Base Station 1300, waiting for handoff, and a method of accurately synchronizing the TOD at the Base Station to the TOD of the Base Station, which the handset is about to leave, and a passive method for detecting the arrival of a handset in a Base Station's coverage area during a call, including:

Three TOD counters 371, 380 and 384 (compare 303)

Antenna 382 (compare 301);

Receiver 379 (compare 305);

A Receiver Frequency Controller 375;

Three Hopping Sequence Generators 372, 373 and 374;

Three Emulators 376, 377 and 378;

Three Correlators 381, 382 and 383 (compare 308), all connected as illustrated in the figure and as discussed hereinbelow.

FIG. 13 illustrates a passive method for determining which handsets (i.e. handset which is participating in a call with a certain device address) transmissions is being received by a Base Station.

A plurality ("K", three shown) of TOD counters 371, 380 and 384 are set when a rough TOD ("Rough TOD") estimate is received, via the LAN (140), from other Base Stations. The counters 371, 380 and 384 are incremented by the TOD clock 310. Using the TOD and the device addresses ("Bluetooth Device Address") that are connected to calls in which handsets in the neighboring cells (connected to neighboring Base Stations) participate, a corresponding plurality ("K", three shown) of hopping frequency (sequence) generators 372, 373, 374 generate the list of frequencies in which the handsets are likely to transmit.

The receiver frequency controller 375 sets the frequency, which the receiver 379 will monitor. A plurality ("K", three shown) of correlators 381, 382 and 383 is used to compare the energy at the receiver's output, to the emulation of the receiver's output. The output of the receiver can be emulated, since a rough estimate of the TOD is available, as well as the hopping frequency list, and the receiver frequency list. The emulator continuously checks for a match between receiver frequency and the hopping frequency, when it finds the match it reports to the correlator the frequency and the time. By comparing the actual received signal with the emulation that is based on the rough TOD, the correlator detect the presence of the transmitter and computes a line estimate of the TOD offset (i.e., the error between the rough TOD estimate and the actual TOD). Correlator-based time offset measurement is a standard estimation method that is described in many textbooks.

26

example of implementation shall be described later on. The number of handsets that can be detected simultaneously is equal to the number of hopping sequence generators, and the number of emulators of receiver output, and the number of correlators.

In FIG. 13 up to "K" handsets can simultaneously be detected. The main advantage of the method described above is that since the detection is passive, there is no need to achieve fine synchronization between Base Stations. Another advantage of this passive method is that there is no need to decode the messages that the handset transmits, and therefore it is relatively easy to implement.

The receiver frequency controller 375 selects the frequency on which the receiver 379 will wait to "capture" hops. To increase the probability of detection, the receiver frequency controller 375 should be programmed to choose frequencies that are not blocked by interferences (e.g., interferences from other than Bluetooth transmitters). For each frequency that the receiver frequency controller 375 chooses, a histogram of the number of hops that have been detected in a certain duration of time, and their average signal-to-noise ratios are maintained by the receiver frequency controller 375. A measure of the spectral "cleanness" of a certain frequency can be determined as a function of the signal-to-noise ratios (SNRs) of the hops—for example, as the number of hops multiplied by the average signal-to-noise ratios (SNRs) of the hops.

The receiver frequency controller 375 preferably chooses a group of 'M' frequencies that have the best "cleanness" measure, and the receiver 379 waits on them most of the time, when once in T1 milliseconds the controller changes the frequency. Once in T2 milliseconds (T2 is selected to be much larger then T1) the receiver frequency controller 375 selects a frequency which is not in the group of 'M' best, and the receiver 379 waits on it for T3 milliseconds (T3 is selected to be smaller then T1). This enables the receiver frequency controller 375 to monitor the "cleanness" of frequencies that are not in the 'M' best frequencies. If the receiver frequency controller 375 detects a frequency that is cleaner then one of the 'M' frequencies that is in its list, it puts it in the list, instead of the frequency with the lowest "cleanness" measure. Typical values for the parameters M, T1, T2, T3 are 20, 250, 2500, 100, respectively.

Generally, the signal-to-noise ratio (SNR) or signal-to-interference ratio for each hop is measured by measuring the bursts of energy which match the expected hop duration, to all other signals that do not match the hop duration. The average noise level is continuously monitored. When the energy increases for duration ranging from Th-D to Th+D (Th is the nominal hop duration; D is a measurement "window" interval), the hop energy will be computed, and it will be added to the average hop energy. During the duration of the hop the average noise level is not be updated. Typical values for Th and D, are 0.65 milliseconds, and 1000 milliseconds respectively.

### Another Method of Detecting a Handset

An alternative method for detecting a handset which enters the coverage area of a Base Station, is now described. This method is also passive, and also relies on a handset being engaged in a call in order to detect the handset. This method requires fine synchronization between the Base Stations and therefore is somewhat more complicated than the passive method previously described, but using this method has a few substantial advantages over the method previously described, including:

improved detection performance,

improved timing of handoff, and

US 6,430,395 B2

<table>
<tr><td>27</td><td>28</td></tr>
</table>

the ability to detect a moving handset that is not currently participating in a call.

According to the invention, once in a while the Base Station that is currently communicating with the handset will "give up" (omit, yield to its neighbors) a short transmission duration, during which one or more neighboring Base Stations may transmit to the handset. In order for the handset to receive their transmission, the neighboring Base Station(s) must therefore be synchronized with the Base Station that is currently communicating with the handset, and during the time that the neighboring Base Station(s) transmits, it (they) acts as if it were the Base Station that has yielded a transmission slot for handset detection by the neighboring Base Stations.

This method can be illustrated in the context of the Bluetooth short-range communication, wherein frequency hopping is used. The Base Station that is currently communicating with the handset, will give up a single hop. Any of the neighboring Base Stations that are not close to each other may use the same hop to transmit to the handset. The neighboring Base Stations that are close to each other will use different hops to call (communicate with) the handset. This is illustrated in FIGS. 14A, 14B, 14C and 14D.

FIG. 14A, which is similar to FIG. 1, illustrates a wireless communication system 1400 (e.g., WPBX) having a Base Station 391 that is currently communicating with a mobile unit 390 that is a wireless telephone handset, and a plurality (six shown) of neighboring Base Stations 392, 393, 394, 395, 396 and 397 that are waiting (available) for the handset 390 to enter their coverage areas. Each Base Station 391, 392, 393, 394, 395, 396 and 397 has an area of coverage, 391a, 392a, 393a, 394a, 395a, 396a and 397a, respectively. The interconnections between the Base Stations, and between the Base Stations and a central Switch, such as 35 shown in FIGS. 2 and 4, are omitted, for illustrative clarity.

FIG. 14B, which is similar to FIG. 10, illustrates that the Base Station 391 which is currently communicating with the handset 390, periodically (once in K hops) transmits with higher power $P_1$, in order to enable the neighboring Base Stations to synchronize their TOD. According to the handset detection technique being discussed, the Base Station 391 also periodically (once in M hops) skips a transmission on a single hop 702, 703 (shown as dashed lines) in order to allow the neighboring Base Stations 392, 393, 394, 395, 396 and 397 to transmit at these times. As shown in FIG. 14C, three of the neighboring Base Stations 393, 395, 397 transmit on even-numbered skipped hops 705. As shown in FIG. 14D, the other three of the neighboring Base Stations 392, 394, 396 transmit on odd-numbered skipped hops 707. At other times (other than the hops 705, 707), the neighboring Base Stations 392, 393, 394, 395, 396 and 397 may transmit normally to other handsets (not shown) to which they are connected.

As described hereinabove, the Base Station that is communicating with the handset sends the call parameters to neighboring Base Stations via the local area network (LAN 140) that connects all of the Base Stations. It will also send information regarding the timing of hops that they may use to call handsets that it is communicating with. As described hereinabove with respect to FIG. 11, the neighboring Base Stations can synchronize the TOD. According to the timing of the hops received with high energy ($P_1$), the Base Stations that wait for the call, can determine the times in which they are allowed to try to call the handset. In these times the Base Stations transmit to all handsets that are communicating with neighboring Base Stations.

### Detecting Movement of a Handset

The two techniques for detecting a handset, described immediately hereinabove, are "passive" in the sense that they do not require any actions to be taken by the handset, other than the initial action of being engaged in a call (connected to a Base Station). The technique described immediately hereinbelow is "active" in the sense that it requires some further participation (albeit minimal) from the handset. However, such a mechanism is standard in most wireless communication protocols, even in those that were not originally meant to support mobility (handoff). In either case ("passive" or "active"), it is important to recognize that the present invention can work with standard handsets, without modification thereto.

Although the handsets do not need to have a mechanism for supporting (actively participating in) handoff, they preferably have a mechanism that allows checking whether their communication links are operating normally. For example, in the Bluetooth short-range communication link, a "PING" command that is sent on the asynchronous link is used to check whether the data communication link is operative. When the handset receives a "PING" command it will automatically respond with an "ECHO" message (response). Since the "PING" command is sent on an asynchronous link, and not the synchronous link that is used for voice communication, it does not disrupt the voice quality, but only slightly (and temporarily) reduces the available bandwidth for data transfer.

The "PING" command includes the following data fields:
Device address
Identifier
Length
Data (optional)
The "ECHO" response includes the:
Identifier
Length
Data (optional)

In the Identifier, an identification of the originating Base Station is sent. Hence, when the handset replies it is possible for any Base Station receiving the "ECHO" reply to know which Base Station originated the reply.

The "PING" command and "ECHO" response are used by a Base Station in order to determine whether a certain handset has entered its coverage area. Unlike the methods of passively detecting the handset presence, discussed hereinabove, this method allows detection of a Base Station that was not actively engaged in a call at the time of handoff. It is enough for the handset to have only created an initial communication with a Base Station.

FIGS. 15A and 15B, illustrate the use of "PING" command and the "ECHO" response by the Base Station that is waiting for the call.

As shown in FIG. 15A, the handset 121 is currently communicating with the Base Station #1 123 via communications link 122. During this time, the Base Station #2 124 that is waiting for the call will periodically send a "PING" command 145 to the handset 121. When the handset 121 enters the coverage area (is in range) of the waiting Base Station 124, and when it receives a "PING" command with its address, it will reply with an "ECHO" response 146. The "ECHO" response 146 is also received by the Base Station #1 123.

The waiting Base Station #2 124 transmits the "PING" command 145 during the hops that the Base Station #1 123 has dedicated (yielded) for this operation, as described

US 6,430,395 B2

29

hereinabove (see, e.g., FIG. 14B, 702, 703). The "ECHO" reply 146 will be received by both Base Stations 123 and 124, whereupon the Base Stations 123 and 124 can each measure the quality of the received signal ("ECHO") and report the measurements to the Switch (e.g., 129; FIG. 2). Based on this measurement of the quality of the received signal, the Switch 129 can compare signal quality and decide when is the right time to perform the handoff, and implement the handoff procedures described hereinabove.

FIG. 15B illustrates an alternative, "active" method for detecting the handset 121. In this example, The Base Station #1 123 that is currently connected to the handset 121 transmits a "PING" command 147, once in M hops. The handset 121 replies with an "ECHO" response 146' for each "PING" command 147 it receives. When the handset 121 enters the coverage area of neighboring Base Station #2 124, the neighboring Base Station #2 124 will receive the "ECHO" response 146' by monitoring each Mth hop, in order to receive the "ECHO" response of the handset 121 that is approaching it. When the neighboring Base Station #2 124 receives the "ECHO" response 146', it measures the quality of the received signal, and reports to the Switch 129. This method is different from the method previously described with respect to FIG. 15A in two aspects:

1) In the method of FIG. 15B, the Base Station 123 connected to the handset, does not skip each Mth hop, but rather transmits a "PING" to the handset
2) In the method of FIG. 15B, the neighboring Base Stations (e.g., 124) do not transmit "PING"'s to the handset 121—rather, they only passively monitor each Mth hop.

The quality of each hop may be measured by many known methods, such as energy level measurement, signal-to-noise ratio (SNR) measurement, packet loss ratio and bit error rate (BER) that can be performed on the header of each message.

Another Handset Detection Technique

Each Base Station maintains a "Neighbor Connections Table", which includes information about the connections between handsets and neighboring Base Stations. The "Neighbor Connections Table", includes the following information:

Connection number
Handset ID
Base Station ID
Handoff status: Idle/Started
Handset detection status
Number of successful "PING"
Time of last successful "PING"
Quality measurements in successful "PING"

FIG. 16A illustrates a technique (procedure) for detecting a handset that enters the coverage area of a Base Station when (as in the example of FIG. 15B) the Base Station that the handset is currently connected to generates the "PING" command that is sent to the handsets. All of the Base Stations (e.g., 391–397; FIG. 14A) preferably perform the same detection procedure, whether they the handset is connected with them or not.

When a hop is due (steps 400, 401), the even-numbered hops are used by the handset, and the Base Stations use the odd-numbered hops. In a step 402, a hop counter is incremented by one, and if (as determined in the step 403) it is the Kth hop, the Base Station will to try to send a "PING" to one of the handsets that are candidates for handoff. If it is not the Kth hop (step 403, "N"), the Base Station waits for the next hop (step 400).

30

As used herein, "NMAC" represents the address of the handset that will be called, and "NegTab" is an abbreviation of "Neighboring Connection Table".

If handoff has not started yet with any handset (step 404, "N"), all the handsets will be called in order. The pointer to the NegTab is incremented (step 405), and the address of the handset is retrieved from the NegTab (step 406). The Base Station then transmits a "PING" command with the address of the handset (step 407). When handoff has already started with one or more than one handsets, these handsets are "PING"ed more often than the others. The next item in the NegTab is checked (step 411) and, if handoff with it has already started, it will be "PINGED" (steps 412, 407). The handsets that have not started handoff, will be "PING"ed only once in K2 "PING"s (steps 410, 413, 414).

When an "ECHO" is received (step 420, "Y") and it is determined to be from a handset that communicates with a neighboring Base Station (step 419, "N"), it will be compared to all the entries in the "Neighbor Connections Table" (NegTab) 421, 422. If it is found in the NegTab (step 422, "Y"), the quality of the hop is measured (step 423) and a record of the average quality in the previous hops is maintained in the "Neighbor Connections Table" (step 424). The following measurement parameters are sent to the Switch (step 425):

Base Station communicating with handset
Base Station originating "PING"
Base Station receiving "PING"
Identification of handset
Quality of received signal

FIG. 16B illustrates a procedure that a Base Station performs when it receives an "ECHO" response from one of the handsets that are connected to it (from FIG. 16A, step 419, "Y"). The "ECHO" response can be received either when the connected Base Station or one of its neighbors sends a "PING" message to the handset. (See, e.g., FIGS. 15A and 15B.) First, the Base Station checks to see if the "ECHO" reply was caused by itself, or by one of the neighboring Base Stations (steps 430, 431). This information is contained in the Identifier of the "ECHO" reply, as described hereinabove.

If the "ECHO" was caused by a neighboring Base Station (step 431, "Y"), the quality of the received signal is measured and averaged (step 432), and the measurement parameters are sent the Switch (step 433) to be used by the Switch in determining when to perform handoff. If the Base Station itself caused the "ECHO" reply (step 431, "N"), the task simply exits ("B").

FIGS. 16A and 16B illustrated the procedure of transmitting the "PING" from the Base Station that the handset is connected too, and detecting the arrival of a handset from a neighboring Base Station.

FIG. 23 illustrates a procedure for performed by the Base Station when reception or transmission of a hop is required (steps 1200, 1201). Once in K hops (step 1202), if the next time slot is for transmission (step 1203), the Base Stations sends a "PING" to one of the handsets that are connected to it. Tcount is incremented (step 1204), and the next handset that appears in the list of handsets (Connection Table, or "ConTab") that are connected to the Base Station is chosen (step 1205).

The "PING" is sent with the address taken from the ConTab (step 1206). When it is time to receive a hop, the receiver looks for an "ECHO" response (step 1207). If an "ECHO" is received, and it originator was a neighboring Base Station (step 1208), the parameters are compared to the

DTX 0501-0040

US 6,430,395 B2

31

32

NegTab (step 1209), and if it is found in the table (step 1214), the quality of the signal is measured (step 1210) and averaged (step 1211). If the "ECHO" response was to a "PING" command that originated from the same Base Station, the quality is measured (step 1213). In both cases the connection parameters and the quality are sent to the Switch (step 1212).

When an "ECHO" response is received (FIG. 16A, step 425; or FIG. 16B, step 433; or FIG. 23, step 1212), the following data is sent to the Switch:

Received quality

If from handset from neighbor Base Station, the average quality of the received "PINGS"

If from handset connected to same Base Station, the received quality that is monitored continuously, and also the average quality of the received "PINGS"

Base Station originating "PING"

Base Station receiving "ECHO"

Base Station currently connected to handset

Measurement TOD

### Performing Handoff

Two methods for detecting that a handset moves from one Base Station to another have been described hereinabove. The first handoff detection method (FIGS. 13, 14A, 14B, 14C, 14D) is based on passive monitoring of the handset. In the second handset detection method (FIGS. 15A, 15B, 16A, 16B) the handsets are actively "PING"ed, and their "ECHO" responses are noted. Using either one of these two methods, a Base Station that is connected to a handset continuously sends received quality measurements to the Switch and, when a neighboring Base Station detects a handset, a quality measurement is also sent by the neighboring Base Station to the Switch. A Base Station receiving an "ECHO" from one of the handsets that are connected to it (e.g., FIG. 15B), also sends the quality measurement to the Switch. The decision as to when to perform handoff, between one Base Station and another, is made at the Switch, which uses these signal quality measurements from the Base Stations to determine the time for and destination of a handoff. FIG. 17A illustrates a method for making the handoff decision, when a passive detection method is used. FIG. 17B illustrates a method for making the handoff decision, when an active detection method is used.

FIG. 17A illustrates a procedure that is implemented at the Switch (129) in order to decide to which Base Station the handset should be handed. Energy measurements from two or more (three shown) Base Stations 801, 802 and 803 receiving a signal (i.e., the same signal) from a single handset (i.e., the same handset, not shown) are provided to the Switch, as described hereinabove (e.g., over the LAN 140). At the Switch, these measurements are "smoothed" by a plurality (three shown) of sliding window averaging filters 804, 805 and 806, respectively, and they are compared with one another by decision (handoff control) logic 807, which issues a signal ("Select Base Station") to effect handoff. The sliding widow average filters 804, 805 and 806 compute the average quality received from a given Base Station over the previous $T_r$ milliseconds, (over a time interval encompassing at least two subsequent signals from the receiving Base Station), taking into account only the times in which the handset signal was received by more than one Base Station.

The following pseudo-code describes a preferred operation of the decision logic 807:

The inputs to the decision logic are marked by $X_i \ldots X_k$.

The current Base Station communicating with the handset is Base Station 'm'

(1) If maximum $(X_i, \ldots, X_k) = X_j$

(2) If $X_j > X_m + D_1$

(3) If time from previous handoff $> T_d$

(4) Transfer call to Base Station j

(5) If $X_j > X_m + D_2$

(6) Transfer call to Base Station j

If a Base Station receives the handset at a level which is stronger by at least $D_1$ decibels than the level which is currently received by the Base Station with which the handset currently communicates, and at least $T_d$ milliseconds have passed from the last handoff, a handoff is required. This is intended to address the situation of a moderate and slow movement of a handset from one Base Station to another.

If a Base Station receives the handset at a level, which is stronger by at least $D_2$ decibels than the level, which is currently received by the Base Station with which the handset currently communicates a handoff will be performed immediately. This is intended to address the situation of an abrupt move from one Base Station to another.

When the Base Stations use one of the active methods to detect handset presence, the decision algorithm is basically the same as has just been described. The main difference comes from the fact that in the active method the different Base Stations are able to determine the quality that they measured for a single hop, which all of them can identify. Therefore, the Switch is able to compute the quality difference per hop, and thus improve the timing accuracy of handoff.

FIG. 17B illustrates the handoff decision method when using an active detection method. According to the TOD indication that is received along with the quality measurements, the measurements of the same hops are aligned in time (808). They are then averaged over X hops (804, 805, 806), and the same decision logic (807) that was described above may be used to determine which is the most suitable Base Station to connect to the handset, and issue the "select Base Station" signal.

The methods described hereinabove relate to performing handoff between Base Stations when the handset is conducting a call. When a handset is not conducting a call it may move from one Base Station to the other. When it moves, one connection will be ended, and another will be created. The mechanism for ending a connection, and initiating a new one is part of the short-range wireless communication protocol. For example in the Bluetooth protocol, the handset searches for a Base Station, when it finds one, it stays connected to it. If it leaves the coverage area of the Base Station, the connection will end, and the handset will search again for a Base Station. This mechanism is sufficient for a handset that is not currently in a call, but it does not guarantee smooth handoff while in a call. Although this method may be suitable in some conditions, disconnecting from one Base Station and re-establishing connection with the other may take several seconds, and during this time it will not be possible to initiate a call. One of the advantages of the method of actively "PING"ing a handset is that its movement can be detected quickly, even when it is not engaged in a call, and this "waiting" period can be eliminated.

### Operation Procedures

The following sections describe the operation procedures of the Base Stations and the Switch, that are used on the following events:

A new connection is created

A connection is closed

A205

US 6,430,395 B2

33

A handset presence is detected

Switch decides on handoff

Handoff performed by Base Stations

When receiving an update message from a Base Station

Base Station Procedures:

1) New connection created:

Create new low-level protocol instance.

Add connection to "Base Station Connections Table"

Set reserved hops for neighbors transmissions (if active detection method is used)

Send new connection information (handset ID, Base Station ID, handle to low-level protocol instance) to Switch

Send new connection information to all neighboring Base Stations (handset, id, Base Station id, reserved hops, call's parameters: TOD, device address, encryption key, authentication key, links status, etc.)

2) Connection closed:

Close low-level protocol instance.

Remove connection from "Base Station Connections Table"

Send closed connection information to Switch (handset ID, Base Station ID, handle to low-level protocol instance)

Send closed connection information to neighboring Base Stations (handset ID, Base Station ID)

3) Receive new connection information from neighboring Base Station

Add connection information to "Neighboring Connections Table"

4) Receive closed connection information from neighboring Base Station

Remove connection from "Neighboring Connections Table"

5) Detect presence of handset in coverage area

Create low-level protocol instance.

Synchronize TOD

Measure received quality

Update Switch (handset ID, neighbor Base Station ID, and Base Station ID, TOD, handle of low-level protocol instance).

6) Receive message from high-level protocol

Check if corresponding low-level protocol is running on Base Station and, if it is:

Route message to the corresponding low-level protocol instance.

7) Receive handoff command with TOD of handoff

If the Base Station is the Base Station currently communicating with the handset:

Wait until handoff TOD

Stop transmissions to the handset

Move connection parameters from "Base Station connection table" to "Neighboring Connection Table"

If the Base Station was a neighbor of the Base Station communicating with the handset:

Wait until handoff TOD

Start transmitting to handset

Route call to destination Base Station or Switch

Send new connection information (handset id, Base Station ID, handle to low-level protocol instance) to Switch

Send new connection information to all neighboring Base Stations, ID, Base Station ID, reserved hops,

34

call's parameters: TOD, device address, encryption key, authentication key, links status, etc.)

Switch procedures:

1) Receive new connection information

Create instance of high-level protocol

Update "Connections Table"

1) Receive close connection message

Close high-level protocol instance

Remove from "Connections Table"

1) Receive quality measurement from Base Station

If from Base Station connected to the handset,

Store measured quality and TOD of measurement

Check if a neighboring Base Stations should be removed from the handoff candidate list (according to last TOD in which they detected the handset), and remove if necessary

If from a neighbor of the Base Station connected to the handset,

Add neighbor as candidate for handoff to "Connection Table" with TOD of message.

Perform quality comparison and decision of handoff.

If a handoff is required:

Send handoff commands to the originating Base Station and the Base Station receiving the handset.

Update "Connections Table"

When there is more than one Switch in the system (see, e.g., FIG. 22) the Switch procedures will be slightly different, as follows:

1) Receive new connection information

Create instance of high-level protocol

Update "Connections Table"

Send new connection information to all the Switches.

1) Receive close connection message

Close high-level protocol instance

Remove from "Connections Table"

Send remove connection to all Switches

1) Receive quality measurement from Base Station

If from Base Station connected to the handset

Store measured quality and TOD of measurement

Check if the neighboring Base Stations should be removed from handoff candidate list (according to last TOD in which they detected the handset), and remove if necessary

If one of the neighboring Base Stations is connected to a different Switch, send updated information to the other Switch.

If from a neighbor of the Base Station connected to the handset

Add neighbor as candidate for handoff to "Connection Table" with TOD of message.

Perform quality comparison and decision of handoff.

If a handoff is required:

Send handoff commands to the originating Base Station and the Base Station receiving the handset.

Update "Connections Table"

Update "Calls Table"

Send information to all Switches

1) Receive update from another Switch

If new connection: add item to "Connections Table"

If closed connection: remove item from "Connections Table"

A206

US 6,430,395 B2

| 35 | 36 |

If quality measurement: update "Connection Table"
If handoff
Update "Connections Table"
Update "Calls Table"

The Switch also keeps a LOG file of the events in the system. The LOG file includes the quality measurements, call parameters (time, caller ID, called ID, reason for termination, etc.) and the handoff decisions. These may serve to analyze the Base Station's topology and allow for topology improvements and adjustments. For example the reason for a call termination may be correlated to low receive quality, which could imply that there is a "hole" in the coverage pattern.

### Detection and Time Synchronization

FIG. 20 illustrates the implementation of detection and time synchronization method that is based on a correlator. As described hereinabove, the correlator/detector (308) was the basis for synchronization of TOD in FIG. 11, and for the detection of presence of a transmitter and synchronization in FIG. 13.

It is important for a neighboring Base Station to be able to detect and synchronize with a mobile unit prior to receiving a handoff. This process should be done as quickly as possible to ensure seamless handoff of a session. Generally, the process begins with a wide-range search for "target" signals having the correct timing for a mobile unit, based on the rough synchronization information provided by the Base Station which is connected with the mobile unit. These "target" signals are estimated, based on the rough synchronization data. When a match is found (an actual signal from mobile unit is acquired) the search range can be narrowed accordingly (and dramatically). Then, synchronization can proceed as described hereinabove.

The detector/correlator 2000 comprises a signal detector 1001 and a correlator 1002. The task of the detector/correlator 2000 is to provide information whether a target signal is currently received, and to estimate the parameters which serve the hand-off process. The signal detector 1001 and correlator 1002 receive the actual received signal 1008 and its corresponding time 1009 and frequency 1004, as illustrated, and correlates them to the emulated time and frequency instances 1006. The fine TOD, drift and quality of the target signal are estimated by the correlator 1002 which reports the estimated parameters 1007, along with a status which indicates whether the target signal has been acquired, or not. The task of the signal detector 1001 is to process the received signal 1008 and to estimate its time of arrival (TOA), i.e. the exact timing of a hop, and quality values 1003. This may be done by several techniques, which are well known from classical detection theory. As an example of such techniques, an energy detector and a matched filter can be used.

FIG. 21 shows an example of the implementation of the signal detector 1001 of FIG. 20. In FIG. 21, the received signal 1008, which is received from the RF receiver output, is fed to an energy detector 1011. The energy detector 1011 produces a signal 1014, which represents the temporal energy shape of the signal. The temporal energy shape 1014 is fed into a matched filter 1012. The matched filter 1012 has an impulse response, which matches the energy shape the target signal. As is known, per classical estimation and detection theory, the matched filter 1012 will produce maximum value at the time instance which represents an estimation of the time of arrival (TOA), i.e. exact timing of the hops, of the target signal 1008. The maximum value of the

filter output represents an estimation of the received signal quality. The time instance, which represents the estimation of the TOA, is represented in terms of the time clock 1009. The matched filter 1012 reports TOA and quality values for which the quality is above a threshold value $T_h$, and the maximum is a global maximum within a two-sided time window of $T_{x1}$ microseconds. Other implementations of the signal detector 1001 in FIG. 20 can be utilized. Such implementations can correlate the received signal 1008 with the known portions of the target signal temporal pattern instead of its energy temporal shape. Such implementations may achieve improved estimation performance.

The time-frequency correlator 1002 in FIG. 20 receives the TOA and quality values 1003 produced by the signal detector 1001 and corresponding frequency values 1004, which are the actual tuning frequency of the RF receiver. These inputs are referred to herein as the 'actual' TOA-frequency-quality instances. These include the estimated information of the signals, which are received from the various sources. On the other inputs, the time/frequency correlator 1002 receives emulated values of TOA and frequency 1006 instances for a specific target source (i.e. a specific handset). We will refer to these values hereafter as 'target' TOA-frequency instances. The time-frequency correlator seeks matches in the instances from both sources—the 'actual' and the 'target' and detects TOA-frequency patterns in the 'actual' instances which are 'similar' to the 'target' pattern. This process is performed in two possible modes:

1. 'Acquisition' mode in which a match of the 'target' to 'actual' patterns is searched over longer time shifts periods, which cover the uncertainty of the possible fine TOD.

2. 'Tracking' mode in which the fine TOD and drift have been already estimated, and the match between of the 'target' to 'actual' is searched and verified on new TOA-frequency instances over a shorter uncertainty period.

The 'actual' data 1003 and data 1006 is written into 'actual' instances history buffer (e.g., FIFO) and constitutes a list of which records consists of 'actual_TOA', 'actual frequency' and 'actual_quality'. The 'target' data 1006 is written into 'target' instances histories buffer (e.g., FIFO) and constitutes a list of which records consist of 'target_TOA' and 'target_frequency'.

In the 'acquisition' mode, at any given time, records from both lists of which TOA values are 'younger' than $T_{y1}$ milliseconds (where $T_{y1}$ is typically 10,000) in relation to current time clock (to be referred hereafter as 'young' records) are processed as follows:

For each 'target' record, look for 'actual' records, which satisfy:

Matching frequency value (i.e. 'actual frequency'= 'target_frequency').

Absolute value of 'TOA_diff' ('TOA_diff'='known_diff' −('actual_TOA'-'target_TOA')) is smaller than $T_{y2}$ milliseconds (where $T_{y2}$ is typically 500). Note: 'known_diff' is 0 in the acquisition mode.

The 'target' and 'actual' records, which satisfy these conditions, are referred hereafter as 'candidate_records'.

For each of the 'candidate_records' write the corresponding 'TOA_diff', 'actual_quality' value and 'actual_TOA' value into a 'candidates_list'.

When all the 'young_target' records are processed against all 'young_actual' records, sort the 'candidate_list' by 'TOA_diff' values and produce a 'diff_histogram' with resolution of $T_{y3}$ microseconds (where $T_{y3}$ is typically 1000) as follows:

37                                                                                                  38

Scan the sorted 'candidate_list' records, identify the 'TOA_diff' values which are within the TOA diff range of each bin, and accumulate the corresponding 'quality_values' producing 'diff_quality_histogram' values per each bin.

Search the 'diff_quality_histogram' for values, which are bigger than Ky (where Ky is typically 50). If found, set the status output 1007 value to 'detected', and identify the corresponding 'actual_TOA' and 'TOA_diff' values. The corresponding 'actual_TOA' and 'actual_diff' values are referred to hereinafter as a 'diff_cluster' of records. If no 'diff_quality_histogram' values exceed Ky, set the status output 1007 to 'not_detected'.

If status has been set to 'detected' perform a 'least mean square error' (LMSE) estimation of a linear line which mostly fits the two-dimensional 'diff_cluster' instances ('actual_TOA' by 'actual_diff'). LMSE estimation is a well-known estimation technique and is described in the classical literature.

The estimated linear line can be represented as:

$$diff = 'est\ diff0' + 'est\ drift'*('TOA-TOA0)$$ where TOA0 is the smallest 'actual_TOA' value out of the 'diff_cluster' records, 'est_diff0' is the estimated output parameter of 'line TOD' 1007 and 'est_drift' is the estimation the output parameter 'drift' 1007. The 'diff_quality_histogram' value normalized by the corresponding 'bin_population' is the 'quality' output 1007 value.

In the 'tracking' mode, at any given time, process the data in a similar way as in the 'acquisition' mode but with the following differences:

The value of 'known diff' is set to 'prev_est_diff0' + 'prev_est_drift'* ('current_TOA0'-'prev_TOA0'). The terms 'prev_est_$_{diff0}$' and 'prev_TOA0' represented the 'est_diff0' and 'TOA0' which has been evaluated in the previous calculation (either in 'acquisition' mode or in 'tracking' mode). The term 'current_TOA0' is the 'TOA0' of current calculation.

A smaller value of 'Ty$_4$ microseconds (when Ty4 is typically 2000) for the 'tracking' mode replaces Ty$_2$ of the 'acquisition' mode.

## Base Station

FIG. 18 illustrates, in block diagram form, major components of a Base Station 1800. A plurality (three shown) of front-end processors 604, 605 and 606 are connected to a plurality (three shown) of antennas 601, 602 and 603, respectively. The front-end processors 604, 605 and 606 perform the low-level protocols of the short-range communication protocol, described hereinabove.

When idle, a front-end processor 604, 605 and 606 waits for a handset to establish a new connection. When a connection is created it reports the call parameters (e.g., Bluetooth device address, TOD, Encryption key, authentication key, etc.) and transfers the call stream to the central processing unit 607. When a front-end processor is idle, it can also be used to receive (detect, monitor) a handset that is leaving a neighboring Base Station. The central processing unit 607 then sends the front-end processor, the call parameters, and the exact time of handoff. The front-end processor, would at that time, continue the communicating with the handset, as if it was still in the neighboring Base Station.

A separate circuit module 612 (TOD Synchronization & Handset Detection) is used to detect arrival of new handset, and also to synchronize the TOD of all the calls, according to the techniques described hereinabove. This unit 612 is shown having its own antenna 611.

The central processing unit 607 controls the operation of the front-end processors 604, 605 and 606, receives data about new handoff and fine TOD estimation, receives data from neighboring Base Station, maintains the "Neighbor Connection Table", communicates with the Switch and the other Base Stations. The local area network interface 609 is suitably a standard interface, for example a connection to a 10Base-T or 100-Base-T Ethernet, for connecting to the Local Area Network (LAN) 140. Memory 608 and Non-Volatile Memory (NVM) 610 is shown connected to the central processing unit (CPU) 607.

FIG. 19 illustrates, in greater detail, an implementation of a representative one 604 of the front-end processors 604, 605 and 606 described hereinabove with respect to FIG. 18. A base-band processor 631 determines the transmission and reception channels, encodes and decodes speech, deals with error correction, authentication and encryption. The radio frequency front end 630 modulates and demodulates the data, and connects to the antenna 601. The base-band processor 631 controls the frequency ("frequency control" 633) of each hop, sends and receives data ("energy, time of detection" 634) from the RF front end, and receives indication of signal strength ("base band parameters" 635).

## Applications for the WPBX

Most of the preceding sections discussed the use of the methods disclosed in the current invention for a WPBX supporting telephony applications. Except for the methods shown in FIGS. 5, 6 and 7, most of the methods disclosed hereinabove are application independent, as follows:

The method for dividing the short-range communication protocol in order to support mobility of devices. The high-level protocols, including telephony-related protocols, and also protocols for data transfer, such as PPP over the short-range communication link.

The methods for synchronizing the Base Station.

The methods for detecting movement of transmitter from one Base Station to another

The methods for decide when to perform handoff and to what Base Station to hand the call.

These methods can be implemented in order to connect mobile devices that are equipped with a short-range communication transmitter/receiver such as a Bluetooth chipset. Such devices may move from the coverage area of one Base Station to the coverage area of another, when the Switch and Base Stations handle the handoff of the connection from one Base Station to another. Typical application may be the connection of laptop computers equipped with a Bluetooth short-range communication link to the organization's e-mail server. Another possible application is connecting such mobile devices that for example utilize the PPP (point-to-point protocol) over Bluetooth wireless link, to the Internet, via a central remote access server. A system may also support several such applications.

For example in FIG. 24, a personal data (or digital) assistant (PDA) 1301, a laptop computer 1302 and a cellular handset 1303, connect to the systems Base Stations 1304 and 1305, as illustrated. The PDA 1301 and the laptop 1302 may connect, via the local area network (LAN) 1306 to an e-mail server 1308 in order to send or receive messages, and may also connect to a remote access server (RAS) 1309 for Internet connection. The cellular handset 1303 may connect to another handset (not shown) or, via a Telephony Gateway 1306 to the PSTN. The Base Stations 1304 and 1305 and the Switch 1307 handle the various levels of the communication protocol, utilizing the methods described hereinabove.

It is within the scope of the invention that the mobile unit is a device which is any of the following devices: telephone

US 6,430,395 B2

39

handset, standard cordless telephone handset, cellular telephone handset, personal data device, personal digital assistant (PDA), computer, laptop computer, e-mail server, and a device utilizing point-to-point protocol (PPP) to a device via a central remote access server, a headset (including a cordless headset), a personal server, a wearable computer (or computing device), a wireless (video or still) camera, or a mobile music players (i.e., MP-3 devices etc).

Although the invention has been described with respect to a limited number of embodiments, it will be appreciated that many variations, modifications and other applications of the invention may be made, and are intended to be within the scope of the invention, as disclosed herein.

What is claimed is:

1. In a wireless communication system comprising at least two Base Stations, at least one Switch in communication with the Base Stations, a method of communicating between mobile units and the Base Stations comprising:

dividing a short-range communication protocol into a low-level protocol for performing tasks that require accurate time synchronization and a high-level protocol which does not require accurate time synchronization; and

for each connection of a mobile unit with a Base Station, running an instance of the low-level protocol at the Base Station connected with the mobile unit and running an instance of the high-level protocol at the Switch.

2. Method, according to claim 1, wherein:

the low-level protocol comprises procedures selected from the group consisting of control and modulation of RF signals transmitted to the mobile unit by the Base Station, frequency hopping, error correction, accurate time synchronization, device address, rough Time Of Day (TOD), voice channel allocation, forward error correction parameters, encryption keys, authentication keys, voice coding, device addressing, address of a parked mobile unit, definition of an asynchronous data link, and data FIFOs; and

the high level protocol comprises procedures selected from the group consisting of procedures for link setup and control, high-level protocol multiplexing, packet segmentation and re-assembly, quality of service management, service discovery, emulation of serial port over a logical link manager, interoperability for applications over Bluetooth and infra-red protocols, call control signaling and establishment of speech and data calls between mobile units, interoperability for Bluetooth wireless technology with PPP as communication bearer for wireless application protocol (WAP), command interface to a base-band controller and link manager, access to status information, discovering available services, cordless telephony, supporting intercom features in handsets, emulation of serial port, supporting the use of a headset, supporting dial up networking, supporting fax transmission and reception, defining how mobile units can access a LAN with PPP, defining generic object exchange, supporting an object push model, supporting file transfer, and synchronizing the mobile units.

3. Method, according to claim 1, further comprising:

using a real time multi-tasking operating system in order to allow handling of many instances of the protocols simultaneously in the Base Stations and in the Switch.

40

4. Method, according to claim 1, wherein:

the Switch handles routing of data from the high-level protocols to the low-level protocols, and from the low-level protocols to the high-level protocols.

5. Method, according to claim 1, wherein:

the mobile unit is equipped with a short-range wireless communication transmitter/receiver.

6. Method, according to claim 1, wherein a mobile unit is a device selected from the group consisting of:

telephone handset, standard cordless telephone handset, cellular telephone handset, personal data device, personal digital assistant (PDA), computer, laptop computer, e-mail server, a device utilizing point-to-point protocol (PPP) to the Internet via a central remote access server, a headset, a personal server, a wearable computer, a wireless camera, and a mobile music player.

7. Method, according to claim 1, further comprising:

providing communication links between the Base Stations, wherein the communication links between the Base Stations are selected from the group consisting of RF links and land lines; and

transferring connection status information and synchronization information between the Base Stations over the communications links.

8. Method, according to claim 1, wherein:

the Base Stations and the Switch are connected via a wired or wireless local area network (LAN).

9. Method, according to claim 1, wherein:

a first plurality of Base Stations are connected to a first Switch;

a second plurality of Base Stations are connected to a second Switch;

the Switches maintain status tables for calls and connections that they are handling, and maintain copies of each other's status tables; and

when a Switch updates one of its status tables, it sends the updated status table to the other Switches.

10. Method, according to claim 1, wherein:

the wireless communication system comprises a wireless private branch exchange (WPBX) handling calls from mobile units comprising handsets.

11. Method, according to claim 10, further comprising:

in the Switch, maintaining a table of calls being handled by the WPBX, comprising information selected from the group consisting of a unique Call Identification number for each active call being handles by the WPBX, the origin of the call, the destination of the call, Calling Number Identification (CNID), Destination Number (DN), Originating Base Station Identification, Destination Base Station Identification, Status of call, information for billing, and information for performance analysis.

12. Method, according to claim 10, further comprising:

in the Switch, for each call, maintaining a table of connections comprising information selected from the group consisting of Handset ID, Current Base Station ID, handle of high-level protocols, handle of low-level protocols, Number of candidate Base Stations for handoff, List of candidate Base Stations for handoff, and List of handoff status for each candidate Base Station.

* * * * *

DTX 0501-0045

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of February, 2012, I caused two copies

of the foregoing Brief for Defendants-Appellants to be served via electronic mail

and overnight courier to the following address:

> Mark S. Werbner
> Richard A. Sayles
> Mark D. Strachan
> SAYLES WERBNER
> 4400 Renaissance Tower
> 1201 Elm Street
> Dallas, Texas 75270
> (214) 939-8700 (Telephone)
> (214) 939-8787 (Facsimile)
> mwerbner@swtriallaw.com
> dsayles@swtriallaw.com
> mstrachan@swtriallaw.com

WILLIAM G. McELWAIN

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rules of Appellate Procedure 28.1(e)(3) and

32(a)(7)(C), the undersigned hereby certifies that this brief complies with the type-

volume limitation of Federal Rule of Appellate Procedure 28.1(c)(2)(B)(i).

1.    Exclusive of the exempted portions of the brief, as provided in Federal

Rule of Appellate Procedure 32(a)(7)(B) and Federal Circuit Rule 32(b), the brief

contains 13,911 words.

2.    The brief has been prepared in proportionally spaced typeface using

Microsoft Word 2003 in 14 point Times New Roman font.  As permitted by

Federal Rule of Appellate Procedure 32(a)(7)(B), the undersigned has relied upon

the word count feature of this word processing system in preparing this certificate.


WILLIAM G. MCELWAIN

February 15, 2012