No. 2012-1042

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

COMMIL USA, LLC,

*Plaintiff-Appellee,*

v.

CISCO SYSTEMS, INC.,

*Defendant-Appellant.*

Appeal from the United States District Court for the Eastern District of
Texas in Case No. 07-CV-0341, Magistrate Judge Charles Everingham

## BRIEF FOR PLAINTIFF-APPELLEE COMMIL USA, LLC

**SAYLES | WERBNER**
Mark S. Werbner
Richard A. Sayles
Mark D. Strachan
4400 Renaissance Tower
1201 Elm Street
Dallas, TX 75270
(214) 939-8700

**HEIM, PAYNE & CHORUSH**
Leslie V. Payne
Nathan J. Davis
Miranda Y. Jones
JP Morgan Chase Tower
600 Travis, Suite 6710
Houston, TX 77002
(713) 221-2000

April 24, 2012

## CERTIFICATE OF INTEREST

Counsel for Plaintiff-Appellee Commil USA, LLC, certifies the following:

1.     The full name of every party or amicus represented by us is:

Commil USA, LLC

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by us is:

None.

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by us are:

None.

4.     The names of all law firms and the partners or associates that appeared for the party or amicus now represented by us in the trial court or agency or are expected to appear in this court are:

**Sayles Werbner, P.C.:** Richard A. Sayles, Mark S. Werbner, Mark D. Strachan, Eve L. Henson, Christopher W. Hogue, Eric D. Pearson, John A. Conway

**Heim Payne & Chorush, LLP:** Leslie V. Payne, Nathan J. Davis, Miranda Y. Jones

Dated: April 24, 2012

Mark S. Werbner

i

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ............................................................. i

TABLE OF AUTHORITIES ............................................................... iv

STATEMENT OF RELATED CASES ................................................ ix

STATEMENT OF THE ISSUES ......................................................... 1

INTRODUCTION ............................................................................... 3

STATEMENT OF FACTS .................................................................. 4

    A.    Commil's Technology and Patent .......................................... 4

    B.    Cisco's Infringing Products ................................................... 9

    C.    Procedural Background ........................................................ 14

SUMMARY OF ARGUMENT ......................................................... 16

ARGUMENT ................................................................................... 17

I.    THE PARTIAL NEW TRIAL WAS APPROPRIATE .................. 17

    A.    The District Court Did Not Err In Granting a New Trial .................. 17

    B.    The District Court Did Not Err In Granting a Partial New Trial ........ 21

II.    THE INFRINGEMENT VERDICT IS SUPPORTED BY SUBSTANTIAL EVIDENCE ............................................................ 23

    A.    Substantial Evidence Shows the Accused Products Perform the "Dividing" Step ................................................................... 23

    B.    Substantial Evidence Shows the Accused Products Perform the "Running" Step .................................................................... 27

    C.    Substantial Evidence Supports the Inducement Verdict ............. 32

1.    Substantial evidence shows that Cisco had actual knowledge of Commil's patent by early 2005 ................................................32

2.    Substantial evidence shows Cisco intended to induce its customers' infringement..........................................................34

III.    THE INDUCEMENT INSTRUCTION WAS PROPER ...............................38

IV.    THE DISTRICT COURT PROPERLY EXCLUDED CISCO'S INVALIDITY EVIDENCE FROM THE SECOND TRIAL .......................43

V.    THE CONSTRUCTION OF "SHORT-RANGE COMMUNICATION PROTOCOL" IS CORRECT.........................................................................48

    A.    The Claims Are Not Limited to the Preferred Embodiment...............48

    B.    "Short-Range Communication Protocol" Is Not Indefinite ...............52

VI.    THE ASSERTED CLAIMS ARE VALID.........................................................53

    A.    The Written Description Requirement Is Satisfied ............................53

    B.    The Claims Are Enabled ....................................................................54

VII.    SUBSTANTIAL EVIDENCE SUPPORTS THE JURY'S AWARD ..........57

    A.    The Revenues of Cisco's Accused Products form the Proper Base....57

        1.    The royalty base is the smallest saleable unit............................58

        2.    The patented architecture drove the Accused Product sales.....59

    B.    Substantial Evidence Supports the 5% Royalty Rate..........................62

        1.    The four industry licenses were sufficiently comparable.........62

        2.    Numerous *Georgia-Pacific* factors support Commil's rate......64

CONCLUSION .....................................................................................................68

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Advanced Software Design Corp. v. Fiserv, Inc.*, 641 F.3d 1368 (Fed. Cir. 2011) ................................................................................................40, 42

*Alaniz v. Zamora-Quezada*, 591 F.3d 761 (5th Cir. 2009) ......................................20

*Apeldyn Corp. v. AU Optronics Corp.*, Civ. No. 08-568-SLR, 2011 WL 5552520 (D. Del. Nov. 15, 2011) ..........................................................................33

*Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336 (Fed. Cir. 2010) ................53

*AstraZeneca LP v. Apotex, Inc.*, 633 F.3d 1042 (Fed. Cir. 2010) ...........................37

*BJ Servs. Co. v. Halliburton Energy Serv., Inc.*, 338 F.3d 1368 (Fed. Cir. 2003) ..............................................................................................................54

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141 (1989)...................47

*Broadcom Corp. v. Qualcomm Inc.*, 543 F.3d 683 (Fed. Cir. 2008)..... 34-36, 40, 46

*Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 381 F.3d 1371 (Fed. Cir. 2004) ....................................................................................................... 21-22

*Comaper Corp. v. Antec, Inc.*, 596 F.3d 1343 (Fed. Cir. 2010) ..............................22

*Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182 (Fed. Cir. 1998).............33

*Compaq Comp. Corp. v. Ergonome Inc.*, 387 F.3d 403 (5th Cir. 2004) .................47

*Cornell University v. Hewlett-Packard Co.*, 609 F.Supp.2d 279 (N.D.N.Y. 2009) ...........................................................................................................58

*Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374 (Fed. Cir. 2006) ......................................................................................................51, 52

*Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448 (Fed. Cir. 1998).........................44

*Digital Control, Inc. v. Charles Machine Works*, 437 F.3d 1309 (Fed. Cir. 2006) ................................................................................40

*DSU Medical Corp. v. JMS Co.*, 471 F.3d 1293 (2006).................. 16, 38-42, 44, 46

*Everson v. Leis*, 412 Fed. Appx. 771 (6th Cir. 2011) ...............................................40

*Exxon Resources & Engineering Co. v. United States*, 265 F.3d 1371 (Fed. Cir. 2001) ................................................................................53

*Farmer v. Brennan*, 511 U.S. 825 (1994) ...............................................................40

*Gautreaux v. Scurlock Marine, Inc.*, 84 F.3d 776 (5th Cir. 1996), *rev'd on other grounds*, 107 F.3d 331 (5th Cir. 1997)..............................................................19

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F.Supp. 1116 (S.D.N.Y. 1970) ...............................................................16, 59, 62-64, 66-67

*Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S.Ct. 2060 (2011) ......... 1, 16, 38-43

*Golden Blount, Inc. v. Robert H. Peterson Co.*, 438 F.3d 1354 (Fed. Cir. 2006) ................................................................................41

*Guaranty Serv. Corp. v. Am. Employers' Ins. Co.*, 893 F.2d 725 (5th Cir. 1990) ................................................................................19

*Haemonetics Corp. v. Baxter Healthcare Corp.*, 607 F.3d 776 (Fed. Cir. 2010) ................................................................................52-53

*Hall v. Freese*, 735 F.2d 956 (5th Cir. 1984)............................................................20

*Hartsell v. Doctor Pepper Bottling Co.*, 207 F.3d 269 (5th Cir. 2000)...................38

*High Tech Med. Instrumentation, Inc. v. New Image Industrial, Inc.*, 49 F.3d 1551 (Fed. Cir. 1995)................................................................................45

*In re Innotron Diagnostics*, 800 F.2d 1077 (Fed. Cir. 1986).............................21, 22

*Irvan v. Frozen Food Exp., Inc.*, 780 F.2d 1228 (5th Cir. 1986).............................20

v

*Johnson v. Ford Motor Co.*, 988 F.2d 573 (5th Cir. 1993) ....................................20

*Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341 (Fed. Cir. 2009)....................49

*Kinetic Concepts, Inc. v. Blue Sky Medical Group*, 554 F.3d 1010 (Fed. Cir. 2009) ............................................................................................... 51-52

*LadaTech, LLC v. Illumina, Inc.*, No. 09-627-SLR, 2012 WL 1188266 (D. Del. Feb. 14, 2012)............................................................................... 45-47

*Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301 (Fed. Cir. 2009)..26, 59, 61, 66

*Medtronic, Inc. v. Cardiac Pacemakers, Inc.*, 721 F.2d 1563 (Fed. Cir. 1983) .....................................................................................................21, 44

*Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d 1354 (Fed. Cir. 2004) ..........................................................................................35

*Microsoft Corp. v. i4i Ltd. Partnership*, 131 S.Ct. 2238 (2011) .............................47

*Mills v. Beech Aircraft Corp.*, 886 F.2d 758 (5th Cir. 1989)...................................19

*Nystrom v. TREX Co.*, 424 F.3d 1136 (Fed. Cir. 2005)............................................51

*O'Rear v. Fruehauf Corp.*, 554 F.2d 1304 (5th Cir. 1977).......................................20

*Pandrol USA, LP v. Airboss Railway Products, Inc.*, 320 F.3d 1354 (Fed. Cir. 2003) ......................................................................................21, 44

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) ............................. 23, 48-50

*Predicate Logic, Inc. v. Distributing Software Inc.*, 544 F.3d 1298 (Fed. Cir. 2008) .......................................................................................................31

*Prima Tek II, L.L.C. v. Polypap, S.A.R.L.*, 412 F.3d 1284 (Fed. Cir. 2005) ...........44

*Richdel, Inc. v. Sunspool Corp.*, 714 F.2d 1573 (Fed. Cir. 1983) ...........................44

*Rite Hite Corp. v. Kelley Co.*, 56 F.3d 1538 (Fed. Cir. 1995)..................................57

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337
(Fed. Cir. 2001). ............................................................................51

*In re Seagate*, 497 F.3d 1360 (Fed. Cir. 2007) ......................................46

*SEB S.A. v. Montgomery Ward & Co., Inc.*, 594 F.3d 1360 (Fed. Cir. 2010).........42

*Spectra-Physics, Inc. v. Coherent, Inc.*, 827 F.2d 1524 (Fed. Cir. 1987)...............56

*Spectralytics, Inc. v. Cordis Corp.*, 649 F.3d 1336 (Fed. Cir. 2011)................57, 67

*Thomas v. Texas Department of Criminal Justice*, 297 F.3d 361 (5th Cir.
2002) ...................................................................................38

*Thorner v. Sony Computer Entm't  Am. LLC*, 669 F.3d 1362 (Fed. Cir. 2012)
.................................................................................... 49-50

*Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292 (Fed. Cir. 2011) .............57, 61

*United States. v. Morin*, 627 F.3d 985 (5th Cir. 2010) .............................19

*United States v. Bush*, 451 Fed. Appx. 445, 450-51 (5th Cir. 2011)........................38

*United States  v. McElwee*, 646 F.3d 328 (5th Cir. 2011) ........................................38

*Veritas Operating Corp. v. Microsoft Corp.*, 562 F. Supp. 2d 1141 (W.D.
Wash. 2008) ..............................................................................33

*Verve, LLC v. Crane Cams, Inc.*, 311 F.3d 1116, 1120 (Fed. Cir. 2002)............53

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576 (Fed. Cir. 1996)....................32

*Voda v. Cordis Corp.*, 536 F.3d 1311 (Fed. Cir. 2008) .................................... 22-23

*Wang Labs, Inc. v. Am. Online, Inc.*, 197 F.3d 1377 (Fed. Cir. 1999)....................52

*Westbrook v. Gen. Tire & Rubber Co.*, 754 F.2d 1233 (5th Cir. 1985) .................20

*Whitehead v. Food Max of Miss., Inc.*, 163 F.3d 265 (5th Cir. 1998).....................20

*Witco Chemical Corp. v. Peachtree Doors, Inc.*, 787 F.2d 1545 (Fed. Cir. 1986) ............................................................................................21

*Z4 Techs., Inc. v. Microsoft Corp.*, 507 F.3d 1340 (Fed. Cir. 2007) ......................38

### FEDERAL STATUTES AND RULES

35 U.S.C. § 271 ...........................................................................................45

35 U.S.C. § 282 ...........................................................................................47

Fed. R. Civ. P. 59 .......................................................................................21

## STATEMENT OF RELATED CASES

Counsel for Plaintiff-Appellee Commil USA, LLC (Commil) adopts by reference the Statement of Related Cases set forth on page 1 of the Brief for Defendant-Appellant Cisco Systems, Inc.  Other than the related cases set forth therein, counsel for Commil is not aware of any other case pending in this Court or any other court that will directly affect or be directly affected by this Court's decision in this case.

ix

## STATEMENT OF THE ISSUES

1.    Whether the district court exercised proper discretion by ordering a partial

new trial due to Cisco's attempts to incite local and religious prejudices in the first

trial.

2.    Whether the district court properly entered judgment on the jury's verdict

that Cisco induced infringement where substantial evidence showed that:

     a.    Cisco's customers perform all claimed steps when they use Cisco's

lightweight access points and controllers;

     b.    Cisco has had actual knowledge of Commil's patent since late 2004 or

early 2005;

     c.    With knowledge of the patent, Cisco encouraged the infringing use

and knew that its customers' uses of its products would result in direct

infringement; and

     d.    With knowledge of the patent, Cisco gave instructions to its customers

on how to use the products in an infringing manner.

3.    Whether the jury instruction on inducement, which required proof that Cisco

had actual knowledge of the patent, intended that its customers would perform

infringing acts, and knowingly aided and abetted that infringement, requires a new

trial based on *Global-Tech.*

1

4.    Whether the district court exercised proper discretion by excluding Cisco's invalidity evidence from the second trial, where the patent's validity was determined in Commil's favor in the first trial and was not relevant to inducement or damages.

5.    Whether the district court properly found that "short-range communication protocol" was not limited to the protocols expressly mentioned in the specification.

6.    Whether the district court properly entered judgment that Cisco failed to prove its written description and enablement defenses.

7.    Whether the district court properly entered judgment on the jury's damages award.

## INTRODUCTION

At the heart of Cisco's appeal is a demonstrably false proposition: Commil's patent addresses a mobility problem that existed in Bluetooth—not WiFi—and therefore, the patent must be limited to Bluetooth. To the contrary, while WiFi provided some ability to support a mobile device's transition from one access point to another, interruptions were commonly experienced with voice and video applications. Commil's patented architecture solved this problem for WiFi, Bluetooth, and other short-range protocols, by creating a "seamless handoff." Cisco itself touted the advantages of using the patented architecture in WiFi, belying its argument that WiFi had no mobility problem.

Cisco's remaining arguments arise from a series of self-inflicted wounds. In the first trial, Cisco invoked religious and geographic prejudices to sway the jury. Cisco painted Commil as greedy foreigners, who acquired U.S. Patent No. 6,430,395 ("the '395 patent") through miserly dealings in Israel, A5822(138:1-140:1), and who would "fly back home ... with a sack full of Cisco's money that belongs to Cisco and its employees here in Texas." A6041(29:19-22). To further denigrate Commil's patent, Cisco repeatedly referred to it as the "little Arazi Shrine." A6039(20:19-20).

Cisco coupled its prejudicial affronts with "trial by ambush" tactics that earned several rebukes. For example, flouting the pretrial order, Cisco withheld

3

documents until the middle of trial. The district court found that Cisco "did so in the spirit of trial by ambush as opposed to full disclosure of relevant information." A6295(145:2-146:3). Nor was the improper conduct limited to Cisco's counsel. Cisco's star witness changed his sworn testimony from the first trial to the second on a critical fact (knowledge of Commil's patent). A6206(104:14-18); A6306-07(36:22-40:11). Its improper conduct having failed at trial, Cisco now argues to this Court that the jury should have disregarded Commil's expert, Cisco's own documents, and the admissions of Cisco's employees and experts.

## STATEMENT OF FACTS

### A.    Commil's Technology and Patent

Wireless communication systems enable computers and other electronic devices to communicate with each other without physical cables. A common implementation of such technology is a wireless local area network ("WLAN") where fixed base stations (sometimes referred to as "access points") are installed in an office. When in range, laptops and other mobile devices can connect to the base station and access the local network, and in many cases, the Internet.

For mobile devices to communicate with access points, there must be a set of procedures that dictate how the connection will be established, maintained, and used to transmit and receive data. These specified behaviors are called the

4

communication protocol. A number of short-range communications protocols have been developed, including Bluetooth and WiFi (IEEE 802.11).

The '395 invention solved a problem that occurs when mobile devices connect to short-range wireless networks in large areas (*e.g*, universities, large corporate campuses and buildings) that require multiple access points. The preferred embodiment uses Bluetooth, but the specification makes clear that Bluetooth is merely one example and that the invention can be used with other short-range communication protocols. *See, e.g.*, A190(1:10-15; 2:8-19); A191(3:45-53); A193(8:41-45; 8:51-54). There are no limiting statements in the specification that exclude WiFi. Indeed, the '395 invention greatly enhances WiFi's ability to support a mobile device's transition from one access point to another. A15016 (autonomous WiFi networks "cannot perform fast handoffs, which are required to support real-time applications such as voice and video").

Figure 14A of the patent illustrates how multiple base stations provide full coverage of an area:



A180.

As mobile device 390 moves, it disconnects from base station 391 and connects to an adjacent base station. A190(1:10-15); A203(27:25-36). In wireless networks pre-dating Commil's invention, each base station independently handled the entire communication protocol. A6137(102:23-103:11). Those pre-'395 base stations are called "fat" or "autonomous" access points. *Id.* The process of moving from one access point to another—referred to as a "handoff," "roaming," or "mobility"—interrupted the communications and could interfere with the user's activities. A205(32:45-57).

The '395 inventors devised a new way to implement short-range wireless networks to provide coordination between base stations and improve the speed and reliability of handoffs. A190(1:10-15); A191(3:45-67); A194(9:12-22). Rather than using autonomous base stations that handle the entire communication protocol, the '395 invention provides a novel architecture that includes a new device called a "switch," which is connected to and supports multiple base stations. Based on this architecture, the communication protocol is divided into two parts, with certain functionality performed at the base station and other functionality performed at the switch:



Figure 2
200

A166; A194(9:53-59); A191(3:56-67).

The '395 patent teaches that the communication protocol is divided based on time sensitivity. The protocol portions that require accurate time

7

synchronization—"real-time capabilities"—are performed at the base station. A197-200(15:1-24; Tables 1-2). This part of the protocol is called the "low-level protocol." *Id.* Other parts of the protocol that are not time-sensitive comprise the "high-level protocol," which is performed at the switch. *Id.*[1] The base station and switch cooperate to handle a connection with a mobile unit. To implement the full communications protocol, the base station runs an instance of the low-level protocol for the connection and the switch runs a corresponding instance of the high-level protocol. A197(16:7-18).

This novel design "enable[s] the Switch 129 to control the operation of the Base Stations." A194(9:55-58). As a result, the architecture permits a "high-level of synchronization between the Base Stations and the Switch" and "provide[s] seamless and reliable handoff of sessions between Base Stations while the device is moving." A165(Abstract).

In 2000, the inventors formed Commil Limited and applied for the '395 patent. The patent issued and Commil sought investors in order to develop a commercial embodiment. A5784(156:17-157:9); A5789(3:10-4:11); A5790(6:1-16; 8:2-12). Because the principals believed that WiFi consumed too much power and was not being rapidly adopted, Commil focused on Bluetooth. A5790(8:17-9:12). Unfortunately, Commil underestimated WiFi's potential. Advancements in

---

[1] Not all non-real time functions must be performed at the switch; it is permissible for the base station to perform some of those functions. A197(15:24-26).

8

power consumption technology helped WiFi to become the dominant short-range technology, and other factors—resistance from cellular companies, time-to-market and costs—prevented Commil's Bluetooth product from being commercially successful. A5790-91(9:18-10:9); A5792-93(17:17-18:23).

After this miscalculation, Commil redirected its efforts to WiFi. A5801(50:1-25). Development of a commercial WiFi product, however, required significant additional funding, which Commil lacked. A5794(22:18-23:22). Trying every avenue, Commil approached several companies (including Cisco) seeking a partner. A5803(61:5-17); A6215-17(3:13-10:17).

Commil's CEO, Yuval Dovev, spoke with a Cisco mergers and acquisitions manager several times in late 2004 or early 2005. A6215(3:13-5:5). Mr. Dovev told Cisco about Commil's technology and patents and explained that they "line[d] the core" of the products at issue, which Cisco was then acquiring from Airespace. A6216(6:4-9:15). Cisco did not partner with Commil. A6215(5:20-23).

Ultimately, Commil Limited shut down and the '395 patent was sold to Commil USA, which brought this lawsuit. A6218(14:6-15:2).

**B.    Cisco's Infringing Products**

Cisco's products were developed by Airespace, which Cisco acquired in March 2005 for $450 million. A6281(89:19-22). Before acquiring Airespace, Cisco only sold autonomous access points. A6231(68:24-69:21); A5898(64:6-

9

65:1). Airespace was founded more than a year after the April 7, 2000 priority date of the '395 patent. A6145(4:10-5:11); A6273(54:13-55:1). One of the founders, Bob O'Hara, was presented by Cisco at trial.

Consistent with the '395 patent, Airespace implemented a "split-MAC" architecture that "revolutionized the WLAN industry." A15230. Airespace described its products with language that is strikingly similar to Commil's patent:

> Split-MAC WLAN systems ... split[] the processing of the 802.11 data and management protocols, as well as the AP [access point] functionality, between the AP and the WLAN switch or controller .... In the split-MAC approach, the AP handles the portions of the protocol that have real-time requirements .... All other functionality is handled in the WLAN switch/appliance, where time-sensitivity is not a concern ....

A15113; *see also* A15230.

Cisco sells two relevant devices acquired from Airespace: (1) lightweight access points ("LWAPs"); and (2) controllers (also called "switches."). A6301(14:12-15:1); A6209(116:13-17).[2]     A Cisco White Paper illustrates the relationship between controllers and LWAPs:

---

[2] Commil refers to Cisco's LWAPs and controllers as the "Accused Products."

Figure 1. Split Media Access Control Functions



**Controller MAC Functions**

- 802.11 MAC Management: (Re)association requests and action frames

- 802.11 Data: Encapsulate and sent to access point

- 802.11e Resource Reservation: Control protocol carried to access point in 802.11 management frames—signaling done in the controller

- 802.11i authentication and key exchange

**Access Point MAC Functions**

- 802.11: Beacons, probe response, authentication (if open)

- 802.11 Control: Packet acknowledgement and transmission (latency)

- 802.11e: Frame queuing and packet prioritization (access to RF)

- 802.11i: Encryption in access point

A15029. To implement a wireless network, Cisco's customers connect multiple LWAPs to a single controller. *Id.* A mobile device can connect to any of the LWAPs. For each connection, the 802.11 protocol is divided between the LWAPs, which "perform[] only time-critical portions of [the] 802.11 protocol" (A15015), and the controllers, which perform other 802.11 functions "where time-sensitivity is not a concern" (A15113).

Although Cisco argues that the '395 patent "addresses a problem that does not exist in WiFi" (Cisco Br. at 2), a primary benefit of the WiFi split-MAC architecture touted by Airespace and Cisco was enhanced handoffs between access points. A15097 (Split-MAC architecture "significantly speeds up roaming in a WLAN"). Mr. O'Hara explained that autonomous access points were

11

"inadequate" because the preexisting mobility "was both too slow and was unable to span multiple subnets," thus requiring "a tremendous amount of time to update if a device moved from one subnet to another." A6210(119:12-25).

Cisco documents confirm this inadequacy: the old WiFi systems "cannot perform fast handoffs, which are required to support real-time applications such as voice and video." A15016; *see also* A15106-07 (autonomous access points make it "very difficult" to "provide[] high performance roaming"). Mr. O'Hara testified that voice applications suffered from "an audible click or pop or gap in the communication" when the mobile device "would move from one access point to another." A6207(108:24-109:19).

Shortly after acquiring Airespace and with knowledge of Commil's patent, Cisco implemented a "migration plan" to move all customers from non-infringing autonomous access points to the infringing Accused Products "as quickly as possible." A15239. Indeed, Cisco's sales team was instructed to "encourage future migration" to the Accused Products even when customers resisted:

12

## Autonomous AP Migration

```
                    ┌──────────────────┐
                    │ Currently Using  │
                    │ Autonomous AP    │
                    └──────────────────┘
```



A15262; A15244-49 (showing how to "overcome customer objections" to switching to the infringing systems).

The Accused Products succeeded because of the split-MAC architecture. A6294(138:18-139:3) (O'Hara testifying that the architecture "was a driving force behind the sales"); A6355-56(57:18-58:5) (Cisco's damages expert testifying that it "did open up a—a large new market"); A6223(37:7-15) (Commil's damages expert testifying that it "drives the sales of the controllers and access points"). Between March 2005 and January 2011, Cisco's sales of LWAPs and controllers— independent of convoyed sales (*e.g.*, antennas and cables)—generated revenue of

13

$1,275,823,058 with an average margin of 50%. A6222(31:11-33:7); A6230(64:2-65:20); A6232(70:12-20).

### C.    Procedural Background

Commil USA filed this lawsuit in 2007. A1500. At the first trial in May 2010, Commil presented evidence that the Accused Products performed the claimed steps when implemented in a split-MAC wireless network. *See, e.g.,* A5758-61(51:2-62:21); A5769(94:19-95:7). Accordingly, Commil contended that Cisco directly infringed by using the Accused Products and induced its customers' infringement by encouraging their use of split-MAC networks. A112-113.

Cisco did not challenge the claims on grounds of anticipation or obviousness. A113. Instead, Cisco relied on written description, enablement, and attempts to prejudice the jury. For example, Cisco played on stereotypes by painting Commil as foreign, greedy, "bottom-feeders" who acquired the patent through shady dealings in Israel and sought to "fly back home ... with a sack full of Cisco's money that belongs to Cisco and its employees here in Texas." A5822(139:19-140:1); A6041(29:19-22); *see also* A5825(147:22-148:8). Cisco's counsel even made overt insinuations about the Jewish background of Commil's owner and inventors. *See, e.g.,* A5825(146:20-24); A6038-39(16:14-15; 17:16-21; 20:19-20).

The jury returned a verdict that Cisco directly infringed, but did not induce

14

infringement, and awarded damages of $3,726,207 (Cisco's damage model). A136-39; A2046. Commil then filed a motion for new trial due to Cisco's misconduct. A2029-43; A6057(6:12-21). The court found that Cisco's conduct "impliedly align[ed] Cisco's counsel's religious preference with that of the jurors and employ[ed] an 'us v. them' mentality—i.e., 'we are Christian and they are Jewish.'" A6. The court concluded that the verdict was "inconsistent with substantial justice" and ordered a new trial on inducement and damages. A7.

During the second trial, Commil again demonstrated infringement of claims 1, 4, and 6 whenever the Accused Products were used in a customer's wireless network. A6178(136:7-137:14), A6155-56(44:24-46:24); A6175(122:19-23). Cisco's misconduct continued. First, Cisco elicited testimony from Mr. O'Hara about Cisco's knowledge of the patent that was directly contradictory to his testimony in the first trial. A6206 (104:14-18); *see also* A6306-07 (36:22-40:11). Second, Cisco engaged in "trial by ambush" by withholding licensing documents it used to cross-examine Commil's damages expert. A6295(145:9-13). When questioned, Cisco's counsel acknowledged the misconduct:

> THE COURT: Okay. Okay. Then why were [the documents] not turned over before he went on the stand?
>
> [CISCO'S COUNSEL]: Your Honor, we should have turned them over before he went on the stand.

A6276(67:22-25). The district court ensured a fair trial by questioning Mr. O'Hara

15

and imposing sanctions. A6315-16(73:11-74:21); A6276-77(68:1-2; 69:18-70:9).

The second jury returned a verdict that Cisco induced its customers' infringement and awarded damages of $63,791,153. A163-64.

## SUMMARY OF ARGUMENT

Substantial evidence supports the jury's inducement verdict. Cisco's documents and Commil's expert demonstrated that when used by Cisco's customers, the Accused Products necessarily divide the 802.11 protocol based on time-sensitivity and run an instance for each connected mobile unit.

Substantial evidence also demonstrated the level of culpability required by *DSU* and *Global-Tech*. Although Commil's CEO told Cisco about the '395 patent and how it covered the Accused Products when Cisco was acquiring Airespace, Cisco declined to partner with Commil and then systematically encouraged its customers to switch from non-infringing autonomous access points to the Accused Products. Cisco's supposed "good-faith belief" that the patent was invalid is both irrelevant and implausible.

The infringing architecture generated over a billion dollars in sales of LWAPs and controllers, with an average margin of 50%. The jury's award of a 5% royalty on LWAPs and controllers was based on consideration of all relevant *Georgia-Pacific* factors and is sufficiently supported by evidence that the '395 patent was necessary to implement this "revolutionary" architecture.

16

Cisco's attempt to avoid liability based on the factually and legally incorrect premise that WiFi is incompatible with the claims should be rejected. WiFi is a well-known short-range communication protocol that, before the patented architecture, could not provide seamless roaming. One of ordinary skill would recognize that the '395 patent's description of how to design a short-range wireless network based on a divided protocol is applicable to, adequately describes, and enables its use with WiFi. Commil's inability to secure the funding necessary to commercialize a WiFi product is a red herring.

The district court's evidentiary and procedural decisions were tailored to counteract Cisco's misconduct and ensure a fair trial. It was not an abuse of discretion to order a partial new trial where Cisco prejudiced the jury with ethnically- and religiously-charged comments and the re-tried issues were sufficiently distinct to avoid Seventh Amendment concerns.

## ARGUMENT

## I.    THE PARTIAL NEW TRIAL WAS APPROPRIATE

### A.    The District Court Did Not Err In Granting a New Trial

Cisco's counsel's comments throughout the first trial demonstrated an inexcusable attempt to appeal to the local bias and religious prejudices of the jury. A review of the entire record does not support Cisco's position that the comments

17

were "isolated." During cross-examination of Jonathan David, Commil's owner,

Cisco's counsel made the following improper comments:

- Perpetuating stereotypes of Jewish people as greedy opportunists: Cisco's counsel asked Mr. David if his cousin was a "bottom-feeder" like people involved in the "subprime mortgage catastrophe," "buying people's houses that they got kicked out of for next to nothing." A5823(139:19-140:1).

- Implying that Commil was "hiding" an inventor, Nitzan Arazi: Cisco's counsel asked Mr. David if Mr. Arazi "hit the road for Israel." A5825(146:4-147:18).

- Appealing to religious prejudices: When Mr. David mentioned eating at a local BBQ joint, Cisco's counsel quipped, "I bet not pork." A5825(146:4-24).

Eventually the court stopped Cisco's cross-examination and rebuked Cisco's

counsel for the "pork" comment. A5827-28(157:16-158:7).  But Cisco's counsel

continued with his improper comments in closing:

- Cisco's counsel repeatedly referred to the patent, which names Jewish inventors, as "the little Arazi shrine" and the "little shrine." *See, e.g.,* A6038(17:19-21); A6039(18:1-2; 18:13-16; 20:18-20); A6040(24:23-24).

- "You remember the most important trial in history, which **we all** read about as kids, **in the Bible** had that very question from the judge." A6038(16:14-16) (emphases added).

- "Mr. David got the inside word from his cousin, who works with the bank that forecloses on people over there and kicks them out of their businesses." A6038(16:24-17:2).

- "And if you put those three nos down, the one thing that won't happen is that **Mr. David won't fly back home [to Israel] later this week with a sack full of Cisco's money that belongs to Cisco and its employees here in Texas and its shareholders**." A6041(29:18-22) (emphasis added).

Ruling on Commil's new trial motion, the district court concluded that "when these comments are considered as a whole," they "prejudiced the jury's findings ... and had a tendency to appeal to the prejudices of the jurors." A7; *see also* A6057(6:12-21). The court was "convinced that the jury's verdict is inconsistent with substantial justice." A7. On Cisco's motion to reconsider, the court reiterated:

> [T]his court is in the best position to evaluate the prejudicial effect of Cisco's counsel's improper religious comments on Commil's substantial rights and the jury's verdict. The court is not persuaded that it committed a manifest error of law or fact in granting the partial new trial.

A12.

In the Fifth Circuit, the district court's grant of a new trial is reviewed for abuse of discretion. *Guaranty Serv. Corp. v. Am. Employer' Ins. Co.*, 893 F.2d 725, 729 (5th Cir.1990); *see also United States v. Morin*, 627 F.3d 985, 1000 (5th Cir. 2010) ("The trial judge's on-the-scene assessment of the prejudicial effect, if any, [of a prosecutor's remark] carries considerable weight."). The majority of Fifth Circuit cases affirm the trial judge's decision on a new trial, whether it was a grant or denial, finding no abuse of discretion. *See, e.g., Morin*, 627 F.3d at 1000; *Gautreaux v. Scurlock Marine, Inc.*, 84 F.3d 776, 783 (5th Cir. 1996), *rev'd on other grounds*, 107 F.3d 331 (5th Cir. 1997) (en banc); *Guaranty Service*, 893 F.2d at 729; *Mills v. Beech Aircraft Corp.*, 886 F.2d 758, 765 (5th Cir. 1989). This

19

practice recognizes that the trial judge is in the best position to evaluate prejudicial comments, instead of "an appellate court which reviews only the cold record." *See O'Rear v. Fruehauf Corp.*, 554 F.2d 1304, 1308 (5th Cir. 1977).

Fifth Circuit cases cited by Cisco have only refused a new trial where the challenger did not file a motion in the district court, and the appellate court is not reviewing a district court's decision. *See, e.g., Alaniz v. Zamora-Quezada*, 591 F. 3d 761, 778 (5th Cir. 2009); *Johnson v. Ford Motor Co.*, 988 F.2d 573, 582 (5th Cir. 1993). These cases are inapposite as this Court has the benefit of the district court's decision, and is reviewing it for an abuse of discretion.

Moreover, the district court's decision is consistent with cases granting new trials following prejudicial comments. *See, e.g., Whitehead v. Food Max of Miss., Inc.*, 163 F.3d 265, 275-78 (5th Cir. 1998) (improper appeal to local bias and "Golden Rule" argument); *Irvan v. Frozen Food Exp., Inc.*, 780 F.2d 1228, 1231 (5th Cir. 1986) (improper moral appeal); *Westbrook v. Gen. Tire & Rubber Co.*, 754 F.2d 1233, 1238-39 (5th Cir. 1985) (improper appeal to local bias); *Hall v. Freese*, 735 F.2d 956, 960-61 (5th Cir. 1984) (racial prejudice and local bias). For these reasons, the court did not abuse its discretion.[3]

---

[3]    Cisco's attempt to benefit from its counsel's conduct, in seeking a new trial of validity, is beyond the pale. Given that Cisco bore the burden of proving invalidity and that Cisco failed even when employing its trial tactics, the district court was entitled to refuse to re-try validity.

**B.    The District Court Did Not Err in Granting a Partial New Trial**

The partial new trial on inducement and damages complies with the Seventh Amendment.  Seventh Amendment rights are not violated by "having two juries review the same *evidence*, but rather ... having two juries *decide* the same *essential issues*." *In re Innotron Diagnostics*, 800 F.2d 1077, 1086 (Fed. Cir. 1986). Federal Rule of Civil Procedure 59 provides for a partial new trial where the issues are "distinct and separable," which Cisco acknowledges.  Cisco Br. at 64.

Nonetheless, Cisco argues that "indirect infringement and damages are not 'distinct and separable' from direct infringement and invalidity." *Id.* Yet, this Court "has long recognized that patent infringement and invalidity are separate and distinct issues." *Pandrol USA, LP v. Airboss Ry. Products, Inc.*, 320 F.3d 1354, 1364-65 (Fed. Cir. 2003); *see also Medtronic, Inc. v. Cardiac Pacemakers, Inc.*, 721 F.2d 1563, 1583 (Fed. Cir. 1983) ("Though an invalid claim cannot give rise to liability for infringement, whether it is infringed is an entirely separate question capable of determination without regard to its validity.").[4]  Further, ordering a new trial on infringement and damages, while upholding the first verdict of validity, is similar to new trials this Court routinely orders on remand. *See, e.g., Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 381 F.3d 1371, 1374 (Fed. Cir. 2004)

---

[4]     Cisco's reliance on *Witco Chemical Corp. v. Peachtree Doors, Inc.*, 787 F.2d 1545 (Fed. Cir. 1986), is misplaced.  While the court granted a new trial on all issues, it only did so after finding an "improper coercion of the jury amounting to an unfair trial for defendants." *Id.* at 1548.

(remanding for new trial on infringement and damages, while reinstating the previous verdict of validity); *Comaper Corp. v. Antec, Inc.*, 596 F.3d 1343, 1354-55 (Fed. Cir. 2010). Similarly, trial courts routinely hold separate trials of invalidity and damages. *See, e.g., Cardiac Pacemakers*, 381 F.3d at 1374.

In this case, where the only invalidity issues in the first trial concerned written description and enablement (A138) and the issues submitted to the jury in the second trial concerned inducement and damages (A163-64), the two juries were not at risk of deciding the same essential issues. Moreover, direct infringement and indirect infringement were tried together in the second trial, in which Commil proved both that Cisco's customers directly infringed and that Cisco induced that infringement.[5] A148; A163. In sum, validity is separate and distinct from inducement and damages, two juries did not decide the same essential issues, and there was no Seventh Amendment violation. *See, e.g., Innotron*, 800 F.2d at 1086.[6]

---

[5]    Cisco's direct infringement is not at issue. As Cisco recognizes, "Commil elected not to seek damages for [Cisco's] direct infringement at the second trial." Cisco Br. at 24 n.7; A2264. Cisco's request for a **third** trial on remand to provide for the joint trial of both its direct infringement and its indirect infringement is nonsensical because Commil is not pursuing liability or damages based on Cisco's direct infringement.

[6] To constitute a Seventh Amendment violation, the separate trials must "constitute a 'clear and indisputable' infringement of the constitutional right to a fair trial," which Cisco has not established. *Id.*; *see also Voda v. Cordis Corp.*, 536 F.3d 1311, 1329 (Fed. Cir. 2008) (rejecting an "argument that, under the Seventh

## II.    THE INFRINGEMENT VERDICT IS SUPPORTED BY SUBSTANTIAL EVIDENCE

At both trials,[7] Commil presented substantial evidence that when the Accused Products operate, they necessarily perform all steps of claims 1, 4, and 6. This evidence sufficiently supports the jury's verdict that Cisco's customers directly infringe by using the Accused Products in wireless networks and that Cisco induced the infringement.

### A.    Substantial Evidence Shows the Accused Products Perform the "Dividing" Step

The claims are directed to a "method of communicating" between mobile units and base stations in a "wireless communication system" (comprising base stations and at least one switch). A209(39:15-18). The claims cover a "method of communicating," which necessarily occurs during operation of a "wireless communication system," which only exists after design and manufacture. Cisco's argument that the claims only cover the **design and manufacture** of such systems, but not the **operation** of those systems is nonsensical. *Cf. Phillips v. AWH Corp.,* 415 F.3d 1303, 1314 (Fed. Cir. 2005) ("[T]he context in which a term is used in the asserted claim can be highly instructive."). The Accused Products infringe

---

Amendment, a new trial on willfulness would require a new trial on infringement.").

[7] Because Cisco's direct infringement is not at issue, the discussion below focuses on evidence from the second trial.

because they perform both claimed steps **during operation** of a split-MAC WLAN. A reasonable jury could and did accept this evidence.

It is undisputed that the low-level and high-level procedures that comprise the claimed protocol are divided in Cisco's "Split-MAC WLAN system." A15113; A15230. Nor does Cisco challenge that the division of the procedures between LWAPs and controllers is based on time-sensitivity. A15489-92; A6152-53(33:19-34:7, 36:3-20); A15030; *supra*, pp. 10-11. Procedures that are not time-sensitive comprise the high-level protocol and are executed at the controller. A15489-92; A6160(62:19-21); A6167(92:19-22); A6176(127:18-24); A6174(118:21-120:4); A6153(34:1-4). Procedures requiring accurate time synchronization comprise the low-level protocol and are performed at the access point. A6152(33:22-25); A6167(92:14-18); A6176(127:6-11).

During operation, the mobile units communicate directly with the LWAPs. A6157(51:23-52:8). The LWAPs are programmed to divide the communication procedures into high and low-levels. A6157(51:18-22). An LWAP receives information from the mobile unit in the form of packets, which invoke these procedures (both low-level and high-level) as part of the 802.11 protocol. When an LWAP receives a packet, the LWAP evaluates it and determines whether the procedures demand accurate time synchronization, requiring execution at the

24

access point, or whether they are part of the high-level protocol performed at the

controller. As Commil's expert, Joseph McAlexander, explained:

> The [mobile unit] takes that information and packetizes it, reduces it to a string of bits, 1s and 0s, and that's encoded into an 802.11 packet transferred wirelessly to the access point.

> The access point receives that series of packets and begins to tear it apart, decipher it. And it first says that there's certain parts of this protocol that I have to establish an accurate time synchronization with; there's portions of it that I don't.

> **And it makes that decision at the access point, divides how it handles the protocol,** and then sends the high-level up to—some of the high-level up to the controller to actually operate, because it's not time sensitive, and does the operation on the—the lower-level protocol at the access point.

A6156-57(49:24-50:18) (emphasis added); *see also* A6157(51:23-52:8);

A6158(56:7-12); A6165-66(85:24-86:6).[8]

Thus, the LWAP's determination of how to process the packets in

accordance with either low- or high-level protocols **during operation** constitutes

the claimed dividing, which is what the jury found. Cisco did not call an expert,

leaving Mr. McAlexander's testimony un-rebutted.

With no witnesses to rely on, Cisco asserts Mr. McAlexander conceded that

"the WiFi procedures" were "divided not by Cisco's customers, but by Cisco itself

---

[8] Mr. McAlexander's testimony was based on his review of Cisco's documentation, source code, as well as testing the Accused Products with software called a "sniffer." A6134(91:9-17); A6152(33:17-25); A6153(35:13-22); A6148(14:11-15:1).

when the access points and controllers were designed and manufactured." Cisco
Br. at 35. This is a red herring that ignores the claim language and context.
Cisco's conceptual decision to "divide the set of procedures" in the design and
manufacture of the Accused Products was neither Commil's infringement theory
nor the basis for the jury's infringement verdict. A6159(60:1-9). Unremarkably,
Mr. McAlexander acknowledged that Cisco determined **where** the claimed
dividing would occur and wrote software that specified **how** the access point
would divide "when [it] design[ed] the system." A6155(44:17-19); A6197(68:13-
15). But the actual division of procedures occurs when the firmware is executed
**during operation** and "the access point divides how it operates on that protocol
according to whether it's a time synchronized or not requirement." A6157(53:18-
20); A6155-56(45:17-46:24); *see also Lucent Techs., Inc. v. Gateway, Inc.*, 580
F.3d 1301, 1317 (Fed. Cir. 2009) ("Infringement occurs only when someone
performs the method using a computer running the necessary software.").

Cisco also argues that dividing "data packets" (a term Mr. McAlexander did
not use) cannot infringe because the claim requires the dividing of "a set of
procedures," which is different from dividing "data." Cisco's failure to cite the
record to support this assertion is not accidental, and the distinction Cisco draws
between "data" and "procedures" is a straw-man because Commil's infringement

26

theory does not rely on dividing data.[9]   Instead, the infringement evidence establishes procedures are divided **during operation**.

When a mobile device is used, it sends packets to the LWAP that invoke procedures. These procedures are (and must be) executed to establish, enable and maintain the connection.  The Accused Products implement a "division of labor" where the LWAP acts as a conductor by determining whether the procedures will be invoked at the LWAP or the switch.  This dividing of the protocol is performed dynamically, during operation, and was sufficient to support the jury's finding that Cisco's customers performed the "dividing" step.

**B.    Substantial Evidence Shows the Accused Products Perform the "Running" Step**

As with the dividing step, the only expert testimony presented on the "running" step was that of Commil's expert.  The claim language and court's construction plainly state that this limitation applies only to "connections" between mobile units and base stations.  A2.  As shown, the LWAPs determine—on a packet by packet basis for each connection—whether to process the packets based on either low- or high-level protocols at the LWAP or controller, respectively. This unchallenged fact, when coupled with the nature of how 802.11 wireless

---

[9] Nor is Cisco's distinction consistent with the specification. A199-200(20:46-47, 20:58-21:28); A209(39:30-40) (identifying device addresses, time of day parameters, and encryption keys—all "data"—as part of the low-level protocol or "set of procedures").

communications operate (as described below), necessarily means that the Cisco system requires running a separate instance of the high- and low-level protocols for each connection. Mr. McAlexander confirmed this fact by monitoring the wireless traffic in a test system using two access points and a controller. A6201-02(85:18-86:22). This evidence—to which Cisco presented no rebuttal expert testimony—sufficiently supports the jury's finding that Cisco's customers performed the "running" step.

Once a mobile unit connection is established, the Accused Products create a unique copy of the protocol that enables the communications with that particular unit (and only that unit). A6176(128:5-17); A6177(130:13-21). This copy of the protocol—sometimes referred to by Commil's expert as the "state"—contains the information and instructions necessary to enable and maintain the communications. A6176(128:9-13, 129:5-8); A6177(130:19-20, 131:3-8). Because the protocol is divided between the high-level protocol at the controller and the low-level protocol at the LWAP and the entire protocol is needed to enable communications, the controller and the LWAP must create copies of the high- and low-level protocols, respectively, for each mobile unit.[10] A6177(130:13-21); A6155(45:17-22); A6156-57(49:20-50:18).

---

[10] Cisco incorrectly asserts that Commil's proof pertained only to the LWAP (and not the controller). Mr. McAlexander explained that the claim and the court's construction require the respective instances of the protocol at the LWAP and the

The nature of 802.11 requires separate instances of the protocol for each mobile unit because Cisco's LWAPs can communicate with only one mobile unit at a time. A6176(127:25-128:4). As a result, the system must switch between its separate communications with each mobile unit without losing track of communications with other mobile units. A6177(130:17-21). The separate instances of the high- and low-level protocols for each mobile unit are necessary to enable the access point and controller to do this. A6176(128:18-129:20); A6177(130:17-21). Mr. McAlexander monitored the wireless traffic between the access points and the mobile units and confirmed that each connected mobile unit had a separate copy of the protocol. A6202(86:1-22). His testimony shows that Cisco's products and the devices shown in Figs. 8A-B operate in a similar manner—there are unique copies of the protocols for each connected mobile unit:

---

controller. A6175(124:12-125:17). He testified that 802.11 as a whole (including both the high-level and low-level protocols) requires a separate copy of the protocol for each connected mobile unit so that the system can handle multiple connections. A6176-77(128:1-20; 130:13-131:8). Because the high-level and low-level protocols are both necessary to establish and maintain WiFi communications, his testimony demonstrates that the LWAP and the controller must each run a separate copy of their respective portions of the protocol for each connected unit. A6177-78(130:13-131:8; 134:6-8). This context provides the basis and evidentiary support for Mr. McAlexander's testimony that the running limitation, including separate instances of the low-level and high-level protocols at LWAP and controller, was met. A6155(44:24-45:4); A6166(86:19-87:1); A6174(121:12-16); A6178(136:15-22).

29



A174-75. Cisco's arguments mischaracterize the trial testimony and import

unwarranted claim limitations. First, Mr. McAlexander did not concede that

Cisco's LWAPs run only one copy of the WiFi protocol. The testimony Cisco

cites merely establishes the irrelevant fact that the LWAP has only one copy of the

**program**. A6204(97:7-8); A6177(131:3-8). Mr. McAlexander explained that it is

possible to have a single copy of a **program** that runs multiple instances of the

**protocol**. A6177(131:9-133:13) (explaining the analogy of multiple "tabs" in

Internet Explorer). The testimony Cisco cites from the first trial is irrelevant to the

second trial and similarly inconsequential. Mr. McAlexander's testimony was

simply that only one copy of the protocol is running at any one moment—a

byproduct of the fact that LWAPs can only communicate with one mobile unit at a

time. A6018(42:18-43:17). The claims do not require that separate copies of the

30

protocol for each mobile unit be run **simultaneously**. It is consistent with the claims to maintain multiple unique instances but only run one instance at a time.

Second, Cisco's reliance on the "beacon" function turns on the incorrect assumption that every function in the short-range protocol must be part of either the "low-level protocol" or "high-level protocol" in the "running" step. "Beacon" is an LWAP function that transmits a signal informing mobile units in range that the LWAP is present. A6156(48:8-49:2). "Beacon" is used **before** a connection is established and, accordingly, does not implicate the "running" limitation, which by its plain language applies only to "each connection." A6156(48:9-49:2); A6175(125:2-6). The '395 patent teaches that the claimed instances are created **after** a connection has been initiated. A197(16:11-12) ("These instances are created, on an as-needed basis, when a connection is initiated.").

The existence of additional procedures outside the claimed protocols is consistent with claim interpretation principles, as well as the specification. Claim 1 is a "comprising" claim that is satisfied even if additional steps are present. *See Predicate Logic, Inc. v. Distrib. Software Inc.*, 544 F.3d 1298, 1304 (Fed. Cir. 2008). For example, the specification provides that "certain high-level protocols can also be performed in the Base Station, even though they do not require real time capabilities." A197(15:24-27). Additionally, the base stations in the preferred embodiment use at least one pre-connection procedure that is directed at

31

multiple unconnected mobile units. A203(27:65-67). These procedures are outside of the scope of the claimed high- and low-level protocols. Cisco's interpretation of claim 1 improperly excludes the preferred embodiment. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996).

Finally, Cisco again relies on its alleged distinction between "information," "data," "states," and "protocols." The evidence demonstrated that the unique copy of the protocol for each connection included the instructions and information needed to perform the necessary tasks. A6176(128:9-13, 129:5-8); A6177(130:19-20, 131:4-8). This testimony comports with the claim language, the court's construction, and the specification's discussion of "protocols" and "procedures," which include information such as device addresses. A199-200(20:46-47, 20:58-21:28); *see also* A192(5:13-15) ("... creating a copy of the low-level communications protocol, including at least a synchronized time of day (TOD) parameter ...").

C.    **Substantial Evidence Supports the Inducement Verdict**

1.    **Substantial evidence shows that Cisco had actual knowledge of Commil's patent by early 2005**

Mr. Dovev told Cisco in "late 2004" about "Commil's solution and Commil's core technology, including its patents," which he described to Cisco as "lin[ing] the core of the Airespace system." A6216(6:7-10; 8:10-12). He also testified that, according to his customary practice, he likely gave Cisco detailed

materials about Commil's technology and patents, including a "description of how [Commil's] patent worked" and "references to the patent numbers and to the major claims." A6216(8:24-9:15); A6217(10:2-17). A reasonable jury could conclude that Cisco became aware of the '395 patent through its discussions with Mr. Dovev. A6216-17(8:10-12; 8:24-10:17).

While sufficient, Mr. Dovev's testimony was not the only evidence. On December 15, 2004—when Cisco was negotiating the Airespace acquisition—the USPTO sent Cisco notice that the '395 patent was one of a small number of references relevant to a technologically-related Cisco application.[11] A12609; A12724. Mr. O'Hara, who continued to work at Cisco after Airespace was acquired, admitted that this gave Cisco notice of the patent (although a year later, he changed his testimony in a manner blatant enough to warrant inquiry from the trial judge). A6206(104:14-18); *see also* A6306-07(37:16-40:12); A6315-16(73:11-74:21).

Cisco's arguments are an improper request for the Court to reweigh the evidence and make new credibility determinations. *See Comark Commc'ns, Inc. v.*

---

[11] Cisco's cited cases do not preclude notice via USPTO communications. The "transitive knowledge" theory in *Apeldyn Corp. v. AU Optronics Corp.* was far more attenuated. Civ. No. 08-568-SLR, 2011 WL 5552520, *9 (D. Del. Nov. 15, 2011). *Veritas Operation Corp. v. Microsoft Corp.* is unpersuasive because the court first concluded that Microsoft did have knowledge (p. 1278) and then later announced the contrary conclusion (p. 1285, cited by Cisco). 562 F. Supp. 2d 1141 (W.D. Wash. 2008).

*Harris Corp.*, 156 F.3d 1182, 1192 (Fed. Cir. 1998). There is no legal requirement that Mr. Dovev remember the Cisco representative's last name or the exact dates of the discussions. These are factors for the jury to weigh. Additionally, Cisco's alleged timing "inconsistency" in Mr. Dovev's testimony is insignificant given the closeness of the events. He testified that his discussions with Cisco occurred in "late 2004" and were triggered by Cisco's acquisition of Airespace, which Cisco announced no later than January 12, 2005. A15083.

### 2.    Substantial evidence shows Cisco intended to induce its customers' infringement

"A patentee may prove ... inducement of infringement by either direct or circumstantial evidence." *Broadcom Corp. v. Qualcomm Inc.*, 543 F.3d 683, 700 (Fed. Cir. 2008). "[T]he drawing of inferences, particularly in respect of an intent-implicating question ... is peculiarly within the province of the fact finder that observed the witnesses." *Id.* Commil presented sufficient direct and circumstantial evidence to show the requisite intent.

First, Commil's expert testified that once Cisco knew about the patent, there was "no reasonable way" it would **not** have known that its LWAPs and controllers infringe because the claim language was straightforward and Cisco's own documents describe dividing the protocol between the LWAP and controller based on time-sensitivity. A6175(122:2-23); *see also* A6178-79(137:24-138:22); A15029 (firmware "splits the [MAC]" into "[t]iming-critical functions" performed

34

at the LWAP and other functions performed at controller); A15100 (the
"architecture has revolutionized [wireless LAN technology] by splitting the
processing of the 802.11 protocol"). He further testified that once the LWAPs and
controllers were installed in the intended configuration, the customer's use would
necessarily infringe. A6178(136:7-137:14); A6155-56(44:24-46:24);
A6174(122:19-23).

Second, Cisco admits it systematically encouraged customers to use the
Accused Products in the infringing configuration. *Supra*, pp. 10-13. Cisco
aggressively encouraged companies to "migrate" from the autonomous products to
the infringing split-MAC architecture. A15239; A15260; A15280. Cisco also
helped customers with every step of the installation. *See, e.g.*, A15126 ("During
the migration project, the Cisco team practically lived on campus with us.");
A6155(43:12-44:11); A6168-6171(94:25-100:9, 103:8-107:10); A6178-79(137:15-
138:12). These are classic "aiding and abetting" activities that prove inducement.
*See Broadcom*, 543 F.3d at 700; *Metabolite Labs., Inc. v. Lab Corp. of Am.*
*Holdings*, 370 F.3d 1354, 1365 (Fed. Cir. 2004). The evidence further showed that
Cisco enjoyed a 50% margin on the Accused Products in a burgeoning new
market, a fact that the jury was entitled to consider in determining Cisco's intent.
A6230(64:8-19); A6232(70:15-20).

35

Cisco offered no credible evidence to rebut Commil's proof of intent. Again, there was no Cisco expert testimony. Nor did Cisco offer any opinions of counsel. *See Broadcom*, 543 F.3d at 699 (failure to obtain an opinion of counsel is a factor regarding intent). Cisco also failed to present any employees to testify about Cisco's state of mind with respect to the '395 patent.

Cisco's sole evidence was the flawed testimony of Bob O'Hara, which the jury was entitled to disregard because he was heavily impeached. Mr. O'Hara repeatedly acknowledged on cross-examination that Cisco's documentation contradicted his opinions. *See* A6292-93(133:20-136:1); A6302-06(19:20-28:23, 29:13-30:3, 35:10-36:10); A6308-09(43:22-45:16, 47:4-48:15). He even admitted that he could not identify a single Cisco document in support of his positions. A6304(27:7-19). Mr. O'Hara's credibility suffered further by his willingness to change his testimony concerning knowledge of the patent. A6306-07(37:16-40:11); A6315-16(73:11-74:21). Finally, no evidence corroborates his testimony that he reviewed the '395 patent in any meaningful way. For example, he could not remember to whom he allegedly conveyed his views about Commil's patent and no evidence exists that Cisco relied on his views. A6291-92(128:6-130:14).

Cisco's reliance on alleged "substantial non-infringing uses" is also misplaced.[12]  Cisco's LWAPs operate in an infringing manner by default, but it is possible to reprogram them to operate as autonomous access points.  In order to do so, the customer must power up the LWAP in the default mode, download and install new software, and reconfigure the LWAP to operate in an autonomous mode.  A6154-55(39:22-42:8).  Because LWAPs are more expensive than autonomous access points, customers would not buy an LWAP with the intention of reprogramming it.  A6154(40:25-41:8).  Cisco did not present evidence that any customer ever modified an LWAP in this manner.  Instead, the evidence showed that Cisco's marketing campaign was aimed at convincing customers to use the LWAPs in an infringing manner.  Cisco's sales team literature even outlined a seven-point strategy for convincing customers who "like autonomous APs and don't want to migrate to a lightweight architecture" to switch to the infringing technology.  A15267; see *AstraZeneca LP v. Apotex, Inc.*, 633 F.3d 1042, 1059 (Fed. Cir. 2010) (finding intent despite substantial non-infringing uses because the evidence "shows statements or actions directed to promoting infringement").

For these reasons, substantial evidence established Cisco's intent to induce its customers' infringement.

---

[12] Cisco's citation to contributory infringement is misplaced.  Commil withdrew its claim for contributory infringement in the first trial and did not seek to reassert contributory infringement in the second trial.  A13.

## III.   THE INDUCEMENT INSTRUCTION WAS PROPER

Under Fifth Circuit law, a new trial will be granted based on a purportedly erroneous jury instruction only if the appellant demonstrates that "the charge as a whole creates substantial and ineradicable doubt whether the jury has been properly guided in its deliberations." *Z4 Techs., Inc. v. Microsoft Corp.*, 507 F.3d 1340, 1353 (Fed. Cir. 2007) (quoting *Hartsell v. Doctor Pepper Bottling Co.*, 207 F.3d 269, 272 (5th Cir. 2000)). Even where that standard is met, reversal is still inappropriate if, "based upon the entire record," the instruction "could not have affected the outcome of the case." *Id.* An inaccuracy does not require reversal if the instructions "as a whole" are correct. *Thomas v. Texas Dept. of Criminal Justice*, 297 F.3d 361, 365 (5th Cir. 2002).

For a defendant's state of mind, an instruction error that permits a lower state of mind is harmless where the plaintiff offers substantial evidence of actual knowledge. *United States v. McElwee*, 646 F.3d 328, 341 (5th Cir. 2011) (erroneous instruction of deliberate ignorance was harmless error); *United States v. Bush*, 451 Fed. Appx. 445, 450-51 (5th Cir. 2011) (same).

The inducement instruction, as a whole, was consistent with this Court's *en banc* decision in *DSU Medical Corp. v. JMS Co.*, 471 F.3d 1293 (Fed. Cir. 2006), and *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060 (2011), which, aside from modifying the knowledge-of-the-patent requirement, applied substantially the

38

same standard. Both cases require that the inducer engage in "purposeful, culpable expression and conduct" aimed at encouraging direct infringement. *See Global-Tech*, 131 S. Ct. at 2067 (quoting *Metro-Goldwyn-Mayer Studios Inc. v. Grokster*, 545 U.S. 913, 937 (2005)); *DSU*, 471 F.3d at 1306 (same). Under *DSU*, "inducement requires that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement." 471 F.3d at 1306 (quotation marks omitted). *Global-Tech* describes the same type of culpability. *See* 131 S. Ct. at 2068. In this light, *Global-Tech* is not the major departure from *DSU* that Cisco argues.

The instructions here properly required the requisite level of culpability. Specifically, the instructions required Commil prove "that Cisco actively and knowingly aided and abetted [its customers'] direct infringement." A6389(98:19-23). The instructions further provided that "[i]nducing third-party infringement cannot occur unintentionally" and that "Cisco ... cannot be liable for inducing infringement if it was not aware of the existence of the patent." A6389(99:3-7). These instructions imposed an intent standard much more stringent than the negligence standard claimed by Cisco.

Cisco complains about a single phrase requiring that "Cisco knew or should have known that its actions would induce actual infringement." A6389(98:24-99:2). When combined with the rest of the instructions, this single phrase—which

39

was expressly approved in *DSU*—simply recognizes a particular collection of circumstantial evidence[13] that has been repeatedly held sufficient to prove intent. *Global-Tech* did not change this framework; in fact, the Supreme Court affirmed the jury's verdict based on even less compelling circumstantial evidence.

In cases where the defendant had actual knowledge of the patent and intentionally encouraged the infringing conduct, a showing that the defendant should have known of the third-party's infringement is proper circumstantial evidence that the defendant had actual knowledge. *See Farmer v. Brennan*, 511 U.S. 825, 842 (1994) ("[I]f the risk is obvious, so that a reasonable man would realize it, we might well infer that [the defendant] did in fact realize it ..." (quoting LaFave & Scott § 3.7, p. 335)); *Everson v. Leis*, 412 Fed. Appx. 771, 782 (6th Cir. 2011) ("[A]n inference can be drawn from the fact that he should have known, and that inference is circumstantial evidence of Wittich's actual knowledge.").

This Court has recognized the jury's freedom to draw this inference. *See, e.g., Broadcom*, 543 F.3d at 700 ("[T]he drawing of inferences, particularly in respect of an intent-implicating question ... is peculiarly within the province of the fact finder that observed the witnesses."). For example, *Advanced Software*

---

[13] Proof of intent can be either direct or circumstantial. *See DSU*, 471 F.3d at 1306; *see also Broadcom*, 543 F.3d at 700. This standard recognizes that proof typically rests on circumstantial evidence because direct evidence of wrongful intent is rarely available. *Cf. Digital Control, Inc. v. Charles Mach. Works*, 437 F.3d 1309, 1317 (Fed. Cir. 2006) ("Direct evidence of intent is rare, such that a court must often infer intent from the surrounding circumstances.").

*Design Corp. v. Fiserv, Inc.*—issued after *Global-Tech*—held that "evidence that

Fiserv knew of the [patent] and instructed its bank customers about how to use [the

accused functionality] ... is sufficient to create a genuine issue of material fact as

to whether Fiserv had the requisite specific intent to induce infringement." 641

F.3d 1368, 1376 (Fed. Cir. 2011); *see also Golden Blount, Inc. v. Robert H.*

*Peterson Co.*, 438 F.3d 1354, 1365 n.4 (Fed. Cir. 2006).

   *DSU* confirms the correctness of the "knew or should have known"

language in a jury instruction that also requires culpable conduct (A6389(98:21-

23)), knowledge of the patent (A6389(99:5-7)), and intent to cause the acts that

constitute infringement (A6389(98:24-99:1)).  Specifically, the *en banc* Court

affirmed an instruction requiring that the defendant "must have known or should

have known tha[t] its action would cause the direct infringement." *See* 471 F.3d at

1305-06.

   *Global-Tech* does not change the sufficiency of proving intent by

circumstantial evidence in this manner because the defendant in that case

indisputably lacked actual knowledge of the patent.  131 S. Ct. at 2064-65.  At

trial, the instructions provided that "Defendants cannot be liable for inducing

infringement if they had no reason to be aware of the existence of the '312 patent."

Respondents' Br., *Global-Tech Appliances Inc. v. SEB*, 2010 WL 5488407, at *42

n.22.  On JMOL, at the Federal Circuit, and at the Supreme Court, the defendant

consistently argued that inducement requires actual knowledge of the patent. *SEB S.A. v. Montgomery Ward & Co. Inc.*, 594 F.3d 1360, 1376-77 (Fed. Cir. 2010); *Global-Tech*, 131 S. Ct. at 2065. The Federal Circuit held that the knowledge-of-the-patent requirement in *DSU* could be satisfied by proof of a "deliberate[] disregard[ of] a known risk" that there was a protective patent. *SEB*, 594 F.3d at 1376-77.

The Supreme Court's reasoning tracked this Court's analysis in *DSU*. First, the Court explained that inducement requires "purposeful, culpable expression and conduct" (or, stated differently, "knowledge that the induced acts constitute patent infringement"). 131 S. Ct. at 2067-68; *see also DSU*, 471 F.3d at 1306. The Supreme Court also concluded that knowledge of the patent was required. 131 S. Ct. at 2068; *see also DSU*, 471 F.3d at 1304. However, the Supreme Court rejected the conclusion that knowledge of the patent could be shown by "deliberate indifference" and instead adopted the more rigorous "willful blindness" standard. *See* 131 S. Ct. at 2068. The Supreme Court had no occasion to consider the type of circumstantial evidence theory asserted by Commil. Nevertheless, its endorsement of the *DSU* intent standard suggests that it would agree that the jury instruction properly permitted a finding of inducement based on Commil's evidence. *See Advanced Software*, 641 F.3d at 1376.

42

Of particular significance, the Supreme Court affirmed the jury's verdict although the instruction used the "knew or should have known" and "reason to be aware" language. Respondents' Br., *Global-Tech Appliances Inc. v. SEB*, 2010 WL 5488407, at *42 n.22. The Supreme Court reached that decision because the evidence was "more than sufficient" to satisfy the "willful blindness" standard. *See* 131 S. Ct. at 2072. The same is true here, where Commil's evidence showed that Cisco would have subjectively believed that there was a high probability of infringement (because Commil's CEO told Cisco as much) and that Cisco deliberately made no credible attempt to determine whether it was infringing. *Supra,* pp. 9-13; 131 S. Ct. at 2070.

## IV. THE DISTRICT COURT PROPERLY EXCLUDED CISCO'S INVALIDITY EVIDENCE FROM THE SECOND TRIAL

Excluding Cisco's evidence of its alleged good-faith belief of invalidity was not an abuse of discretion for two reasons. First, the relevant inducement question is whether the defendant intended to induce **infringement**; whether the patent is valid is a separate issue that had already been established. Cisco's subjective beliefs about validity, therefore, were irrelevant in the second trial. Second, even if such a belief were relevant, the probative value of Cisco's proffered evidence—which was either not presented in the first trial or rejected by the first jury—was substantially outweighed by the dangers of prejudice, jury confusion, and waste of judicial resources, and thus properly excluded under Federal Rule of Evidence 403.

43

Inducement requires that the defendant "knowingly induced **infringement** and possessed specific intent to encourage another's **infringement**." *DSU*, 471 F.3d at 1306 (en banc, emphasis added). Whether a patent is infringed is independent from its validity:

> [T]his court has long recognized that patent infringement and invalidity are separate and distinct issues. "Though an invalid claim cannot give rise to liability for infringement, whether it is infringed is an entirely separate question capable of determination without regard to its validity."

*Pandrol*, 320 F.3d at 1365 (quoting *Medtronic* 721 F.2d at 1583). Infringement requires applying the properly construed claims to the infringing device. *See Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998) (en banc). Validity has no place in the analysis.

This Court has not directly addressed Cisco's argument that a good faith belief in invalidity can negate inducement intent. The sound-bites relied upon by Cisco do not speak to this issue. In those two cases, the panel simply decided that it did not need to address the infringement issues raised on appeal because its validity determinations resolved all liability issues. *See Prima Tek II, L.L.C. v. Polypap, S.A.R.L.*, 412 F.3d 1284, 1291 (Fed. Cir. 2005); *Richdel, Inc. v. Sunspool Corp.*, 714 F.2d 1573, 1580 (Fed. Cir. 1983). Indeed, after finding the claims invalid, the Court in *Prima Tek* dismissed the cross-appeal on inducement and contributory infringement as moot. 412 F.3d at 1291. If the Court concluded that

44

validity controlled the inducement analysis, it could have simply affirmed the

judgment of no inducement or contributory infringement on the merits. *See id.*

Although the district courts are split, the interplay between infringement,

validity, and liability in the inducement context was correctly explained in *Applera*

*Corp. v. MJ Research Inc.*:

> [T]he parties are in agreement with the legal premise that **a patent can be infringed notwithstanding that it may also be invalid or unenforceable**, and counsel will be expected to refrain from arguing or eliciting testimony to the contrary.
>
> Defendants may argue that they have no liability for any patent infringement found if that patent is found invalid or unenforceable. They may not argue, however, that opinions concerning invalidity and unenforceability are relevant to the intent element of 35 U.S.C. § 271(b). Legal opinion is only relevant to the intent analysis to the extent the advice bears on whether the alleged direct infringer actually infringes patented claims. **Opinions on validity or unenforceability, which bear on infringement only with respect to liability, are thus legally irrelevant as to whether or not the alleged indirect infringer has the requisite intent to induce actual infringement.**

No. 3:98CV1201 (JBA), 2004 WL 367616, at *1 (D. Conn. Feb. 24, 2004)

(citation and footnote omitted; emphasis added); *LadaTech, LLC v. Illumina, Inc.*,

No. 09-627-SLR, 2012 WL 1188266, at *2 (D. Del. Feb. 14, 2012); *cf. High Tech*

*Med. Instrumentation, Inc. v. New Image Indus., Inc.*, 49 F.3d 1551, 1556 (Fed.

Cir. 1995) ("[T]he manufacturer may be held **liable** for infringement if the device,

as altered or assembled, **infringes a valid** patent." (emphasis added)).

45

That a defendant's subjective belief about validity is irrelevant to inducement makes particular sense when considered against the willfulness backdrop. For willfulness—unlike inducement—the defendant's subjective belief about validity is a factor. *Compare In re Seagate Tech.*, 497 F.3d 1360, 1371 (Fed. Cir. 2007)("[T]o establish willful infringement, a patentee must show ... that the infringer acted despite an objectively high likelihood that its actions constituted **infringement** of a **valid** patent." (en banc; emphasis added)), *with DSU*, 471 F.3d at 1306 ("[I]nducement requires that an alleged infringer knowingly induced **infringement** and possessed specific intent to encourage another's **infringement**.") (en banc; emphasis added)).

Because willfulness permits enhanced damages, a higher level of culpability is required. *See In re Seagate*, 497 F.3d at 1368 (en banc); *Broadcom*, 543 F.3d at 699 ("[A] lack of culpability for willful infringement does not compel a finding of non-infringement under an inducement theory."). Under *Broadcom*, a plaintiff can rely on the defendant's failure to obtain an opinion of counsel to prove inducement even though such evidence cannot be used to prove willfulness. 543 F.3d at 699-700. The same principle applies here—a defendant has more defenses to a willfulness allegation (*e.g.*, a good faith belief in invalidity) than to an inducement charge. *See LadaTech*, 2012 WL 1188266, at *2 ("While defendants' beliefs

46

regarding patent validity may be a relevant defense to willfulness, such beliefs are not a relevant defense to inducement of infringement.").

Moreover, patents enjoy a presumption of validity that can only be overcome by clear and convincing evidence. *See* 35 U.S.C. § 282; *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238 (2011). Permitting an inducer to escape all liability simply because it "thought" the patent was invalid would undermine the "carefully crafted bargain" designed by Congress. *See Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 150-51 (1989).

Even if Cisco's validity beliefs were theoretically relevant, the exclusion of evidence under Rule 403 was not an abuse of discretion. *See Compaq Comp. Corp. v. Ergonome Inc.*, 387 F.3d 403, 408 (5th Cir. 2004) (stating "abuse of discretion" standard). Cisco's proffer concerns anticipation, obviousness, written description, and enablement, all of which have minimal (or no) probative value. *See* A2322-26. In fact, Cisco did not even make anticipation and obviousness arguments at the first trial (where validity was actually at issue). Moreover, the USPTO, in a reexamination filed by Cisco, recently confirmed the '395 patent's validity after considering Cisco's primary reference (A16621), and the first jury rejected Cisco's written description and enablement defenses. A138. These facts demonstrate the meritless nature of Cisco's purported good-faith invalidity position. They also highlight that Cisco was planning to use these previously

47

unasserted or rejected invalidity positions to prejudice Commil and to cast doubt

on the patent, which Cisco hoped would affect damages. It was not an abuse of

discretion for the district court to prevent a prejudicial and confusing second trial

on validity.

## V.     THE CONSTRUCTION OF "SHORT-RANGE COMMUNICATION PROTOCOL" IS CORRECT

### A.     The Claims Are Not Limited to the Preferred Embodiment

Cisco relies on a false premise (WiFi does not benefit from the '395

invention's enhanced mobility) to justify ignoring this Court's *en banc* proscription

against limiting claims to the specification embodiments. *See Phillips*, 415 F.3d at

1323 ("[W]e have repeatedly warned against confining the claims to th[e

specification's specific] embodiments.").

The specification and claims speak in terms of "short-range communication

protocols." *See, e.g.*, A190(1:10-15, 2:20-28); A192(5:63-65); A193(8:41-43);

A209(39:20). The expert testimony demonstrated that a person of ordinary skill in

the art ("POSITA") would consider WiFi to be a "short-range communication

protocol." A5754(34:12-15); A5944(86:3-7). Furthermore, Cisco's counsel stated

at the second trial's pretrial conference that Cisco did not dispute that 802.11 was a

short-range communications protocol. A6063(20:4-11). Unless the specification

or prosecution history "clear[ly] and explicit[ly]" redefines or disclaims part of the

scope, "claim terms must be given their plain and ordinary meaning to one of skill

48

in the art." *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1367-68 (Fed. Cir. 2012).

Rather than limiting the invention to Bluetooth, the specification consistently refers to Bluetooth as an exemplary short-range protocol. A198(18:23-24) ("Bluetooth wireless technology is an example of such a short-range communication protocol."); A193(8:41-46) ("a short-range communication link (*e.g.*, Bluetooth wireless technology)"); *see also* A194(10:56-58); A199(20:49-51); A203(27:15-17); A208(38:40-42). There are no limiting statements in the specification that would exclude WiFi. Moreover, claims are not limited to the preferred embodiment, even where only one embodiment is described in detail. *See Phillips*, 415 F.3d at 1323 ("[W]e have expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment."); *Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1347-48 (Fed. Cir. 2009).

Cisco's WiFi carve-out based on its purported mobility is contrary to the overwhelming evidence. Cisco's documents and witnesses concede that WiFi's mobility capabilities were inadequate. *See, e.g.*, A6210(119:12-19) (Cisco's witness testifying that "[t]he mobility, as it existed prior to the introduction of our [split-MAC] system, was inadequate to meet the needs of our customers"); A15016 (autonomous WiFi networks "cannot perform fast handoffs, which are required to

support real-time applications such as voice and video"). Cisco records further showed that a major benefit derived from the split-MAC architecture was achieving fast, cellular-like handoffs. A15018 (listing Mobility Benefits, "fast handoffs"); A15474 (touting "fast, secure roaming" and "fast secure mobility").

The '395 invention achieves the coveted "seamless" handoffs. A165. It makes no sense to exclude WiFi simply because it permitted slow and disruptive handoffs—particularly where Cisco's own documents describe dividing the 802.11 protocol based on time sensitivity in order to achieve seamless mobility using terminology nearly identical to the '395 patent.[14] *Supra* pp. 11-12.

The prosecution history also supports Commil's entitlement to the full scope of "short-range wireless communication protocol." Cisco's reference to an Office Action containing the short-hand notation, "drawn to Bluetooth," is misleading. In context, the document shows that Bluetooth is exemplary by noting that the asserted claims have "utility **such as** supporting Bluetooth wireless technology in wireless communication systems." A12487 (emphasis added); *see Phillips*, 415 F.3d at 1317 (prosecution history "often lacks the clarity of the specification and

---

[14] The specification passages that Cisco asserts limit the claims to protocols with no support for mobility are not "clear and unmistakable disclaimer[s]" of protocols that offer inadequate mobility. *See Thorner*, 669 F.3d at 1366-67. The reference to "mobile units that have no built-in support for handoff" is simply describing the preferred Bluetooth embodiment. A194(9:23-30). The Abstract is premised on the reasonable view that protocols that offer only unacceptable mobility "are not specified to handle handoffs of sessions while moving between Base Stations ... in a data, voice, or telephony wireless network." A165.

thus is less useful for claim construction purposes"). Moreover, in the Notice of Allowability, the examiner made clear that the claims were not limited to Bluetooth by stating that "[t]he invention is drawn to a wireless communication system using short-range communication protocol." A16401.

Cisco's cases are inapposite. The patentee in *SciMed Life Sys. Inc. v. Advanced Cardiovascular Sys, Inc.*, expressly disclaimed the disputed embodiments. *See* 242 F.3d 1337, 1344 (Fed. Cir. 2001) ("The words 'all embodiments of the present invention' are broad and unequivocal. It is difficult to imagine how the patents could have been clearer in making the point that the coaxial lumen configuration was a necessary element of every variant of the claimed invention.").

In *Nystrom v TREX Co.,* the patentee improperly attempted to use "obscure" dictionary definitions to broaden the term "board" to include non-wood materials, where the specification and prosecution history consistently reflected the ordinary meaning ("a piece of sawed lumber"). 424 F.3d 1136, 1143-45 (Fed. Cir. 2005). Here, it is undisputed that the ordinary meaning of "short-range communication protocol" includes WiFi.

In *Kinetic Concepts* and *Curtiss-Wright*, the rejected broader construction simply did not make sense in the context of the invention and, accordingly, would not be the meaning understood by a POSITA. *See Kinetic Concepts, Inc. v. Blue*

*Sky Med. Group*, 554 F.3d 1010, 1018-19 (Fed. Cir. 2009) (proper construction of "wound" did not include fistulae because specification conveys that the described medical treatment should only be used on skin wounds); *Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1379 (Fed. Cir. 2006). Here, in contrast, all of the evidence demonstrates that a POSITA would recognize that the divided protocol architecture would improve mobility in WiFi networks.

In *Wang*, the Court preserved validity by adopting a construction that excluded bit-mapped displays, which were not enabled. *Wang Labs., Inc. v. Am. Online, Inc.*, 197 F.3d 1377, 1383-84 (Fed. Cir. 1999). That reasoning is inapplicable here where, as shown below, WiFi embodiments are enabled. *See also Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906-08 (Fed. Cir. 2004) (holding that *Wang Labs* "does not stand for the proposition that if a patent specification describes only a particular embodiment, the claims must be limited to that subject matter).

### B.    "Short-Range Communication Protocol" Is Not Indefinite

"An accused infringer must ... demonstrate by clear and convincing evidence that one of ordinary skill in the relevant art could not discern the boundaries of the claim based on the claim language, the specification, the prosecution history, and the knowledge in the relevant art." *Haemonetics Corp. v. Baxter Healthcare Corp.*, 607 F.3d 776, 783 (Fed. Cir. 2010). "In light of [the statutory presumption

of validity] ... close questions of indefiniteness ... are properly resolved in favor of the patentee." *Exxon Res. & Eng'g Co. v. United States.*, 265 F.3d 1371, 1380 (Fed. Cir. 2001).

Cisco did not offer any evidence (either at trial or during the *Markman* process) that a POSITA would not understand the meaning of "short-range communication protocol." In contrast, Commil's expert testified that the term's meaning was well understood and that its meaning encompasses WiFi. A5996(115:19-25); *see also* A5734(102:10-16); A5742-43(137:25-138:14; 139:11-24); A5770(98:3-21). Because the undisputed evidence shows that a POSITA would understand the meaning of "short-range communication protocol," it is not indefinite. *See Verve, LLC v. Crane Cams, Inc.*, 311 F.3d 1116, 1120 (Fed. Cir. 2002).

## VI.    THE ASSERTED CLAIMS ARE VALID

### A.    The Written Description Requirement Is Satisfied

Cisco argues that if "short-range communication protocol" covers WiFi (which it does), then the claims lack sufficient written description. Adequacy of written description is a question of fact. *See Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010). The first jury's verdict rejecting Cisco's written description defense (A138) is supported by substantial evidence, namely the testimony that a POSITA would understand WiFi to be a short-range

53

communication protocol.

Mr. McAlexander testified to that effect. A5754(34:12-15; 36:6-14); A5996(115:19-25); A5743(139:18-24). Cisco's expert, Dr. Lansford, agreed. A5944(86:3-7). By using the term "short-range communication protocols" throughout the specification, a POSITA (who recognizes WiFi as a type of short-range protocol) would understand that the inventors were in possession of a method of dividing the WiFi protocol, as well as other short-range protocols. A5996(114:4-117:14). Accordingly, the jury properly rejected the written description defense.

### B.    The Claims Are Enabled

The first jury found that Claims 1, 4 and 6 are not invalid under the enablement requirement. A138. Although enablement is a question of law, it is amenable to resolution by the jury because of the factual nature of the inquiry. *BJ Serv. Co. v. Halliburton Energy Servs, Inc.*, 338 F.3d 1368, 1371 (Fed. Cir. 2003). Where, as here, a jury decided enablement based on factual determinations, this Court "look[s] to whether a reasonable jury could have made the underlying factual findings necessary to provide substantial evidence in support of its conclusion." *Id.* at 1371-72.

Cisco's argument is premised on legal and factual mischaracterizations. First, the claims do not require running multiple copies of the protocol

**simultaneously**. *Supra* p. 30-31. Second, Commil's failure to develop a commercially successful WiFi product was due to time and financial constraints and not an inability to apply the invention to WiFi.

Commil originally chose to pursue Bluetooth because of its greater prevalence in cellular phones, its European roots, its lower power-consumption, and the perception that WiFi was "over its hype and nobody really developed major technologies on [it]." A5790(8:2-9:12). Commil's resources were inadequate to develop Bluetooth and WiFi products in parallel. A5793-94(21:7-22:10).

Once it realized that its Bluetooth product would not be commercially successful, Commil shifted its focus to WiFi. A5792-94(17:7-18:19; 22:24-23:5). At that time (in 2004), Commil had a "conceptual framework for how to make [a WiFi product] work." A16619. But building a commercially feasible wireless networking system is a time-consuming and expensive process,[15] and Commil's investors were unwilling to invest additional resources. A5794(22:24-23:10).

Accordingly, Commil knew "how to make [a WiFi embodiment] work." But the question was whether it could develop a commercial product quickly enough

---

[15] Commil devoted as many as 30 employees, about three years, and millions of dollars to developing its Bluetooth embodiment, which Cisco does not dispute was enabled. A5790(6:5-16); A5793(18:20-19:11; 20:19-21:6). Commil's WiFi efforts had considerably less time, less money, and fewer employees. A5801(50:18-51:10); A5798(39:19-21).

with limited funds. *See, e.g.*, A16619 ("With the assistance of Ericsson we could probably make this work quicker."). In the end, Commil ceased operating because it was unable to develop a proof of concept of a **commercially-viable product** (as opposed to a mere prototype) by a "target date." A12001; *see also* A6027(80:16-81:11).

The teaching of the specification and evidence of how it could be applied by a POSITA is far more probative than Commil's commercial difficulties. *See* A6027-28(80:16-82:11). The specification details how to implement the new wireless network by dividing a short-range communication protocol into a time-sensitive low-level protocol, performed at the base station, and a high-level protocol that is not time-sensitive, performed at the switch. *See, e.g.*, A198-200; *see also* A5996(116:16-117:14).

WiFi is a well-known short-range protocol. A5754(34:6-15); A5763(73:14-19). The WiFi standard is readily available and defines the functions of the protocol. A5754-55(37:7-9; 38:8-16). A POSITA would easily understand which functions were time-sensitive and could write software necessary to divide the protocol and run separate instances at the base station and the switch. A5755(39:11-23); A5995(113:6-18); A5996(116:16-117:14). Because splitting the MAC layer of Bluetooth is similar to splitting the MAC layer of WiFi, a POSITA could apply the detailed teaching of the preferred embodiment to WiFi.

A5996(114:21-115:18); *see also Spectra-Physics, Inc. v. Coherent, Inc.*, 827 F.2d 1524, 1533 (Fed. Cir. 1987) ("If an invention pertains to an art where the results are predictable, *e.g.*, mechanical as opposed to chemical arts, a broad claim can be enabled by disclosure of a single embodiment."). This testimony is sufficient to defeat Cisco's enablement defense.

## VII. SUBSTANTIAL EVIDENCE SUPPORTS THE JURY'S AWARD

Cisco takes the extreme position that **zero damages** would adequately compensate Commil. A party challenging a damages verdict "'must show that the award is, in view of all the evidence, either so outrageously high or so outrageously low as to be unsupportable as an estimation of a reasonable royalty.'" *See Spectralytics, Inc. v. Cordis Corp.*, 649 F.3d 1336, 1345 (2011) (quoting *Rite Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1554 (Fed. Cir. 1995) (en banc)). Cisco cannot meet this burden.

### A.    The Revenues of Cisco's Accused Products form the Proper Base

Cisco first contends that the jury improperly applied the entire market value rule ("EMVR") to arrive at the royalty base, namely the total sales of Cisco's controllers and LWAPs. Cisco Br. at 53. The EMVR applies "where the patented feature creates the 'basis for customer demand' or 'substantially create[s] the value of the component parts.'" *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318-19 (Fed. Cir. 2011). The EMVR does not apply here, and even if it did, this

standard was met.

### 1.    The royalty base is the smallest saleable unit

Commil's asserted claims cover the operation of Cisco's LWAPs and controllers. A209; A6162-63(73:11-74:14). Claim 1 requires the dividing and running steps to be performed in the context of "Base Stations" (access points) and "at least one Switch" (controllers) that form a "wireless communication system." Given the claim language, Commil narrowly tailored its royalty base to encompass the two products (LWAPs and controllers) that practice the claimed architecture. A6222(32:23-33:7).

Commil's damages expert, Roger Carlile, testified that these products constituted the smallest saleable unit. *Id.*; A6247(130:13-16); *see, e.g.*, *Cornell Univ. v. Hewlett-Packard Co.*, 609 F. Supp. 2d 279, 288 (N.D.N.Y. 2009) (suggesting the proper royalty base is "the smallest salable infringing unit"). Commil did not invoke the EMVR, which would have resulted in a royalty base covering Cisco's entire system that further includes antennas, cables, Ethernet switches, software, and mobile devices. A6222(32:23-33:7).

Cisco nonetheless contends that a patentee must satisfy the EMVR **even where** its chosen base is tailored to the smallest saleable unit. Cisco Br. at 55. This leads to an absurd conclusion: if correct, the applicable base would always be **zero** unless the patentee could show, for even the smallest salable unit, that the

58

patented technology was **the basis** for consumer demand. No case demands satisfaction of the EMVR where the royalty base is based on the smallest saleable unit and the royalty rate properly accounts for the value of the patented technology under a *Georgia-Pacific*[16] analysis. In *Lucent*, this Court expressly rejected such a standard, suggesting that "the base used in a running royalty calculation **can always be** the value of the entire commercial embodiment, as long as the magnitude of the rate is within an acceptable range." *Lucent,* 580 F.3d at 1338-39 (emphasis added).

Significantly, Cisco's damages expert used the same base. A6349(32:19-33:9). For these reasons, the jury was entitled to include the total sales of LWAPs and controllers based on the trial testimony and claim scope.

### 2. The patented architecture drove the Accused Product sales

Even if satisfaction of the EMVR were necessary, substantial evidence shows that the patented architecture created the value of the Accused Products. Substantial evidence showed that consumers rapidly abandoned autonomous access points in favor of infringing LWAPs and controllers. A6357-58(65:4-67:3); A15020; A6231(69:11-25); A15039; *infra,* pp. 12, 16, 36-37. If non-patented features actually drove sales, consumers should have no preference for the

---

[16] 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).

infringing products over the predecessor products, but that is not the case. *Id.* The

following testimony of Bob O'Hara demonstrates this point:

> Q. But those features and benefits exist in the old autonomous fat
> standalone access points as well, don't they?
>
> A. Yes, they do.
>
> Q. So none of these access points will -- will sell without security
> and the power and the antennas and the other things, right?
>
> A. That's correct.
>
> Q. But the new system, the thin access points, when they come
> out, even though they have these same benefits and features,
> these thin ones, the sales go up 125 percent, and the fat ones
> immediately start to decline by 25 percent. And maybe those
> figures aren't exactly right, but that's what we heard from Mr.
> Carlile yesterday. Doesn't that make it pretty clear that the
> driving force is the Split MAC architecture that enables certain
> key functions, not these other things that they both have?
>
> A. No. What enabled us to increase our sales was that we solved
> the customer's problems.
>
> Q. And it was the [split-MAC] architecture that enabled those
> enhanced features, correct?
>
> A. Yes.

A6293(136:12-137:9).

Moreover, before Cisco implemented the infringing architecture, there were

no controllers. The patented architecture, therefore, created an entirely new

product, namely controllers (with a sales volume of $500,000,000), which Cisco's

witnesses did not dispute. A6294(138:15-140:5); A6354(53:1-17); A6224(38:9-

60

15). Thus, contrary to the EMVR cases cited by Cisco, the royalty base here is directly tied to product markets that arose from the implementation of the patented architecture.[17]

Mr. O'Hara also admitted that the patented architecture was the driving force behind the Accused Product sales:

> Q. This architecture opened up an entire new market with a large business enterprise, didn't it?
>
> A. Yes.
>
> Q. This architecture, in your own words, was revolutionary, wasn't it?
>
> A. Yes.
>
> Q. This architecture was a driving force behind the $100 million worth of [Airespace] sales that you mentioned, correct?
>
> A. Oh, yes, absolutely.
>
> Q. And this architecture was a driving force in the billion dollars of sales that Cisco made, correct?
>
> A. I didn't know about the amount of the sales, but it certainly drove sales.

A6354(52:5-20). Cisco's expert echoed Mr. O'Hara's statements, stating "that architecture did open up a -- a large new market." A6355-56(57:10-58:5). Mr.

---

[17] The direct relationship between Commil's claimed invention and the Accused Products comprising the royalty base is not found in any of Cisco's EMVR cases. For example, while the patent in *Lucent* covered only a date-picker feature, the royalty base encompassed sales of Microsoft Outlook, yielding a $358 million damages award. 580 F.3d at 1338. Similarly, while the patent in *Uniloc* covered only a product activation feature, the royalty base encompassed sales of Microsoft Office and Windows, yielding a $388 million damages award. 632 F.3d at 1296-99, 1318.

Carlile also testified that the patented technology drove sales of the Accused
Products. A6223(37:7-15) ("It's my opinion that the -- the Split MAC
architecture, the '395 patented technology, is -- is what drives the sales of the
controllers and access points that are included in those sales numbers.").

### B.    Substantial evidence supports the 5% royalty rate

Commil's expert discussed each of the relevant *Georgia-Pacific* factors and
explained that these factors support a 5% royalty. A6224-33(39:3-74:11). Cisco's
sole criticism of the rate is the comparability of the licenses on which Mr. Carlile
relied, which is merely **one** of the **fifteen** factors that the jury considered. By
focusing on only one factor, Cisco effectively disregards evidence on all other
*Georgia-Pacific* factors. Even if the four licenses were not comparable, Cisco has
not suggested that Commil's evidence as to the remaining factors is insufficient.

### 1.    The four industry licenses were sufficiently comparable

*Georgia-Pacific* factor 12 concerns the portion of the profit or price that is
customary in comparable businesses. After explaining that Commil has no '395
patent licenses to consider under factor one and that Cisco had not produced any
licenses for consideration under factor two, Mr. Carlile discussed four industry
licenses under factor 12. A6225-28(42:20-57:2). These licenses include rates

between 1 and 5%.[18]  A6228(56:16-22).  Each license provided for a running

royalty in the wireless industry.

While the licenses' terms differed in certain respects from the terms

expected in the hypothetical negotiation, these differences were taken into

consideration, and Cisco highlighted those differences for the jury.  *See, e.g.*,

A6248-49(136:16-138:1); A6250-51(144:4-146:15).  For example, under *Georgia-*

*Pacific* factor 3, Mr. Carlile considered that the hypothetical negotiation would

result in a non-exclusive license.  A6232(72:14-16).  Cisco insinuates that Mr.

Carlile chose a 5% rate based on the highest rate in one comparable license, but

that is incorrect.  After considering the four licenses, Mr. Carlile settled on a mid-

point royalty of 3% as the starting point.  A6228(56:16-22); A6232-33(73:22-

74:11).  He then discussed the other *Georgia-Pacific* factors, which enhanced the

rate, as described below.  Mr. Carlile testified that these additional factors

supported a 5% royalty.  A6232-33(73:22-74:11).

---

[18] To identify industry licenses, Mr. Carlile used a service called Royalty Source, which provides license summaries.  A6225(43:7-44:16); A6255(163:15-164:10). Whenever possible, Mr. Carlile also considered publicly available information about the licenses and pulled copies of the licenses, but he was unable to locate every license.  A6249(140:1-9).  Cisco improperly withheld documents regarding the licenses.  A6295-96(145:2-146:3).  When Cisco surprised Mr. Carlile with the licenses on cross-examination, the district court sanctioned Cisco for "deliberately delay[ing]" disclosure of the documents "in the spirit of trial by ambush as opposed to full disclosure of the relevant information."  *Id.*  The "least severe sanction" available under the circumstances was preventing Cisco's expert from criticizing the four licenses.  *Id.*

2.     **Numerous *Georgia-Pacific* factors support Commil's rate**

As Commil's expert explained, relevant *Georgia-Pacific* factors include, among others, factors 7, 8, 9, 10, 11 and 13. Cisco ignores these factors. With respect to factors 9[19] and 10[20], Commil presented substantial evidence of the utility and advantages of the infringing LWAPs over the autonomous access points. A6357-58(65:17-67:3); A15020; A6231(69:11-21); A15039; *supra* pp. 5-7. As Mr. McAlexander testified, prior to the invention, "it was very difficult, if not impossible" to attain seamless migration, and the split-MAC architecture gave Cisco the ability to seamlessly integrate access points. A6160(63:23-64:7). A 2003 email from Mr. O'Hara confirms the advantages of the split-MAC architecture. A15097.

In addressing factor eight, "[t]he established profitability of the product made under the patent; its commercial success; and its current popularity," *Georgia-Pacific*, 318 F. Supp. at 1120, Commil showed that Cisco realized an average margin of 50% on the Accused Products, a fact which Cisco does not dispute. A6232(70:15-20) (a 55% gross profit margin existed at the time of the hypothetical negotiation in 2005); A6230(65:15-20) (Cisco's products had a

---

[19] "The utility and advantages of the patent property over any old modes or devices, if any, that had been used." *Georgia-Pacific*, 318 F. Supp. at 1120.
[20] "The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention." *Id.*

64

contribution margin of approximately 50%). Accordingly, the 5% rate is one tenth of Cisco's profit margin.

Further, at the time of the hypothetical negotiation, third-party analysts predicted dramatic growth in the LWAP industry. A6229-30(61:17-62:3). For example, an independent report estimated that autonomous access points would see a 25% decrease in sales volume and 32% decrease in annual revenue during 2005-2010, whereas infringing LWAPs would see a 111% growth in shipments and 91% annual increase in revenue. A15079; A6229-30(61:17-62:3). The same report observed: "[a]n equally important competing trend is the number of organizations that are swapping out Aironet equipment [*i.e.*, Cisco's autonomous access points] in favor of an Airespace system [*i.e.*, the Accused Products] or a similar architecture from a competitor." A15046. This contemporaneous report confirms that "[i]f all the parties know that there's a large market opportunity to sell these products, then it's going to make the technology necessary to make those products work much more valuable." A6230(62:11-25).

Factor 11 is "[t]he extent to which the infringer has made use of the invention." 318 F. Supp. at 1120. The evidence showed that "you couldn't sell these systems if you didn't have that Split MAC architecture that enabled mobility" and that the Accused Products necessarily infringed when operated. A6223(34:1-37:15). As shown, the split-MAC architecture is not merely an

incidental feature, as the date-picker feature was in *Lucent*. 580 F.3d at 1334. In addition, the importance of the LWAP product line to Cisco was demonstrated through its payment of $450 million to acquire Airespace. A15083; A6230-31(65:21-66:14). Cisco described its acquisition of the infringing technology as allowing it "to address a broader set of market segments and integrate advanced capabilities into current Cisco products." A15083.

Applying factor 7, Mr. Carlile testified that the patent has many years remaining. A6232(72:17-21). In view of these other *Georgia-Pacific* factors, Mr. Carlile reasonably increased from the midpoint of 3% to 5% in a hypothetical negotiation. A6232-33(73:22-74:11).

Cisco also asserts that 5% is unsupportable because Commil "was prepared to sell the patent-in-suit (and eight others) for only $1.2 million in 2004" and the patent was "later sold for only $400,000 in 2007." Cisco Br. at 59. Cisco presented this evidence to the jury, which weighed it along with the other factors before reaching its verdict. It cannot impose a ceiling on the jury's reasonable royalty determination for several reasons. First, the probative value of the $400,000 payment is limited because it occurred several years after the hypothetical negotiation date.

Second, $400,000 was not the only consideration. A6317(78:25-79:12). The seller retained a 10% interest in any enforcement action, which was how the

66

parties reasonably accounted for Commil's expensive and time-consuming prospect of obtaining value for the patent. *Id.*; *see Spectralytics*, 649 F.3d at 1347 (reasonable royalty award that was multiple times the upfront payment for the assets was not excessive).

Third, the jury was instructed that in the hypothetical negotiation (unlike the real-world facts faced by Commil), the patent is believed to be valid and infringed. A6390(102:23-103:2). Accordingly, the 2005 hypothetical negotiation is so different than the circumstances underlying the offer or sale of Commil's assets that it would be improper to give them much, if any, weight. *See Spectralytics*, 649 F.3d at 1347.

In sum, comparable licenses were simply one of the *Georgia-Pacific* factors considered in determining a reasonable royalty. A6221(26:1-21). The award by the jury was supported by substantial evidence.

67

## CONCLUSION

For the above reasons, this Court should affirm the Judgment.

Respectfully submitted,

Leslie V. Payne
Nathan J. Davis
Miranda Y. Jones
**HEIM, PAYNE & CHORUSH**
JP Morgan Chase Tower
1201 600 Travis, Suite 6710
Houston, TX 77002
(713) 221-2000

Mark S. Werbner
Richard A. Sayles
Mark D. Strachan
**SAYLES | WERBNER**
4400 Renaissance Tower
1201 Elm Street
Dallas, TX 75270
(214) 939-8700

*Counsel for Plaintiff-Appellee*
*Commil USA, LLC*

68

# CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of April, 2012, I caused two copies of

the foregoing Brief for Plaintiff-Appellee Commil USA, LLC to be served via

electronic mail and overnight courier to the following address:

William F. Lee
Mark C. Fleming
Jonathan W. Andron
Felicia H. Ellsworth
WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000

Mark S. Werbner

69

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,973 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(&)(B)(iii). The undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in 14-point Times New Roman.

Dated: April 24, 2012

Mark S. Werbner

70